# EXHIBIT 2

```
 1              COMMONWEALTH OF MASSACHUSETTS

 2                        * * *

 3   MIDDLESEX, SS.              SUPERIOR COURT

 4

     ------------------------  )

 5   IN RE:                     )

                                )  CA NO: MICV2011-3750M

 6   SPECIALLY ASSIGNED         )

                                )  Master Docket

 7   MESH IMPLANT CASES         )

                                )

 8   ------------------------  )

 9

10

11                        * * *

12    VIDEOTAPED DEPOSITION OF STEVEN R. LITTLE, Ph.D.

13                  February 13, 2017

14                        * * *

15

16

17

18

19

20

21

22           GOLKOW TECHNOLOGIES, INC.

         877.370.3377 ph | 917.591.5672 fax

23              deps@golkow.com

24
```

Steven R. Little, Ph.D.

```
 1     VIDEOTAPED DEPOSITION OF STEVEN R. LITTLE, Ph.D.,
       a witness herein, taken pursuant to MASS. R. CIV.
 2     P. 30, by and before Dutcheen O. Cameron,
       Registered Merit Reporter and Certified Realtime
 3     Reporter and Notary Public in and for the
       Commonwealth of Pennsylvania, at the Pittsburgh
 4     Marriott City Center, 112 Washington Place,
       Pittsburgh, Pennsylvania, on Monday, February 13,
 5     2017, 9:04 a.m.
 6                          *  *  *
 7     COUNSEL PRESENT:
 8     For the Plaintiffs:
       (Via Telephone Conference)
 9            DANIEL THORNBURG, ESQUIRE
              AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
10            17 East Main Street, Suite 200
              Pensacola, FL  32502
11            850-202-1010
              dthornburgh@awkolaw.com
12

13            KATY KROTTINGER, ESQUIRE
              MONSOUR LAW FIRM
14            404 North Greet Street
              Longview, TX  75601
15            903-758-5757
              katy@monsourlawfirm.com
16

17

18

19
       For the Defendant Boston Scientific:
20            ANDREA J. STEELE, ESQUIRE
              SHOOK, HARDY & BACON, LLP
21            2555 Grand Blvd.
              Kansas City, MI 64108
22            816-474-6550
              asteele@shb.com
23
24     Also Present:  Brad Coble, Videographer
```

Steven R. Little, Ph.D.

```
1                    I N D E X

    WITNESS:                              PAGE:

2

3   STEVEN R. LITTLE, Ph.D.                 5

    EXAMINATION                            5

4   BY MR. THORNBURG

    EXAMINATION                           239

5   BY MS. KROTTINGER

6                    * * * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Steven R. Little, Ph.D.

```
 1               E X H I B I T S
      NO. DESCRIPTION                   PAGE
 2
    Exhibit 1    Notice of Deposition         30
 3  Exhibit 2    Invoices of Steven R. Little  31
                 Consulting, LLC
 4  Exhibit 3    Expert Report of Dr. Steven Little  44
    Exhibit 4    Article:  Characterization of  82
 5               Heavyweight and Lightweight
                 Polypropylene Prosthetic Mesh
 6               Explants from a Single Patient
                 C.R. Costello
 7  Exhibit 5    Article: The myth: in vivo    97
                 degradation of polypropylene-based
 8               meshes  Shelby F. Thames
    Exhibit 6    Article:  Materials          110
 9               characterization and histological
                 analysis of explanted
10               polypropylene, PTFE, and PET
                 hernia meshes from an individual
11               patient  A.J. Wood
    Exhibit 7    Article: Comparison of the In Vivo  132
12               Behavior of Polyvinylidene
                 Fluoride and polypropylene Sutures
13               Used in Vascular Surgery Celine
                 Mary
14  Exhibit 8    Dr. Steven Little's Materials  199
                 Considered List
15  Exhibit 9    Article:  Polypropylene as a  205
                 reinforcement in pelvic surgery is
16               not inert: Comparative analysis of
                 100 explants  Arnaud Clave
17  Exhibit 10   Article:  Degradation, infection  221
                 and heat effects on polypropylene
18               mesh for pelvic implantation: What
                 was know and when it was known
19               Donald Ostergard
20
21
22
23
24
```

Steven R. Little, Ph.D.

```
 1   COMMENCING -- 9:04 A.M.

 2              THE VIDEOGRAPHER:  We are now on the

 3   record.  My name is Brad Coble.  I'm the

 4   videographer for Golkow Technologies.  Today's date

 5   is February 13th, 2017, and the time is 9:04 a.m.

 6              This video deposition is being held in

 7   Pittsburgh, Pennsylvania, in the matter of In Re

 8   Specially Assigned Mesh Implant Case for the

 9   Commonwealth of Massachusetts, Middlesex Superior

10   Court.  The deponent is Steven Little, Ph.D.

11              Counsel, please identify yourselves.

12              MS. KROTTINGER:  Katy Krottinger with

13   the Monsour Law Firm for the plaintiffs.

14              MR. THORNBURG:  Daniel Thornburg with

15   Aylstock, Witkin, Kreis & Overholtz for the

16   plaintiffs.

17              MS. STEELE:  Andrea Steele for defendant

18   Boston Scientific.

19              THE VIDEOGRAPHER:  The court reporter is

20   Dutch Cameron and will now swear in the witness.

21              STEVEN R. LITTLE, Ph.D., having been first

22   duly sworn, was examined and testified as follows:

23                        EXAMINATION

24   BY MR. THORNBURG:
```

Steven R. Little, Ph.D.

1    Q.  Good morning, Dr. Little.

2    A.  Good morning.

3    Q.  My name is Daniel Thornburg.  I represent

4    the plaintiffs.  Do you understand that?

5    A.  Yes.

6    Q.  And we are here to take your deposition as a

7    disclosed expert in the litigation against Boston

8    Scientific concerning its Uphold product.  Do you

9    understand that?

10   A.  Yes.

11        MS. STEELE:  Object to form.

12   Q.  Dr. Little, there is an objection so I'm

13   going to make sure I can clarify.  Are you offering

14   any other opinions about any other products other

15   than the Uphold?

16   A.  Well, so my report covers polypropylene mesh

17   in general, and I'm here as a general expert in

18   biomaterials and chemical engineering.

19   Q.  Do you know whether or not you are offering

20   any opinions in the Massachusetts State Court

21   litigation regarding any other product besides the

22   Uphold?

23   A.  Well, my -- my review of the literature that

24   I discuss in my report is primarily focused on the

Steven R. Little, Ph.D.

```
 1   products that are made from the Marlex resin, so

 2   they may be applicable to other products besides

 3   the Uphold.

 4      Q.  You talk specifically about one mesh product

 5   in your expert report, and that's the Uphold;

 6   correct?

 7      A.  Well, I mean, I guess my answer is the same.

 8      Q.  Did you name any other products specifically

 9   by name, other than the Uphold, in your expert

10   report?

11      A.  I could review my report to see what

12   specific --

13      Q.  Have you -- have you reviewed your report

14   before today?

15      A.  I have reviewed my report before today, yes.

16      Q.  Doctor, let me just try to speed this up.

17   If you turn to page 5 of your expert report --

18      A.  Yes.

19      Q.  -- and you see halfway down the first

20   paragraph before Section III, you say, "Boston

21   Scientific's Uphold device was cleared by the FDA

22   for the treatment of pelvic organ prolapse in

23   2008."

24                  Do you see that?
```

Steven R. Little, Ph.D.

1    A.  Yes, I do.

2    Q.  And then you say, "The Uphold device

3    includes a pre-cut piece of Polyform mesh."

4           Do you see that?

5    A.  Yes.

6    Q.  Okay.  In that section, you don't name any

7    other Boston Scientific Corporation mesh device

8    specifically other than the Uphold; correct?

9    A.  In this section here, it appears like the

10   only device that I refer to is Uphold; but I do

11   talk about Polyform, I talk about Marlex, and I

12   talk about polypropylene in the report.

13   Q.  Well, did you talk about the clearance dates

14   for any other Boston Scientific mesh products?

15   A.  No, it doesn't appear that I did, no.

16   Q.  Were you focused primarily on Uphold?

17          MS. STEELE:  Object to form.

18   A.  Well, so what I said before is I -- I

19   reviewed the literature in regard to polypropylene

20   mesh in general.  I did not focus any specific

21   review on just something that would pertain to

22   Uphold.

23   Q.  Do you know what other pelvic mesh devices

24   Boston Scientific manufactured for the treatment of

Steven R. Little, Ph.D.

1    pelvic organ prolapse or stress urinary

2    incontinence?

3      A.  I mean, I'm generally familiar that there

4    are several meshes that are used for pelvic organ

5    prolapse and stress urinary incontinence.  The

6    names --

7      Q.  My question was can you name the specific

8    products by name.

9      A.  Sure.  I'm -- I think the names are like

10   Pinnacle, Lynx, Solyx, Obtryx; some names that I

11   recall.

12     Q.  Did you look at any internal documents

13   concerning the Pinnacle device?

14     A.  I'm pretty sure that I did review at one

15   point 510(k) -- a 510(k) for the Pinnacle device.

16     Q.  Did you identify that in your expert report?

17           MS. STEELE:  Object to form.

18     A.  I do not know.  I could look here to see if

19   I specifically identify that, but I didn't identify

20   everything that I read in this report.

21     Q.  Okay.  So everything that you're relying on

22   for your expert report is contained either within

23   the text of your expert report or on your updated

24   reliance list?

Steven R. Little, Ph.D.

```
1      A.   I believe so, yes.

2      Q.   Would you look at the -- the differences in

3   the material characteristics of the different

4   devices that were manufactured and sold by Boston

5   Scientific for the treatment pelvic organ prolapse

6   and stress urinary incontinence?

7      A.   Well, I've seen the devices before.  I did

8   not spend a lot of time looking into the

9   differences between the properties of the various

10  meshes.

11     Q.   Did you look at the -- do you know what the

12  pore size is for the Pinnacle device?

13     A.   I just know that they are Type 1 porous

14  meshes.  That's all --

15     Q.   Do you know -- do you know what the pore

16  size is, Doctor?

17     A.   Off the top of my head, no, I just know the

18  categorization.

19     Q.   Do you know what the -- the weight of the --

20  of the Pinnacle is?

21     A.   No, off the top of my head, I do not.

22     Q.   Grams per square meter, weight, density?

23  No?

24             MS. STEELE:  Object to form.
```

Steven R. Little, Ph.D.

1     A.   No.

2     Q.   Do you know the material characteristics of

3    the Obtryx device, pore size and weight?

4     A.   Other than what I just specified, no.

5     Q.   So you don't know -- you didn't look at any

6    other -- any internal documents from Boston

7    Scientific that provided you with a description of

8    the specific pore size and specific weight of its

9    pelvic organ prolapse and SUI products; is that

10   correct?

11             MS. STEELE:   Object to form.

12    A.   That information might have been in some of

13   the documents I reviewed.   I just don't recall what

14   they are.

15    Q.   Can you identify what document you reviewed

16   that would provide that information?

17    A.   Well, what I said was that I -- it might

18   have been in the documents that I reviewed, I don't

19   remember.   For instance, it might be in a 510(k),

20   for instance, that I reviewed.

21    Q.   Okay.   So let me try to speed this up.   If

22   it's not in any of the documents that are cited in

23   your expert report or on your reliance list, that

24   would mean that you didn't review it; correct?

Steven R. Little, Ph.D.

```
 1      A.   That would probably be correct other than I
 2   just saw the devices, but I did not do measurements
 3   on the devices, so.
 4      Q.   Do you know who Dr. Klinge is?
 5      A.   Could you repeat that question.
 6      Q.   Are you familiar with who Dr. Klinge is?
 7   K-L-I-N-G-E, Uwe is his first name, U-W-E.
 8      A.   No, the name doesn't ring a bell.
 9      Q.   Are you familiar with Dr. Bernd
10   Klosterhalfen?
11      A.   No.
12      Q.   Did you review or rely on any documents
13   or -- strike that.
14            Did you review or rely on any
15   publications by Dr. Uwe Klinge or Bernd -- Bernd
16   Klosterhalfen?
17      A.   I don't remember the names.
18      Q.   And if they're not on your expert report,
19   that would indicate that you did not review and are
20   not relying on their publications; correct?
21            MS. STEELE:  Object to form.
22      A.   Well, if it's not in my report or on my
23   materials considered list, then I wouldn't have
24   seen it.
```

Steven R. Little, Ph.D.

```
 1      Q.  So you wouldn't have known that they are the

 2   world-renowned experts in the biomaterial science

 3   involve -- concerning the design of mesh devices?

 4           MS. STEELE:  Object to form.

 5      A.  I'm sorry, could you repeat the question.

 6      Q.  So you're not aware that they are considered

 7   experts in the field of designing mesh devices for

 8   implantation into humans?

 9           MS. STEELE:  Object to form.

10      A.  I would not know the source of information

11   that -- that you're referring to or someone's

12   referring to them as that, no, I don't know.

13      Q.  Okay.  Now, Mr. Little, you're not a doctor;

14   is that correct?

15      A.  I have a Ph.D.

16      Q.  You're not a medical doctor?

17      A.  I'm not medical doctor, no.

18      Q.  You're not a veterinarian?

19      A.  No, I am not a veterinarian.

20      Q.  You're not a toxicologist --

21      A.  No.

22      Q.  -- correct?  You're not a pathologist?

23      A.  I am not a formally trained pathologist, no.

24      Q.  You don't hold yourself out as an expert in
```

Steven R. Little, Ph.D.

1    pathology, do you?

2       A.   I do not hold myself out as an expert in

3    pathology.

4       Q.   You're not an expert in histopathology;

5    correct?

6       A.   No.

7       Q.   You do not have any patents concerning

8    polypropylene mesh devices; correct?

9       A.   No, I don't.

10      Q.   You've never designed a mesh device;

11   correct?

12      A.   I have never designed a mesh device, no.

13      Q.   You've never analyzed explanted pelvic organ

14   prolapse mesh devices used for the treatment of

15   pelvic organ prolapse or stress urinary

16   incontinence; correct?

17      A.   Well, so my review of the literature was an

18   analysis of work that was done on explanted

19   devices, but I have not personally analyzed a mesh

20   device myself.

21      Q.   Mr. Little, that's my point.  You've never

22   personally performed any analysis on an explanted

23   polypropylene mesh device; correct?

24      A.   I have not personally analyzed that, but I

Steven R. Little, Ph.D.

```
 1    must have misheard your question; I just thought

 2    you said analyzed.

 3       Q.  You're not an expert in the design of

 4    polypropylene mesh devices; correct?

 5            MS. STEELE:  Object to form.

 6       A.  Well, I mean, I guess it depends on what you

 7    mean by expert.  I have not personally designed a

 8    mesh product.  I did an analysis of the design of

 9    mesh products.

10       Q.  You've never personally designed any mesh

11    device products; correct?

12       A.  No.

13       Q.  You're not an infectious disease doctor;

14    correct?

15       A.  I am not an infectious disease doctor, no.

16       Q.  And in this case, you've not been asked to

17    perform any type of testing on either pristine or

18    explanted mesh devices; correct?

19            MS. STEELE:  Object to form.

20       A.  In this case I was not asked to do testing

21    on any devices, no.  Just a literature review.

22       Q.  Have you ever performed FTIR?

23       A.  I have.

24       Q.  Okay.  And in what context have you
```

Steven R. Little, Ph.D.

1    performed FTIR?

2       A.  Well, I guess I need more information about

3    what you mean by what context.

4       Q.  Well, have you ever -- you -- you said that

5    you have used FTIR before; right?

6       A.  Yes.

7       Q.  And what does that mean, for the ladies and

8    gentlemen of the jury?

9       A.  Well, it's an analysis that's performed

10   that's a chemical-based analysis.  It looks for or

11   it can detect the presence of chemical functional

12   groups of a material, specifically on the surface

13   of a material, maybe a little bit less than a human

14   cell thick into the material.

15      Q.  And what's the acronym FTIR stand for?

16      A.  I think it's Fourier transform infrared.

17      Q.  Are there different types of FTIR techniques

18   that can be used when analyzing the chemical makeup

19   of a product?

20      A.  Well, it all operates on the same principle.

21   But you can, for instance, do surface scanning, or

22   you can crush up a sample and put it into a

23   relatively neutral media and analyze it that way.

24      Q.  Have you ever used FTIR on an explanted

Steven R. Little, Ph.D.

1    polypropylene device?

2        A.   I have not personally done that, no.

3        Q.   Do you own an FTIR machine?

4        A.   I don't personally own a machine.  There is

5    a machine available to my lab at the University of

6    Pittsburgh.

7        Q.   If you wanted to use it, would you have the

8    ability to do so?

9        A.   If I -- if I wanted to do that or needed to,

10   I -- yes, I probably would be able to do that.

11       Q.   So you could have looked at explanted

12   polypropylene devices in the context of this

13   litigation, but you haven't; is that correct?

14            MS. STEELE:  Object to form.

15       A.   Well, my understanding is, is that there

16   were not explanted mesh samples in these

17   litigations, but I can say that the literature that

18   I reviewed had a number of different analyses that

19   were performed on polypropylene meshes.  And

20   those --

21       Q.   But you --

22            MS. STEELE:  He's still answering.

23       Q.   -- you've never analyzed an explanted

24   polypropylene mesh device.  In fact, you've never

Steven R. Little, Ph.D.

1    analyzed any explanted polypropylene device;

2    correct?

3              MS. STEELE:  Object to form.

4    A.  Well, I -- I performed an analysis of the

5    literature where there were a number of different

6    analyses on and I performed analyses of the data in

7    the -- in those manuscripts on explanted

8    polypropylene meshes.  But I have not personally

9    performed a --

10   Q.  I understand you've looked at other people's

11   work.  But you haven't performed any work ever in

12   your entire career that involved using FTIR on

13   explanted polypropylene devices; right?

14             MS. STEELE:  Object to form.  And I

15   understand you're on the phone, but I'd appreciate

16   if you didn't cut Dr. Little off.

17   A.  So, what you're saying is correct, that I

18   performed my analysis by reviewing a number of

19   studies in the literature that performed tests on

20   explanted polypropylene meshes, but I did not

21   personally perform a study on explanted

22   polypropylene mesh.

23   Q.  My question was you've never looked at --

24   you've never tested any explanted polypropylene

Steven R. Little, Ph.D.

1    device ever?

2       A.   And my answer is the same.

3       Q.   The answer is, I'm correct, you've never

4    done that; right?

5       A.   My answer is --

6              MS. STEELE:   Object to form.

7       A.   My answer is that I performed an analysis of

8    the literature and there were a number of different

9    tests on polypropylene meshes, but I have not

10   personally performed a test on an explanted

11   polypropylene mesh.

12      Q.   No, you've never performed an analysis on

13   any explanted polypropylene device, any type of

14   polypropylene device.

15             MS. STEELE:   Object to form.

16      Q.   Right?

17      A.   I have not personally performed testing on

18   explanted polypropylene meshes.

19      Q.   Have you personally performed any testing on

20   any type of explanted polypropylene device?

21      A.   I -- I've answered this question.

22      Q.   Have you ever -- have you ever performed any

23   type of testing, FTIR or otherwise, on an explanted

24   polypropylene suture?

Steven R. Little, Ph.D.

1    A.   No, I have not personally performed testing

2    on an explanted polypropylene suture.

3    Q.   In fact, the first time that you've ever

4    performed any analysis of research done by other

5    scientists on polypropylene meshes is in the

6    context of this litigation; correct?

7              MS. STEELE:  Object to form.

8    A.   I mean, I was aware of the general

9    literature on polypropylene and I understand,

10   generally, its use in biomaterials, and I wouldn't

11   say that it's the first time I ever thought about

12   polypropylene or polypropylene meshes is in the

13   context of this litigation.

14   Q.   My -- my 11-year-old son understands all

15   that generally.  That doesn't make him an expert;

16   right?

17             MS. STEELE:  Object to form.

18   A.   I'm sorry, is that a question?

19   Q.   Yep.

20   A.   Could you repeat the question, please.

21   Q.   Just because somebody has a general

22   understanding of -- that polypropylene devices have

23   been used in medicine and has a general

24   understanding of some of the publications, that

Steven R. Little, Ph.D.

1    doesn't make that person an expert?

2              MS. STEELE:  Object to form.

3       A.  Well, I mean I guess it depends on how

4    you're defining expert.  I would say that I am an

5    expert in biomaterials and in chemical engineering.

6    My focus specifically in that area is on degradable

7    materials, which are materials that degrade in the

8    body.

9       Q.  Let me ask you this question.  Other than

10   this litigation, have you ever consulted with a

11   medical device manufacturer on the design of a mesh

12   implant?

13      A.  No, I have not personally done that.

14      Q.  Have you ever consulted with any medical

15   device manufacturer on the design of any

16   polypropylene medical device?

17      A.  No, again, not on -- specifically on a

18   polypropylene device.  My -- my focus area is on

19   materials that degrade in the body.

20      Q.  You've never observed the implantation of a

21   surgical mesh device; correct?

22      A.  No, I have not.

23      Q.  Is this the very first time that you have

24   offered testimony as an expert regarding

Steven R. Little, Ph.D.

1    polypropylene material that was implanted in a

2    human?

3       A.   Well, I've submitted some reports in this

4    case, and this is the first time I'm being deposed

5    in this case.  I have not performed or given

6    testimony on polypropylene meshes before this case,

7    no.

8       Q.   Outside of the context of the Boston

9    Scientific mesh litigation, is this the first time

10   that you've testified as an expert regarding

11   polypropylene material that's been used as an

12   implant in the human body?

13      A.   Yes.

14      Q.   Prior to your involvement in the Boston

15   Scientific litigation, have you ever tested

16   polypropylene for degradation?

17      A.   Specifically tested it for degradation, no.

18      Q.   Have you ever performed any preclinical

19   testing of polypropylene mesh implants?

20      A.   No, I have not.

21      Q.   Have you ever performed any preclinical

22   testing of any type of polypropylene product?

23      A.   I have not performed preclinical testing on

24   specifically polypropylene product, no.

Steven R. Little, Ph.D.

1    Q.  And do you know what I mean when I -- if I

2    use the term or the terminology "preclinical"; do

3    you know what that means?

4    A.  Yes, I do.

5    Q.  And can you explain that to the ladies and

6    gentlemen of the jury.

7    A.  Well, by preclinical, I think -- when I

8    think preclinical, I think that the testing is

9    performed to determine efficacy or safety in an

10   animal model, and it could be performing an

11   analysis of extracted products, those kind of

12   things.

13   Q.  Have you ever analyzed -- so when I use the

14   phrase "preclinical," you'll understand I'm talking

15   about animal studies, and when I use the word

16   "clinical," I'm talking about human studies?

17   A.  Yes.

18   Q.  Have you ever analyzed any explanted

19   polypropylene product from any preclinical study?

20   A.  No, I've not.

21   Q.  Have you ever performed any post-marketing

22   testing of any mesh implants prior to this

23   litigation?

24   A.  Could you repeat the question.  I'm sorry, I

Steven R. Little, Ph.D.

 1    didn't hear it.

 2      Q.  Have you ever performed any post-marketing

 3    testing of mesh implants prior to this case?

 4              MS. STEELE:  Object to form.

 5      A.  No, I haven't.

 6      Q.  Have you ever performed a failure analysis

 7    of a polypropylene device?

 8      A.  I have not personally performed a failure

 9    analysis of a polypropylene device, no.

10      Q.  Have you ever performed a failure analysis

11    of a polypropylene suture?

12      A.  No.

13      Q.  What does peer-reviewed publication mean to

14    you?

15      A.  It means that a work was submitted to a

16    journal; the editor sent it for peer review,

17    received some comments, usually from reviewers; the

18    manuscript is reviewed according to the comments;

19    and then is evaluated again until the editor

20    believes that the reviewers' comments had been

21    addressed, at which time it's published.

22      Q.  And you've published some peer review --

23    you've got -- strike that.

24              You have some peer-reviewed

Steven R. Little, Ph.D.

1    publications throughout your career; correct?

2    A.  Yes.

3    Q.  But you have never published any articles in

4    a peer-reviewed journal concerning polypropylene

5    degradation; correct?

6              MS. STEELE:  Object to form.

7    A.  No, I've -- I haven't performed testing on

8    polypropylene degradation personally, no.

9    Q.  In fact, you have never published in the

10   peer-reviewed literature on the subject of

11   polypropylene even generally; correct?

12   A.  Even generally.  I mean, I could look to see

13   if generally the class of materials that I have

14   talked about would include it or specifically it's

15   mentioned.  Again, my focus of my particular work

16   is on degradable materials.

17   Q.  You've never studied the biocompatibility of

18   the polypropylene mesh for the human tissue;

19   correct?

20   A.  I don't know.  I think I probably would

21   have -- regarding studied it, I mean, I'm aware of

22   it; it would have been in my education.  I have not

23   published research articles on that topic, myself,

24   no.

Steven R. Little, Ph.D.

1    Q.   Let me ask a better question.  You've never

2    personally performed any biocompatibility studies

3    of polypropylene devices; correct?

4    A.   No.  Personally, no.

5    Q.   And that would include polypropylene mesh;

6    correct?

7    A.   Correct.

8    Q.   And that would include polypropylene

9    sutures; correct?

10   A.   Personally, no.

11   Q.   And that would include any polypropylene

12   medical device; correct?

13   A.   Yes.

14   Q.   You've never published personally on the

15   subject of biocompatibility of polypropylene mesh

16   for use in the human body; right?

17   A.   I have not published specifically on the

18   topic you just stated, no.

19   Q.   You've never held yourself out as an expert

20   in the biocompatibility of polypropylene devices;

21   correct?

22        MS. STEELE:  Object to form.

23   A.   Well, I think I'm -- I'm -- I'm pretty

24   informed on biocompatibility of materials.  I

Steven R. Little, Ph.D.

```
 1    understand biocompatibility concerns with

 2    polypropylene mesh.  I've not published

 3    specifically on the topic of polypropylene

 4    biocompatibility, no.

 5      Q.  Well, in fact, prior to your involvement in

 6    the Boston Scientific litigation, not a single

 7    device manufacturer has come to you and asked you

 8    to perform biocompatibility testing of their

 9    polypropylene devices; correct?

10      A.  No, companies have not come to ask me to

11    perform studies on biocompatibility of

12    polypropylene.

13      Q.  You've never spoken or presented on the

14    topic of polypropylene mesh prior to being retained

15    by the defendants in this case; correct?

16      A.  No, I've not spoken on that specific topic,

17    no.

18      Q.  You've never taught or lectured on the

19    subject of polypropylene; correct?

20      A.  No, I'd say, again, my -- my focus is on

21    biomaterials, chemical engineering; I do talk about

22    a biocompatibility, but I have not specifically

23    given a talk on polypropylene mesh

24    biocompatibility.
```

Steven R. Little, Ph.D.

1    Q.  In fact, you have no understanding

whatsoever of the biomechanical properties of the

pelvic floor?

2

3

4    A.  No understanding whatsoever?  I'd say that's

probably wrong.

5

6    Q.  What's the tensile strength of pelvic tissue

surrounding the -- the urethra?

7

8    A.  I don't know.

9    Q.  What pelvic muscles -- what are the names of

the pelvic muscles in the -- in the pelvic area of

a woman called?

10

11

12   A.  I don't know.

13   Q.  Where's the apex located?

14   A.  I don't know.  Again, my expertise is in

biomaterials and chemical engineering.

15

16   Q.  Where's the introitus located?

17   A.  I don't know.

18   Q.  You're not a urogynecologist; correct?

19   A.  No, I'm not.

20   Q.  You don't hold yourself out as an expert on

the female pelvic anatomy, do you, sir?

21

22   A.  No.

23   Q.  Do you know how many women nationwide have

filed lawsuits against Boston Scientific concerning

24

Steven R. Little, Ph.D.

1    its pelvic organ mesh devices used for the

2    treatment of pelvic organ prolapse or stress

3    urinary incontinence?

4            MS. STEELE:  Object to form.

5    A.  I'm not aware of the number, no.

6    Q.  Have you personally spoken with any patient

7    or individual who has -- who has suffered harm as a

8    result of being implanted with a Boston Scientific

9    pelvic organ device?

10           MS. STEELE:  Object to form.

11   A.  No, I haven't.

12   Q.  Have you ever -- have you treated any

13   patients?  I mean, you're not a medical doctor;

14   right?

15           MS. STEELE:  Asked and answered.

16   Q.  Right, Doctor?

17   A.  No.

18   Q.  So you've never spoken to any patients about

19   the lifelong consequences that they've experienced

20   after having Boston Scientific's either sling or

21   pelvic organ prolapse device implanted; correct?

22           MS. STEELE:  Object to form.

23   A.  No, I'm not a medical doctor.

24   Q.  And the opinions that you're offering in

Steven R. Little, Ph.D.

1    this case in the Boston Scientific litigation

2    concerning degradation of polypropylene mesh

3    implants have never been published by you in any

4    peer-reviewed journal; correct?

5     A.  No.

6     Q.  No -- no, meaning I'm correct?

7     A.  Yes, I have not published my opinions in

8    this case, no.

9     Q.  Now, Dr. Little, you've brought some

10   documents with you today that are -- that you

11   believed are responsive to the Notice of Deposition

12   Duces Tecum?

13    A.  I brought some documents, yes.

14    Q.  Let's go ahead and mark as Exhibit No. 1 the

15   notice of your deposition.

16         COURT REPORTER:  Okay.  It's marked.

17         (Little Deposition Exhibit 1 was marked

18   for identification.)

19   BY MR. THORNBURG:

20    Q.  Dr. Little, have you seen the notice of your

21   deposition before?

22    A.  Yes.

23    Q.  And when were you -- when were you provided

24   the -- your deposition notice?

Steven R. Little, Ph.D.

```
 1      A.   I'm pretty sure it was last week.

 2      Q.   Okay.  And if you go to the Appendix A --

 3   I'm sorry, Schedule A, page 5, of the deposition

 4   notice.  Are you there, Doctor?

 5      A.   I am.

 6      Q.   Okay.  Did you review Schedule A prior to

 7   appearing for your deposition today?

 8      A.   Yes.

 9      Q.   And did you provide a -- strike that.

10              Let's go ahead and mark as Exhibit

11   No. A the invoices that you brought with you

12   related to the work you performed in the Boston

13   Scientific litigation.

14              MS. KROTTINGER:  Exhibit No. 2, you

15   mean?

16              (Little Deposition Exhibit 2 was marked

17   for identification.)

18      Q.   Doctor, you're being paid $850 per hour; is

19   that correct?

20      A.   Yes.

21      Q.   And that's to offer opinions on behalf of

22   Boston Scientific?

23              MS. STEELE:  Object to form.

24      A.   It's to offer my opinions in the areas that
```

Steven R. Little, Ph.D.

```
 1    I refer to in my report.

 2      Q.  Concerning the degradation of polypropylene;

 3    correct?

 4      A.  Well, I do discuss that topic.  I discuss

 5    some other topics as well in my report.

 6      Q.  One of the opinions that you're being asked

 7    to offer your opinions on relates to the propen- --

 8    propensity for Boston Scientific's Marlex

 9    polypropylene mesh device to degrade; correct?

10            MS. STEELE:  Object to form.

11      A.  Well, it's my opinion that they -- they

12    don't degrade.

13      Q.  But it's your opinion after being paid $850

14    per hour by Boston Scientific that Boston

15    Scientific's Marlex meshes do not degrade; correct?

16            MS. STEELE:  Object to form.

17      A.  Well, if you're implying that they're paying

18    me to say that it degrades (sic), that would be

19    wrong.

20      Q.  Well, they are -- they are paying you;

21    right?

22      A.  Yes, they're paying me to do my analysis and

23    work.

24      Q.  They're paying you $850 per hour to do your
```

Steven R. Little, Ph.D.

```
1    analysis and work; correct?

2    A.  Which is a standard rate that I have for

3    everyone that I do consulting for.

4    Q.  $850 per hour; correct?

5    A.  Yes.

6    Q.  And despite the fact that you've never

7    performed any type of analysis, you've never

8    lectured on polypropylene, you've never looked at

9    explanted polypropylene devices, you've never

10   performed biocompatibility studies on Marlex mesh,

11   you were asked to offer opinions in this case;

12   correct?

13            MS. STEELE:  Object to form.

14   A.  Yeah, I mean, if your implication is that I

15   need to have done all of that to provide an opinion

16   on the biocompatibility and degradability of these

17   polymers, that's wrong.

18   Q.  The jury will decide that, won't they?

19            MS. STEELE:  Object to form.

20   Q.  You understand that it's the jury's job to

21   decide the facts in this case and to weigh the

22   credibility of the witnesses that are called to

23   testify at trial; right?

24            MS. STEELE:  Object to form.
```

Steven R. Little, Ph.D.

1    Q.  You understand that, Dr. Little?

2    A.  That -- that may be right.  I know the judge

3    is involved in this.  I -- I don't know.  It's up

4    to you guys.  I'm not a lawyer.

5    Q.  You understand that you're providing

6    deposition testimony today under oath?

7    A.  Yes.

8    Q.  And that you have to provide truthful and

9    accurate information during your deposition today?

10    A.  Yes.

11    Q.  And do you understand that your deposition

12    today has the same force and effect as if we were

13    sitting in a courtroom in front of a judge and in

14    front of a jury?

15         MS. STEELE:  Object to form.

16    Q.  Do you understand that, Dr. Little?

17    A.  I guess I -- that sounds like it could be

18    generally true.  I'm not a lawyer, so I don't

19    know -- I do know that deposition testimony can be

20    played in a courtroom.  I do not understand the

21    details of the force and other things that you

22    specified.

23    Q.  You understand that you are subject to the

24    penalties of perjury today during your deposition

Steven R. Little, Ph.D.

```
 1    the same as you would be in front of -- if you were

 2    sitting in front of a jury or in front of the

 3    court?

 4                MS. STEELE:  Object to form.

 5    A.  I do believe that's true, yes.

 6    Q.  How much -- I don't -- obviously, I'm not

 7    there in person.  You're getting paid $850 per

 8    hour.  How many hours have you invoiced, and what

 9    is the total amount of your invoices?

10    A.  I haven't gone through and added up all of

11    the hours.  I could do that if you'd like me to

12    right now.  The amount total over the period of

13    time is about 300,000; since April, so ten months.

14    Q.  April 2016?

15    A.  Yes.

16    Q.  So in the ten months since you've been

17    retained, you've invoiced $300,000?

18                MS. STEELE:  Object to form.

19    A.  Yes.

20    Q.  And when does the invoice date end?

21                MS. STEELE:  You can look at the --

22    A.  The -- the most recent invoice was just --

23    in January.

24    Q.  Have you performed additional work in this
```

Steven R. Little, Ph.D.

1   case since January?

2      A.   Just preparing for this deposition.

3      Q.   How much time have you spent preparing for

4   this deposition?

5      A.   I don't have the numbers on me right now.

6      Q.   Can you give me an approximation?

7      A.   I don't think so.  I mean, I've spent the

8   last --

9      Q.   I'm entitled to a fair estimation, Doctor.

10     A.   Okay.  I've spent the last couple of weeks

11  looking at materials, I might say more heavily over

12  the last week.  I mean, I would -- if I could try

13  to look and see when I tried to prepare for the

14  last deposition that was moved, I mean, maybe on

15  the order of like 40, 50 hours.

16     Q.   So you're owed, in addition to the $300,000,

17  an additional 12 or $15,000?

18          MS. STEELE:  Object to form.

19     Q.   Approximately.

20     A.   Yeah, I don't -- again, this is a very rough

21  estimate.

22     Q.   Doctor, you don't --

23          (Telephone beeps.)

24     Q.   You don't hold -- strike that.

Steven R. Little, Ph.D.

```
 1              MS. KROTTINGER:  Did someone else --

 2    Q.  You will not offer any opinions concerning

 3    pathology; correct?

 4              MS. STEELE:  Object to form.

 5    A.  Well, what I'd say is that in -- in this

 6    report, I -- there are manuscripts where some, for

 7    instance, histology slides are given.  I don't hold

 8    myself out as a expert in pathology, but I did

 9    review that data, and I'd say it's part of my

10    opinion.

11    Q.  But you're not an expert in pathology.

12    A.  I don't hold myself out to be an expert as a

13    pathologist, no.

14              MS. KROTTINGER:  Who joined the phone?

15    Q.  Despite that --

16              MS. KROTTINGER:  Hold on, Dan.  Somebody

17    joined.

18              MR. THORNBURG:  Hello?  Did somebody

19    join?  Hello?

20              MS. KROTTINGER:  Is anybody else on the

21    phone?

22              MS. STEELE:  Do we have a way of seeing

23    how many people are connected?

24              MR. THORNBURG:  Are we off the record?
```

Steven R. Little, Ph.D.

```
 1                THE VIDEOGRAPHER:  Going off the record.

 2      The time is 9:50 a.m.

 3                          *  *  *

 4      (Whereupon, an off-the-record discussion was held.)

 5                          *  *  *

 6                THE VIDEOGRAPHER:  We're going back on

 7      the record.  The time is 9:51 a.m.

 8      BY MR. THORNBURG:

 9        Q.  Doctor, at trial you're not going to

10      suddenly attempt to hold yourself out as an expert

11      pathologist; correct?

12                MS. STEELE:  Object to form.

13        A.  No.  I'm not going to say that I'm an expert

14      in pathology as a -- as a formally trained

15      pathologist.  I will -- I may refer to data that is

16      in the literature in my analysis.

17        Q.  At trial in this -- in any of these cases in

18      Massachusetts or elsewhere, you're not going to

19      suddenly hold yourself out as an expert in the

20      female pelvic anatomy.

21                MS. STEELE:  Object to form.

22        A.  I'm -- I don't think that I'm going to be

23      holding myself out as an expert in that, no.

24        Q.  Well, look, this is my only time to depose
```

Steven R. Little, Ph.D.

1    you, so I need to know now whether or not you're

2    going to offer opinions as an expert

3    urogynecologist.

4        A.   No, I'm not.

5        Q.   You're not going to suddenly show up at

6    trial and hold yourself out as an expert in the

7    design of polypropylene mesh devices for the

8    treatment of pelvic organ prolapse or stress

9    urinary incontinence; correct?

10              MS. STEELE:   Object to form.

11       A.   Other than what is in my report here that I

12   can comment on with regard to biomaterials and

13   chemical engineering, I'm not going to be holding

14   myself out as an expert in specifically the design

15   of materials for pelvic organ prolapse or stress

16   urinary incontinence.

17       Q.   Well, you're not going to show up at the

18   trial in this case and offer any opinions, for

19   example, of bridging fibrosis?  Do you know what

20   bridging fibrosis is?

21       A.   I'm not going to be providing opinions on

22   that, no.

23       Q.   Do you know what -- do you know what

24   bridging fibrosis is?

Steven R. Little, Ph.D.

```
 1     A.  The name -- the name is not ringing a bell.

 2     Q.  You're not going to show up at trial in any

 3  of these cases and suddenly hold yourself out as an

 4  expert in the material requirements for

 5  manufacturing a pelvic organ prolapse or stress

 6  urinary incontinence mesh device; correct?

 7          MS. STEELE:  Object to form.

 8     A.  You may need to be more specific in terms of

 9  what you mean by requirements.

10     Q.  Well, are you -- have you reviewed any

11  materials in preparation for the deposition or when

12  you drafted your expert report concerning the

13  design requirements for the manufacture of pelvic

14  organ prolapse or stress urinary incontinence

15  devices?

16          MS. STEELE:  I object to form.

17     A.  I'm sorry, could you repeat the question.

18     Q.  I'll ask Madame Court Reporter if she can

19  read back the question.

20  (Whereupon, reporter read pending question.)

21     A.  Well, I mean, I can say that I reviewed

22  materials related to classification of the systems,

23  pore sizes, and things like that, and I generally

24  know the function of the devices, but I'm -- if
```

Steven R. Little, Ph.D.

```
1   you're referring to like design specifications and
2   tolerance levels, no.
3      Q.  You're referring to the amide
4   classifications from 1997?
5      A.  Yes.
6      Q.  You haven't reviewed the publications from
7   Klinge or Klosterhalfen; right?
8      A.  Not that I recall.
9      Q.  And, therefore, you have not relied on or
10  even considered the classifications described by or
11  the design requirements related to pore size and
12  weight authored by Drs. Klinge and Klosterhalfen;
13  correct?
14     A.  Well, so I'd say is -- again, I don't
15  remember those names.  If it's not in my materials
16  considered list, then I wouldn't have seen those.
17  But I would just say that I -- I understand the
18  reasoning behind the Amid classification.  If
19  there's another reason in the other ones, it would
20  be whether or not I -- I mean, I don't remember
21  that.
22     Q.  If it's not on your list, you didn't
23  consider it; correct?
24     A.  Yes.
```

Steven R. Little, Ph.D.

```
 1      Q.  Do you know how many publications have been
 2   authored by Drs. Klinge and Klosterhalfen
 3   concerning the pore size and weight necessary for
 4   manufacturing a biocompatible mesh device?
 5      A.  No, I don't.
 6      Q.  Have you ever heard the phrase "scar plate"?
 7      A.  I have heard the phrase.  It's -- I guess
 8   I've heard the phrase more in the context of this
 9   litigation.  I see it being used quite a bit by --
10   by plaintiffs.
11      Q.  Do you know the difference between scar net
12   and scar plate?
13      A.  I would say that I -- I know what scar
14   tissue is, but the difference between the two
15   specific terms you just said, no.
16      Q.  Do you have any understanding whatsoever
17   concerning the relationship between pore size, scar
18   net and scar plate?
19      A.  No.
20          MS. STEELE:  Object to form.
21      Q.  Can you repeat your answer, please.
22      A.  No.
23      Q.  So you will not suddenly appear at trial in
24   any one of these Boston Scientific cases and
```

Steven R. Little, Ph.D.

1    suddenly have an opinion concerning pore size and

2    its relationship between scar net and scar plate;

3    correct?

4             MS. STEELE:  Object to form.

5    A.  No.

6    Q.  No, you will not show up at trial, correct,

7    with those opinions; correct?

8    A.  No, I'm not going to talk specifically about

9    what you said.  To my understanding.

10   Q.  And when was the first time you met

11   Mrs. Steele?

12            MS. STEELE:  Ms.

13            MR. THORNBURG:  Sorry, Ms. Steel, I

14   apologize for that.

15   A.  I believe, I mean, it would have been

16   midyear last year.

17   Q.  Have you ever been retained by any defendant

18   who was represented by Shook, Hardy & Bacon prior

19   to the Boston Scientific mesh litigation?

20   A.  No.

21   Q.  In your expert report you list a number of

22   depositions you've provided -- testimony provided

23   within the last five years.

24            I think 3.  We -- we might as well

Steven R. Little, Ph.D.

1    mark as Exhibit 3 your expert report.

2              (Little Deposition Exhibit 3 was marked

3    for identification.)

4    Q.  Are you there, Dr. Little?

5    A.  Yes.

6    Q.  All right.  You have Shire Development LLC,

7    Incorporated -- I'm sorry, et al. versus Watson

8    Pharmaceuticals, Incorporated, et al. listed as

9    bullet point No. 1; correct?

10   A.  Yes.

11   Q.  And who were you retained by in that

12   litigation?

13   A.  It was counsel for Shire.

14   Q.  And is Shire a pharmaceutical company?

15   A.  Yes.

16   Q.  And then bullet point No. 2, it says -- you

17   have listed Salix Pharmaceuticals Incorporated, et

18   al. versus Lupin Ltd., et al.  And who were you

19   retained by in that litigation?

20   A.  That was Salix, counsel for Salix.

21   Q.  Okay.  And who was counsel for Shire

22   Development?

23   A.  Counsel for Shire Development I believe is

24   Frommer Lawrence & Haug.

Steven R. Little, Ph.D.

1    Q.   Okay.  And for Salix, who was counsel for

2    them?

3    A.   I believe it was Womble Carlyle Sandridge &

4    Rice.

5    Q.   And again, Salix Pharmaceuticals is a

6    pharmaceutical company; correct?

7    A.   Yeah, I mean, every name on this list, both

8    plaintiffs and defendants, are pharmaceutical

9    companies.

10   Q.   And is it fair to say that you've only been

11   retained to offer expert opinion testimony on

12   behalf of lawyers representing corporate

13   defendants?

14        MS. STEELE:  Object to form.

15   A.   Well, yes, so the work that's on this sheet

16   is -- is pharmaceutical patent litigation, so all

17   defendants and plaintiffs are pharmaceutical

18   companies.

19   Q.   So it's fair to say that in the last five

20   years at least you've only been retained by

21   plaintiffs or defendants who were corporate

22   defendants or plaintiffs?

23   A.   Um, I guess by the nature of doing

24   pharmaceutical patent litigation, that's -- that's

Steven R. Little, Ph.D.

1    a requirement, so yes.

2        Q.  Have you ever been or have you ever -- ever

3    offered opinions where you've been retained by a

4    plaintiff who has alleged personal injury as a

5    result of a pharmaceutical or medical device

6    product?

7        A.  Again, I've -- I've only done patent

8    litigation, so no.

9        Q.  So the answer to my question is, no, you've

10   never offered opinions on behalf of a plaintiff who

11   has alleged personal injuries as a result of a

12   pharmaceutical or medical device product; correct?

13       A.  Um, so what you're saying is right.  I've

14   only done, up to this point, pharmaceutical patent

15   litigation.

16       Q.  Have you ever done any type of medical

17   device litigation?  Let me ask better question.

18               Have you ever been involved in any

19   type of medical device litigation?

20               MS. STEELE:  Object to form.

21       A.  I've only worked on patent litigation so

22   far.  So this is the first time I've done this.

23       Q.  Pharmaceutical patent litigation; correct?

24       A.  Yes.  Correct.

Steven R. Little, Ph.D.

1    Q.  And in the bullet point 1, the first bullet

2    point, Shire Development versus Watson

3    Pharmaceuticals, what type of product was involved

4    in that litigation?

5    A.  It was a -- a pharmaceutical product so a

6    drug.

7    Q.  What drug?

8    A.  I think it was the Lialda product.

9    Q.  And that did not involve the issue of

10   polypropylene biocompatibility or degradation;

11   correct?

12   A.  No, it was a solid oral dosage form.

13   Q.  And that's the same for Salix

14   Pharmaceuticals?

15   A.  That product was different.  I can't

16   remember the name of it off the top of my head, I'm

17   sorry.

18   Q.  Another product but it didn't involve

19   polypropylene; correct?

20   A.  I don't recall all of the specifics as to

21   what's in it.

22   Q.  Do you know if polypropylene is used by

23   pharmaceutical companies?

24   A.  It may be under circumstances.  I don't know

Steven R. Little, Ph.D.

```
1    if I can make the statement that -- if it is or

2    isn't or I'm even allowed to say what's in these

3    products.

4       Q.  Salix Pharmaceuticals Incorporated, is that

5    the same drug that was -- I'm sorry, bullet point

6    3.

7               Hello?

8       A.  Yes?

9       Q.  Dr. Little, did you hear my question?

10      A.  I did not, I'm sorry.

11              MS. STEELE:  I think we were looking at

12   bullet point 3, and you were asking if it was the

13   same drug.

14              Dan, can you --

15      Q.  Yeah, sorry.  My question is, for bullet

16   point 3, Salix Pharmaceuticals versus Novel

17   Laboratories, is that -- did that involve the same

18   drug as bullet point No. 2?

19      A.  Yeah, I mean, I can't remember specifically

20   the name of the drug.

21      Q.  Was there -- was -- was there a polymer used

22   in the drug?

23      A.  I don't know if I'm allowed to say what's in

24   these drugs.
```

Steven R. Little, Ph.D.

1    Q.   I'm not asking you for the specific

2    ingredient; I'm asking you if there was any

3    polymer, any type of polymer whatsoever, as an

4    ingredient within those drugs.

5    A.   I don't think I'm allowed to say that.

6    Q.   Is that -- will that be your answer for all

7    bullet -- bullet points on page 3 and page 4?

8    A.   Yeah, I would need to talk to my counsel for

9    these cases to determine whether or not I'm allowed

10   to say the composition of the drugs.  I think the

11   answer would be no.

12   Q.   You believe that whether or not a polymer

13   was used in any of these drugs would be proprietary

14   information that's subject to some type of

15   confidentiality provision?

16   A.   I would need to ask to be sure.

17   Q.   So today you will not provide that

18   information?

19   A.   Today, I don't know if I'm allowed to

20   provide the information, so I'm not going to.

21   Q.   How -- for how many years have you been

22   offering expert opinion testimony where you've been

23   retained by counsel or a party who was a corporate

24   plaintiff or defendant?

Steven R. Little, Ph.D.

```
1      A.  I'd say maybe five years or so.

2      Q.  So this list on page 3 and 4 includes, to

3   the best of your knowledge, all of the cases where

4   you've been retained as an expert witness on behalf

5   of a corporate defendant or plaintiff?

6      A.  Yes.

7           MS. STEELE:  Object to form, retained.

8   Testified.

9      A.  This list, to the best of my knowledge,

10  includes all of the testimony that I've provided.

11  And again, it's in -- it's in pharmaceutical patent

12  litigation.

13     Q.  When I use the -- the term polyofelin,

14  (sic), do you know what that means?

15     A.  Polyolefin yes.

16     Q.  Yes, polyolefin.  You have an understanding

17  of what that means?

18     A.  Yes.

19     Q.  What is a polyolefin?

20     A.  Polyolefin is a -- is a polymer that's made

21  from -- it's a hydrocarbon chain, a straight

22  hydrocarbon backbone chain.  Can have pendant

23  groups on it, but it's carbon and hydrogen.

24     Q.  What -- what types of polymers fall within
```

Steven R. Little, Ph.D.

1   the polyolefin group?

2     A.  What types of polymers?  I mean, it's

3   polyethylene.

4     Q.  The specific names of them, yes.

5     A.  Right.  Polyethylene and polypropylene are

6   the two that are the most widely used; the

7   production is mainly focused on those two.  But

8   there are others that have different side chains so

9   you can have a longer side chain or branch side

10  chain.

11    Q.  Have you ever offered any expert opinions or

12  been retained as an expert concerning polyethylene?

13    A.  Retained as an expert regarding

14  polyethylene?  Again, I don't know if polyethylene

15  is contained in any of these other formulations.

16  Specifically, only talking about polyethylene, no.

17    Q.  Have you ever consulted with any medical

18  device company concerning designing any type of

19  medical device using polyethylene?

20    A.  Not that I'm aware of, no.

21    Q.  Have you ever been -- have you ever

22  consulted with any medical device manufacturer

23  concerning designing any product made out of any

24  type of polyolefin?

Steven R. Little, Ph.D.

```
 1      A.   Not that I'm remembering right now, no.

 2      Q.   Have you ever performed any type of testing

 3   whatsoever to determine the stability or

 4   degradability of any type of polyolefin?

 5      A.   I have not personally performed testing on

 6   stability/degradability of polyolefins.

 7      Q.   Have you performed any type of testing

 8   concerning the stability or biodegradability of any

 9   type of polymer?

10      A.   Yes.

11      Q.   What polymer?

12      A.   Well, the ones that I focus on the most are

13   polymers that degrade in the body.  So polyesters,

14   polyanhydrides, ortho esters, for instance.

15      Q.   I'm sorry, that was polyesters?

16      A.   Uh-huh.

17      Q.   Orthro -- ortho esters?

18      A.   Yep.

19      Q.   What else?

20      A.   Polyanhydrides.

21      Q.   And those do not belong to the polyolefin

22   group of polymers; correct?

23      A.   No.

24      Q.   And have you ever looked at explant --
```

Steven R. Little, Ph.D.

1    strike that.

2              Have you ever studied explanted

3    polyesters, ortho esters, or pol- --

4    polyanhydrides?

5       A.   Yes.

6       Q.   And what were the names of those products?

7       A.   Well, they were in preclinical studies, so

8    they are systems that we have been designing.  And

9    we would do, at times, histology or removal, and

10   observe the properties.

11      Q.   Did you ever perform FTIR on explanted

12   polyesters, ortho esters, or polyanhydrides?

13      A.   We might have, yes.  I don't recall a

14   specific instance, but we may have.

15      Q.   Have you performed GPC studies on

16   polyesters, ortho esters, or polyanhydrides?

17      A.   Probably, yes.

18      Q.   Have you performed PyMS on polyesters, ortho

19   esters, or polyanhydrides?

20      A.   That specific technique, I don't recall.

21      Q.   Do you know what I mean by the acronym

22   DCS -- DSC?

23      A.   DSC, yes.

24      Q.   What does DSC stand for?

Steven R. Little, Ph.D.

```
 1      A.   That's differential scanning calorimetry.

 2      Q.   Have you used that technique in analyzing

 3    polyesters, ortho esters, or polyanhydrides?

 4      A.   I've used the technique.  I don't recall

 5    specifically what materials it was on.  But yes, I

 6    have experience with the technique.

 7      Q.   And that's a technique -- basically, a

 8    technique of thermal analysis?

 9      A.   Generally, yes.

10      Q.   Looking at the crystallinity of a type of

11    product?

12      A.   You can use it to determine the amount of

13    crystallinity in specific circumstances, yes.

14      Q.   What other thermal techniques have you used

15    to analyze the stability or degradability of

16    polyesters, ortho esters, or polyanhydrides?

17      A.   You specifically saying thermal techniques?

18      Q.   Yep.

19      A.   Well, I mean, you can do, for instance,

20    like, melting point analysis.

21      Q.   Right.

22      A.   And DS --

23      Q.   And have you done a melting point analysis

24    on explanted polyesters, ortho esters, or
```

Steven R. Little, Ph.D.

1    polyanhydrides?

2      A.  We might have, I don't recall.

3      Q.  Would you feel comfortable doing a melting

4    point analysis of a polyester, ortho ester, or

5    polyanhydrides sitting here today?

6      A.  Well, sitting here today, I mean, if you're

7    asking me could I determine the melting point, I'd

8    have to look into it.  But I mean, I've done

9    melting point analysis before.

10     Q.  What other stability techniques have you

11   used in your experience?

12     A.  Stability techniques.  Well, I mean, I

13   have -- I have seen EDS performed, x-ray

14   diffraction performed.

15     Q.  Have you ever performed it yourself?

16     A.  I have performed x-ray diffraction before.

17   I've been involved in testing that was done on EDS.

18     Q.  Have you ever performed it yourself?

19     A.  I believe so, yes.

20     Q.  Okay.  What about scanning electron

21   microscopy; is that a technique that you've done

22   before?

23     A.  Yes.

24     Q.  Okay.

Steven R. Little, Ph.D.

1    A.   That's visual analysis, not thermal.

2    Q.   Right.  And what was your -- what was the

3    purpose of performing a visual analysis of any

4    product you analyzed in your -- in the past?

5    A.   Typically, you use it to examine surface

6    characteristics.  So you're looking for things like

7    roughness patterns, if, for instance, you wanted to

8    design that.  Sometimes you can use it to determine

9    integrity of very thin things because you're

10   looking at the, just the surface.

11   Q.   So you looked at it to look for

12   morphological characteristics, and what was your

13   end goal in using SEM or SEM EDS techniques?

14   A.   Right, so it's just to determine, for

15   instance, integrity.  So if you're making something

16   that you would hope have a smooth surface, you can

17   and look and see if, for instance, the surface

18   isn't -- isn't smooth or doesn't have integrity or

19   something like that.

20   Q.   So you've used SEM to reach a conclusion

21   about whether or not a particular product met

22   the -- your expectations of integrity.

23        MS. STEELE:  Object to form.

24   A.   I think that's right, yes.

Steven R. Little, Ph.D.

1    Q.   For example, if you were looking at a

2    product that should have a smooth surface but under

3    scanning electron microscopy it was cracked, that

4    would be something that would concern you because

5    it didn't meet your expectation.

6              MS. STEELE:   Object to form.

7    A.   Well, I think that -- I've done this before,

8    for instance, like after fabrication.  So you

9    fabricate the device and you look at it and you see

10   whether or not it has the surface characteristics

11   that you -- you'd like.  I mean, you're mentioning

12   cracks which is a major point of analysis for a lot

13   of the literature in this specific case.  I would

14   say that I would not rely on it heavily if you're

15   talking about a material that's been explanted and

16   not cleaned.

17             MS. STEELE:   Are you good?

18   Q.   Are you familiar with the ASTM guidelines?

19   A.   I am familiar with some in my career.  Off

20   the top of my head, I'm not saying that I would be

21   aware of all of them.

22   Q.   Did you review or consider, and offer any

23   opinions in this case, the ASTM guidelines

24   concerning the analysis of explanted polypropylene

Steven R. Little, Ph.D.

1   devices?

2       A.  I mean, I have reviewed the document

3   relating to the ASTM procedures for explanted

4   materials.  Yes, I have reviewed that.

5       Q.  Have you reviewed the materials for the ASTM

6   guidelines -- strike that.

7               When was the last time you looked at

8   the ASTM guidelines concerning explanted materials?

9       A.  Probably within the last several months.

10      Q.  Okay.  Did you review them in conjunction

11  with your preparation for providing testimony in

12  this case?

13      A.  I believe so, yes.

14      Q.  Okay.  Did you list it on your material

15  reliance list?

16      A.  I don't recall if it's on there.

17      Q.  The only protocol that you -- that

18  physically accept as a valid protocol for cleaning

19  explanted polypropylene materials in the -- in your

20  expert report is the protocol used by Dr. Thames;

21  correct?

22              MS. STEELE:  Object to form.

23      A.  Well, there is a protocol that is referred

24  to by Dr. Thames.  But I do recall there being some

Steven R. Little, Ph.D.

1   cleaning methods used in manuscripts prior to that

2   point where you could see material actually being

3   cleaned off.  But specifically referring to the

4   protocol, that's the focus of Dr. Thames' article.

5       Q.  Did you compare Dr. Thames' explant cleaning

6   protocol with the protocol outlined by the ASTM?

7       A.  Did I compare it?  I don't recall if I did a

8   direct comparison.  There was nothing that stood

9   out to me as odd in it, if that's what you mean.

10      Q.  You consider the ASTM guidelines to be

11  authoritative?

12      A.  Um, well, I would say that it's an agreed

13  upon method for certain circumstances; but what I

14  would say is that if you were to perform that and

15  you were to determine that the material's not

16  cleaned off appropriately, then you would need to

17  do something else.

18      Q.  Did you -- but in any case, you did not

19  compare Dr. Thames' cleaning protocol to that of

20  the ASTM protocol; correct?

21      A.  I mean, I don't know what you mean by

22  compare.  I remember some things about --

23      Q.  Look at them side-by-side and consider the

24  ASTM protocol when you offered opinions about

Steven R. Little, Ph.D.

1    Dr. Thames' protocol?

2      A.  Well, I -- what I would say is that there

3    was nothing that concerned me about Dr. Thames'

4    protocol from what I recall in the ASTM procedures.

5      Q.  Did you -- my question is did you

6    specifically set out to compare the protocol

7    outlined by ASTM to the protocol used by Dr.

8    Thames?

9      A.  Did I set out to compare them?

10             I would say that after I read Dr.

11   Thames' article, I didn't feel the need to go back

12   and compare them, no.

13     Q.  So the answer is you did not compare the

14   two; correct?

15     A.  I did not put them side-by-side and go

16   through a comparison because I didn't have a

17   concern to do that, no.

18             MS. STEELE:  Are you good or do you want

19   a break or --

20             THE WITNESS:  I'm fine.

21             MS. STEELE:  Okay.

22     Q.  I hate to go back, but I'm going to go back

23   real quick.  You can confirm for me that in every

24   case where you've provided testimony, you've done

Steven R. Little, Ph.D.

1    that on behalf of a corporate party to a lawsuit;

2    correct?

3      A.  Yeah, I mean, I've already answered this

4    question.  I mean, essentially, what I've done up

5    to this point is pharmaceutical patent

6    infringement; so no matter who I would have worked

7    for, it would have been for a corporate entity.

8      Q.  A hundred percent of the time you have

9    agreed to be hired as a consultant or an expert

10   witness on behalf of corporate parties in a

11   lawsuit; correct?

12     A.  I mean, my answers are the same.

13     Q.  But it's a yes or no answer.  A hundred

14   percent of the time you've been retained by a

15   corporate party in a lawsuit; correct?

16     A.  Right.

17            MS. STEELE:  Asked and answered.

18     A.  By definition, working in pharmaceutical

19   patent litigation, yes.

20            MR. THORNBURG:  I'm going to strike

21   everything except for your answer yes.

22            MS. STEELE:  Oppose motion to strike.

23     Q.  Has any court ever excluded you as an expert

24   witness before?

Steven R. Little, Ph.D.

```
1      A.   No.

2      Q.   Have your opinions ever been limited?

3      A.   Could you explain what you mean by that.

4      Q.   Well, did you have opinions about A, B, C,

5    D, and E but by the time you were able to testify

6    at trial, the Court limited you to opinion A and B?

7      A.   No.

8      Q.   Now, regarding your reliance list, is it

9    fair to say that the materials that you've

10   referenced on your reliance list are materials that

11   were -- were provided to you by Boston Scientific's

12   attorneys?

13            MS. STEELE:  Object to form.

14     A.   No, I mean, I -- I looked up a good number

15   of those on my own.  Some were provided, and at

16   times it was because I was told that I, you know,

17   should see something.  At other times it was

18   because I requested to see it and then counsel

19   provided it.

20     Q.   Is it fair -- so let's talk about that.

21            Did Boston Scientific provide you with

22   any depositions that have been taken for you to

23   review in rendering your opinions in this case?

24     A.   Depositions, I reviewed deposition
```

Steven R. Little, Ph.D.

1    testimony, for instance, by Dr. Mays.

2      Q.  Okay.  And that would have been provided to

3    you by Boston Scientific's counsel; correct?

4      A.  Yes.

5      Q.  Did you review expert reports?

6      A.  Um, I believe I reviewed, yes, Dr. Mays'

7    expert report.

8      Q.  Okay.  And that would have been provided to

9    you by Boston Scientific's counsel; correct?

10     A.  Yes.

11     Q.  The internal documents that are listed in

12   your expert report or within your reliance list,

13   those were -- were chosen by Boston Scientific and

14   provided to you to rely on; correct?

15     A.  The -- what again on the list are you

16   referring to?

17     Q.   Internal corporate Boston Scientific

18   documents.

19     A.  Right.  So, you know, some of those things I

20   would have asked for; some of those things were

21   provided to me.

22     Q.  Did you ever ask for any materials that

23   Boston Scientific was unable to provide to you?

24     A.  No.

Steven R. Little, Ph.D.

1    Q.  Did you ask Boston Scientific to provide to

2    you all of their validation studies concerning the

3    appropriateness of the antioxidants that were used

4    in the Marlex resin or Marlex mesh product?

5            MS. STEELE:  Object to form.

6    A.  Specifically those documents related to that

7    topic, I can't remember.

8    Q.  Do you know what I mean by validation

9    studies?

10   A.  Yes, but I -- I don't remember about when I

11   read those and what the conversation was

12   surrounding them.

13   Q.  Well, have you ever heard of the phrase

14   "design validation"?

15   A.  I have heard of it, yes.

16   Q.  Explain to the ladies and gentlemen of the

17   jury what your understanding of design validation

18   is in the context of designing a medical device

19   like Boston Scientific's mesh product.

20   A.  Yeah, I've heard this term.  I'm not an

21   expert on the details of that.

22   Q.  Okay.  Did you -- did Boston Scientific

23   provide to you any of their design validation

24   internal corporate documents?

Steven R. Little, Ph.D.

1    A.  I don't remember.  I'm sorry.

2    Q.  Did you ask for them?

3    A.  I -- I don't think so, no.

4    Q.  Do you know how Boston Scientific came to

5    decide that Irganox would be an appropriate

6    antioxidant to use as a permanent implantable

7    device?

8            MS. STEELE:  Object to form.

9    A.  How that happened, no.  I'm not aware of it.

10           (Telephone beeps.)

11   Q.  Have you ever studied the suitability of

12   Irganox as a --

13           (Background conversation)

14           MS. STEELE:  Hi, I think we --

15           MR. THORNBURG:  I'm trying to take a

16   deposition and I'm being interrupted.

17           MS. STEELE:  Those people aren't in our

18   room, so we're not sure who just joined the phone.

19   It beeped.

20           MR. THORNBURG:  Hello?

21           THE VIDEOGRAPHER:  Going off the record

22   at 10:32 a.m.

23                        *  *  *

24   (Whereupon, an off-the-record discussion was held.)

Steven R. Little, Ph.D.

```
 1                    * * *

 2             THE VIDEOGRAPHER:  Going back on the

 3      record.  The time is 10:33 a.m.

 4      BY MR. THORNBURG:

 5        Q.  And if the court reporter could just read

 6      back the question, whatever part of it she got for

 7      me.

 8      (Whereupon, reporter read pending question.)

 9        A.  No, I've not.

10        Q.  I don't think I was actually finished

11      answering -- or asking the question.  So no -- no,

12      you have not looked at any internal documents to

13      determine how Boston Scientific determined that

14      Irganox was the appropriate stabilizer to use in

15      its pelvic organ prolapse and SUI products;

16      correct?

17             MS. STEELE:  Object to form.

18        A.  Not that I can recall, no.

19        Q.  Did you ask for those documents?

20        A.  No.

21        Q.  Have you specifically personally studied the

22      suitability of Irganox as a stabilizer in

23      implantable medical devices?

24        A.  I have not personally done that, no.
```

Steven R. Little, Ph.D.

```
1      Q.  Have you ever studied the propensity of

2   Irganox to leach out of the polypropylene fibers

3   after implanted in either a clinic -- clinical or

4   preclinical environment?

5      A.  No, I've not personally done that.

6      Q.  Have you studied in any way the suitability

7   of Irganox as a stabilizer in terms of preventing

8   or retarding or -- or -- strike that.

9              Have you studied the suitability of

10  using Irganox as a stabilizer in any medical

11  devices?

12     A.  No, I have not.

13     Q.  Before you were involved in this litigation,

14  did you -- have you conducted any research on

15  Irganox and the suitability of Irganox as a

16  stabilizer in medical device products?

17     A.  Specifically, no, I have not.

18     Q.  Prior to this litigation, did you have any

19  understanding of Irganox as a stabilizer?

20     A.  Yeah, I mean, I -- I understand the general

21  classification of stabilizers that -- that we're

22  talking about here, these primary stabilizers.  But

23  I did not, for instance, obtain that specific

24  stabilizer and study it, no.
```

Steven R. Little, Ph.D.

1    Q.  You understand -- do you have an

2    understanding that not all stabilizers are the

3    same?

4    A.  Well, I mean, a different stabilizer has

5    different chemical structure, for instance, yes.

6    Q.  Some -- some will leach out more readily in

7    a water environment than others; correct?

8         MS. STEELE:  Object to form.

9    A.  I'm -- you know, I'm not providing opinions

10   on that.  I'd have to look into it.

11   Q.  Do you know what the ion bond is of Irganox?

12   A.  I -- no, I don't.

13   Q.  Do you know what Irganox would look like in

14   an FTIR of a polypropylene implant -- I'm sorry, of

15   a pristine polypropylene Marlex mesh device?

16        MS. STEELE:  Object to form.

17   A.  I mean, offhand, right now I couldn't recite

18   what the spectrum would be.  I mean, I could look

19   at the -- the chemical groups and go through an

20   analysis.  You can even put something like that --

21   the most easy thing to do is put it into a program

22   and it generates what that would look like.

23   Q.  But you haven't done that; right?

24   A.  What the FTIR spectrum specifically would

Steven R. Little, Ph.D.

1    be?  No.

2      Q.  So you can't offer any opinion about whether

3    or not a -- Boston Scientific's pristine Marlex

4    mesh devices under an FTIR analysis can detect

5    Irganox or an Irganox spectrum?

6           MS. STEELE:  Object to form.

7      A.  You're asking me if I could provide an

8    opinion as to whether or not FTIR would detect the

9    functional groups on the specific antioxidant to

10   which you refer.  I mean -- I mean, you would just

11   look at the functional groups and see if there were

12   any distinct from the polypropylene itself.

13     Q.  You haven't done that, have you?

14     A.  I have not specifically gone through that

15   particular exercise, no.

16           MR. THORNBURG:  Okay.  We can take a

17   break.

18           THE VIDEOGRAPHER:  We're going off the

19   record.  The time is 10:38 a.m.

20                    * * *

21           (Whereupon, a recess was taken.)

22                    * * *

23           THE VIDEOGRAPHER:  This is beginning of

24   disc two.  We are going back on the record.  The

Steven R. Little, Ph.D.

```
 1    time is 10:53 a.m.

 2    BY MR. THORNBURG:

 3      Q.  Hi, Dr. Little, how are you?

 4      A.  Fine.

 5      Q.  Did you have a good break?

 6      A.  Yes.

 7      Q.  Did you -- did you by any chance look at any

 8    doc- -- additional documents during the break to

 9    refresh your recollection on any of the testimony

10    that you've provided so far?

11      A.  No.

12      Q.  Okay.  And I want you to turn to page 7 with

13    me of your expert report, which is Exhibit 3.  Are

14    you there?

15      A.  Yes.

16      Q.  Okay.  If you go to the second paragraph,

17    you write, "The Marlex HGX-030-01 polypropylene

18    resin that was used in Boston Scientific's Polyform

19    mesh contained a primary antioxidant (Irganox

20    3114), a secondary antioxidant (Irgafos 168), and a

21    stabilizer (DHT-4A)."

22              Did I read that correctly?

23      A.  Yes.

24      Q.  You write that, "The presence of" a
```

Steven R. Little, Ph.D.

1    primary -- "of primary and secondary antioxidants

2    further prevents oxidation and chemical degradation

3    of the polymer in vivo."

4              Did I read that accurately?

5    A.  Yes.

6    Q.  Okay.  Dr. Little, how did you determine the

7    additive package of the Marlex HGX-030-01?

8    A.  I'm pretty sure that it's in the documents

9    that were provided to me in regard to the

10   composition of the Marlex.

11   Q.  Well, you don't cite to any documents there,

12   do you?

13   A.  I don't cite, in this paragraph, documents,

14   no.

15   Q.  Was that information, whether it was

16   provided to you by -- you know, verbally or

17   provided to you in one of the materials you listed

18   in your materials reliance list or within your

19   expert report, was that provided to you by counsel

20   for Boston Scientific?

21   A.  Yes.

22   Q.  Okay.  So Boston Scientific provided you

23   with some type of information concerning the Marlex

24   formula?

Steven R. Little, Ph.D.

1    A.   Yes.

2    Q.   Okay.   Including the additives package?

3    A.   Yes.

4    Q.   Okay.   Do you know if they provided it to

5    you verbally, or if you were provided with internal

6    corporate documents that identified the additives

7    package within the Marlex resin?

8         MS. STEELE:   Object to form.

9    A.   I remember seeing documents that included

10   the antioxidants specifically which ones that were

11   included in the resin.

12   Q.   Has the additives package of the Marlex ever

13   changed?

14   A.   Hmm.

15        (Telephone beeps.)

16   A.   Has the additives ever changed?   I don't

17   recall seeing any changes to the additive packages.

18   Q.   Well, you have no knowledge one way or the

19   other whether or not the additives package has

20   changed?

21        MS. STEELE:   Object to form.

22        To the best of your recollection.

23   A.   Yeah, to the best of my recollection, no.

24        MR. THORNBURG:   I appreciate no

Steven R. Little, Ph.D.

```
1     counseling of the witness, please.

2       Q.  Did you review any internal documents

3     concerning whether or not any of the additives

4     packages were revised or modified over time?

5               MS. STEELE:  Object to form.

6       A.  I don't recall that information, no.

7       Q.  Do you know one way or the other whether

8     there was a different formula prior to the formula

9     that you have on page 7 which lists Irganox 3114,

10    Irgafos 158, or DHT-4A?

11      A.  Not that I can recall.

12      Q.  Is that information -- would that

13    information be important to your testimony?

14      A.  Um, well, I mean, I think my testimony here

15    is related to this formulation that I'm talking

16    about regarding the Marlex HGX-030-01.

17      Q.  Well, let me ask you this question.  What

18    quantity of Irganox 3114 and Irgafos 168 and DHT-4A

19    are contained within Marlex HGX-030-01 currently?

20      A.  The specific --

21              MS. STEELE:  Object to form.

22      A.  The specific quantities, I don't remember.

23      Q.  Do you have -- what's the significance of

24    the amount of these antioxidants in terms of the
```

Steven R. Little, Ph.D.

1   stability of polypropylene?

2     A.  Well, I mean, I didn't perform an analysis

3   on the amounts.

4     Q.  Do you know -- do you know how Boston

5   Scientific determined -- strike that.

6              Do you know whether or not Boston

7   Scientific ever set out to determine whether the

8   amounts of these additives were suitable to be used

9   in a permanent implantable medical device like its

10  Uphold mesh and its other Marlex mesh devices?

11             MS. STEELE:  Object to form.

12    A.  I did not perform a specific analysis on

13  that, no.

14    Q.  Do you know -- do you know if Boston

15  Scientific ever set out to determine whether or not

16  the quantity of these stabilizers they were using

17  in the Marlex mesh devices was an appropriate

18  quantity to be used in permanent implantable

19  medical mesh devices?

20    A.  I'm sorry, your question is very similar to

21  what I already answered before.  If there's a

22  difference, you can let me know, but I -- I don't

23  believe that I --

24    Q.  I didn't mean to interrupt.  I apologize.

Steven R. Little, Ph.D.

1    The difference --

2        A.  That's okay.

3        Q.  The difference is I asked you whether or not

4    Boston Scientific ever set out to determine whether

5    or not the quantity of its antioxidants were

6    suitable to prevent degradation in a product that

7    would be used in the pelvic organ tissue of humans?

8                MS. STEELE:  Object to form.

9        A.  Well, so what I'd say is, no, I don't

10   remember specifically seeing that information.  I'd

11   just say that, you know, in my opinion, that's

12   really not the point because I -- there's evidence

13   that it's not go -- undergoing oxidation in the

14   body.  So I didn't feel like I needed that

15   information to provide the opinions that I

16   provided.

17       Q.  Do you think it's incumbent upon a medical

18   device manufacturer to determine whether or not

19   they have chosen the right amount of antioxidants

20   to prevent degradation in a product that's going to

21   be implanted permanently in the pelvic tissue of

22   women?

23               MS. STEELE:  Object to form.

24       A.  I mean, I'm not providing opinions on

Steven R. Little, Ph.D.

```
1    conduct, corporate conduct.

2      Q.  Are you going to provide any opinions

3    regarding the industry standards?

4            MS. STEELE:  Object to form.

5      A.  Could you be more specific?

6      Q.  Well, the industry standards of medical

7    device mesh manufacturers in terms of determining

8    the design validation of the amount of stabilizers

9    they put in their medical devices that would be

10   implanted in the pelvic tissue of females for life.

11           MS. STEELE:  Object to form.

12     A.  Yeah, I'm not providing opinions on that.

13     Q.  Do you know if Boston Scientific ever

14   decreased or increased the quantity of Irganox or

15   Irgafos or DHT-4A?

16           MS. STEELE:  Object to form.

17     A.  Again, there may be some difference in the

18   way you're asking the question, but I think I

19   already answered.  I don't recall seeing

20   information related to changing the antioxidant

21   package.

22     Q.  If Boston Scientific changed the antioxidant

23   package by reducing the quantity of the

24   stabilizers, would that be important information in
```

Steven R. Little, Ph.D.

1    rendering your opinions concerning the stability or

2    degradability of Marlex mesh devices?

3             MS. STEELE:  Object to form.

4             (Telephone beeps.)

5             THE WITNESS:  Somebody just joined.

6             MS. STEELE:  Or dropped off.  You can

7    answer.

8    A.  Well, I think -- what I think is that, for

9    instance, if -- if there were changes made, you

10   know, were the changes, you know, relevant amounts?

11   And I mean, I'm not providing opinions on that.  So

12   I don't recall seeing it, and I'm not providing

13   opinions on it.

14   Q.  So are you suggesting to the ladies and

15   gentlemen of the jury that the amount of

16   antioxidants used in the Marlex mesh devices is

17   insignificant or unimportant to your opinion

18   concerning the stability or degradability of Marlex

19   mesh devices?

20            MS. STEELE:  Object to form.

21   A.  What I'm saying is, is that I think an

22   analysis of that would have to consider the

23   tolerance levels of the amount that -- the amounts

24   that would be in there, the susceptibility of the

Steven R. Little, Ph.D.

1    material specifically in the body to degradation, a

2    whole bunch of things that I have not spent time

3    doing an analysis on.  So that's why I'm not

4    providing an opinion on it.

5         Q.  Well, if you're offering opinions concerning

6    the stability of Marlex mesh resin, you would

7    expect that Boston Scientific would provide to you

8    internal studies that they would have done that

9    would have validated exactly what you just said,

10   whether or not the quantity of the stabilizer was

11   sufficient to prevent degradation in these mesh

12   products to be permanently implanted in the pelvic

13   tissue of women; right?

14             MS. STEELE:  Object to form.

15        A.  No, I mean, I think what I said before, I

16   stand by, which is that I have seen no evidence of

17   degradation.  So whether or not a change in the

18   antioxidant package would be something that would

19   be sufficient or not or within tolerance levels or

20   not, I didn't perform that analysis.

21        Q.  Doctor, you didn't even perform any analysis

22   looking at whether or not explanted Marlex mesh

23   devices manufactured by Boston Scientific had

24   degraded.

Steven R. Little, Ph.D.

```
1              MS. STEELE:  Object to form.

2      A.   I performed an analysis of the literature

3   which includes Marlex mesh.

4      Q.   Okay.  Which literature did you analyze that

5   specifically looked at Marlex mesh to determine

6   whether or not the Marlex mesh had degraded?

7              MS. STEELE:  Object to form to the

8   extent that Marlex mesh is a specific type of mesh

9   not manufactured by Boston Scientific.

10             MR. THORNBURG:  Excuse me, you get to

11  object to form.  You don't get to add anything

12  beyond that.

13             MS. STEELE:  Okay.  We can talk about

14  hernia mesh, then.

15     A.   I don't --

16             MR. THORNBURG:  Hold on a second,

17  counsel.  Do you want me to call the judge and tell

18  the judge that you've continued to interrupt and

19  coach this witness?

20             MS. STEELE:  You can.

21             MR. THORNBURG:  I don't want to do that.

22  But if you continue it, I will.

23             MS. STEELE:  I'm just trying to make

24  sure that the record is clear.
```

Steven R. Little, Ph.D.

1          MR. THORNBURG:  You'll have an

2    opportunity to do that when it's your turn to

3    direct your witness.  Right now, it's my turn;

4    okay?  I'd appreciate the courtesy.

5          MS. STEELE:  Is there a question

6    pending?

7          MR. THORNBURG:  There was a question

8    pending before you interrupted.

9          Will the court reporter please read back

10   the last question.

11   (Whereupon, reporter read pending question.)

12     A.  I -- off the top of my head, I mean, all of

13   these articles that I cite and have included in my

14   materials considered list are relating to

15   polypropylene mesh and specific kinds and there's

16   different kinds.  Specifically which ones refer to

17   this, I can't remember off the top of my head.

18   BY MR. THORNBURG:

19     Q.  Did you review the Costello publications

20   concerning mesh degradation in Marlex products?

21          MS. STEELE:  Object to form.

22     A.  I reviewed the Costello -- I reviewed the

23   Costello manuscript, but I don't believe Costello

24   shows that the polypropylene is degrading.

Steven R. Little, Ph.D.

1    Q.  You don't believe -- did the authors of --

2    did Costello and the other authors of his

3    peer-reviewed publications conclude that the

4    explanted Marlex mesh had degraded?

5              MS. STEELE:  Object to form.

6    A.  So I -- I can pull that paper up.

7    Q.  You don't recall off the top of your head?

8              COURT REPORTER:  I'm sorry?

9    Q.  You don't recall without looking at the

10   publication; is that correct?

11   A.  Not -- I think -- I'm pretty sure that when

12   you look at the data in Costello that it suggests

13   that it's not degrading.

14   Q.  My question -- move to strike.

15              The question was, isn't it correct --

16              MS. STEELE:  Oppose motion.

17   Q.  -- that the author of that publication who

18   actually performed the analysis of explanted

19   polypropylene mesh devices, unlike yourself,

20   concluded that the mesh had degraded?

21              MS. STEELE:  Object to form.  And I

22   oppose the motion to strike.

23   A.  (Witness reviewing.)

24              MR. THORNBURG:  I'll go ahead and mark

Steven R. Little, Ph.D.

1    as Exhibit No. 4 "Characterization of Heavyweight

2    and Lightweight Polypropylene Prosthetic Mesh

3    Explants From a Single Patient" by doctors and

4    researchers Costello, Bachman, Grant, Cleveland,

5    Loy, and Ramshaw.

6              (Little Deposition Exhibit 4 was marked

7    for identification.)

8    Q.  Do you have Exhibit No. 4 in front of you,

9    Dr. Little?

10   A.  I do.

11   Q.  Have you reviewed this publication before

12   today?

13   A.  I have.

14   Q.  Okay.  When did you review this publication?

15   A.  I probably looked at it again over the last

16   couple of months, but I probably read it in more

17   depth last year.

18   Q.  And you understand that the University of

19   Missouri Columbia in Columbia, Missouri is a

20   well-respected polymer science institute and

21   biomedical institute?

22              MS. STEELE:  Object to form.

23   A.  Well, I mean, I am not privy to who's

24   calling it that.  I mean, to be honest with you,

Steven R. Little, Ph.D.

 1   everybody says that they are well-respected

 2   institute, so.

 3      Q.  Is this a peer-reviewed publication?

 4      A.  It appears to be.  It's in Surgical

 5   Innovation.

 6      Q.  Do you know -- do you know for how many

 7   decades Dr. Ramshaw has actually been personally

 8   studying explanted polypropylene mesh devices

 9   for -- to determine the stability and degradability

10   of polypropylene mesh devices?

11      A.  I don't know how many specific years he's

12   been doing this.  What I can say is that there's a

13   lot -- a lot of people that have been publishing on

14   this topic, and there's differing opinions about

15   the conclusions that are made in here.

16      Q.  Well, you've never published on this topic;

17   right?

18      A.  I have not specifically published on

19   explanted polypropylene mesh, no.

20      Q.  And you've never looked at a single

21   explanted polypropylene product; right?

22      A.  In my analysis of the literature, there are

23   a number of different analyses that are performed

24   on explanted tissue.  I believe that I'm qualified

Steven R. Little, Ph.D.

1    to look at those and provide the analysis, the

2    results, and the conclusions that I made in my

3    report.

4       Q.  You've never personally -- as we've already

5    established, you've never personally studied the

6    stability or degradability of polypropylene mesh

7    devices; right?

8       A.  I've not personally done that, but I do not

9    feel like I have needed to personally do it to

10   provide the opinions in my report.

11      Q.  Okay.  And do you know who Dr. Ramshaw is?

12   Have you ever heard of his name before?

13      A.  I have not met him, no.

14      Q.  Did you ever listen to him lecture?

15      A.  No, I have not.

16      Q.  Have you ever attended any lectures on the

17   degradability or the stability of polypropylene

18   mesh devices?

19      A.  I probably have seen presentations that were

20   made at the Society For Biomaterials on the topic.

21   I'll say that there's, to be quite honest, compared

22   to everything else, very small numbers of talks

23   that are given on this particular topic.

24      Q.  Probably -- saying you probably have doesn't

Steven R. Little, Ph.D.

1    really cut it for me, Doctor.  Do you specifically

2    remember or recall ever personally attending any

3    presentation concerning the degradability or the

4    stability of polypropylene medical mesh devices;

5    yes or no?

6       A.   Like I told you, I said that I remember

7    seeing some things on polypropylene and would have

8    been in implants and also meshes, so I have

9    attended lectures.  But like I said, there's not

10   very many of them.  It's not a topic that is a huge

11   debate in the scientific field.

12      Q.   Who presented on the topic of polypropylene

13   mesh devices that you're claiming to have attended?

14          MS. STEELE:  Object to form.

15      A.   Again, I'm saying I remember seeing some

16   talks.  I don't remember specifically who was

17   giving that talk.

18      Q.   How long ago did you attend that

19   presentation?

20      A.   It would have been in the last ten years.

21      Q.   Where -- where was the presentation given?

22      A.   Oh, it was most likely at a Society for

23   Biomaterials meeting.

24      Q.   Did you sign in that day?

Steven R. Little, Ph.D.

1      A.   You don't sign in at the Society for

2   Biomaterials.

3      Q.   Okay.  In any case, you don't know who

4   Dr. Ramshaw is?

5      A.   No.

6      Q.   Okay.  Now, if you turn to page 169, or

7   page 2 of Exhibit 4 -- are you there?

8      A.   Yes.

9      Q.   The top of the left-hand page, the first

10   full paragraph that reads, "Surgeons have also

11   historically considered polypropylene to behave as

12   an inert material while in vivo.  However,

13   polypropylene is susceptible to oxidation,

14   resulting from exposure to strong oxidants such as

15   hydrogen peroxide and hypochlorous acid.  These

16   by-products of the inflammatory response may

17   degrade and embrittle the material, causing it to

18   become" brittle (sic).

19            Did I read that correctly?

20            MS. STEELE:  Object to form.

21      A.   You read it -- you read it correctly from

22   this page, yes.

23      Q.   You would disagree with -- with this

24   scientist, wouldn't you?

Steven R. Little, Ph.D.

1    A.  Well, there's a lot of people that disagree

2    with this scientist, and I think there's a lot of

3    evidence that shows that it isn't.  It's referring

4    to articles that go back that provide a hypothesis

5    on this particular idea, but this idea has been

6    rutted -- rebutted even by the individuals who

7    published these articles stated that, that they

8    can't conclude that this is specifically what's

9    going on.

10              MR. THORNBURG:  Move to strike,

11   nonresponsive.

12              MS. STEELE:  Oppose.

13   Q.  My question was very simple.  You disagree

14   with these researchers' opinion or comment that

15   surgeons have "historically considered

16   polypropylene to behave as an inert material while

17   in vivo; however, polypropylene is susceptible to

18   oxidation, resulting from exposure to strong

19   oxidants such as hydrogen peroxide and hypochlorous

20   acid"; right?  You would disagree with that?

21   A.  Yes.

22   Q.  And you would disagree with the statement

23   here that, "These by-products of the inflammatory

24   response may degrade and embrittle the material,

Steven R. Little, Ph.D.

1    causing it to become rigid."  You would disagree

2    with that?

3      A.  Yes, no one's shown that.  It's completely

4    speculation.

5             MR. THORNBURG:  Move to strike.

6      Q.  It's yes or no, Doctor.

7             MS. STEELE:  Oppose.

8      Q.  Whether you agree with something or disagree

9    with it, that's a yes or no question; okay?

10             Now, the sentence goes on to say,

11   "Materials used for other types of medical implants

12   (polyethylene in orthopedics and polyurethane in

13   pacemaker leads) have also demonstrated degradation

14   secondary to oxidation."

15             Do you agree or disagree with that?

16     A.  Well, I mean, I'll say that I haven't spent

17   as much time looking into polyethylene, for

18   instance, as I have polypropylene.

19     Q.  Well -- but the only time you've spent

20   researching this issue specifically was when you

21   got involved in this litigation.

22     A.  Well, I mean, I would say that's not right.

23   I mean, I definitely was aware of what was going on

24   in this general area before this point.

Steven R. Little, Ph.D.

1      Q.   Okay.  And if you -- look at the case

2    description, do you see that?

3      A.   Yes.

4      Q.   Okay.  And this describes a -- a female

5    patient who underwent hernia surgery; correct?

6      A.   Yes.

7      Q.   And do you know what products she had

8    implanted?

9      A.   Looks like she had a PTFE mesh that was

10   implanted in 1997.  (Witness reviewing.)

11     Q.   She also had a Kugel implanted?

12     A.   October 2001, yes.

13     Q.   Okay.  And do you have any background in

14   Kugel mesh?

15     A.   Well, I know that it's a PTFE mesh,

16   polytetrafluoroethylene.

17     Q.   Is it a -- is it a -- is there any

18   polypropylene in it?

19     A.   I'm not aware of there being polypropylene

20   in it.

21     Q.   Is it a composite?

22     A.   It is.  I don't remember the specifics of

23   the composite.

24     Q.   Okay.  Do you recall what the results were

Steven R. Little, Ph.D.

1    from this study?

2      A.  Yeah, I mean, the results section shows the

3    explanted -- showed the explanted Kugel composite

4    mesh.  And it is polypropylene composite and PTFE.

5    And there's SEMs, DSCs.  There's a TGA analysis.

6    And the following pages.

7      Q.  Do you know what resin Bard used in its

8    Kugel composites, which polypropylene resin?

9      A.  Off the top of my head, no, I don't

10   remember.

11     Q.  Do you know if it was Marlex?

12           MS. STEELE:  Object to form.

13     A.  I mean, if it's in the manuscript, I can

14   look here.  I don't remember off top of my head.

15     Q.  Would you consider whether or not it was

16   Marlex?

17           Did you -- did you ask Boston

18   Scientific if Bard also used Marlex resin?

19           MS. STEELE:  Object to form.

20     A.  I mean, I don't remember if I had that

21   conversation.  Again, this was sort of in the

22   context generally of polypropylene.

23     Q.  Okay.  And these scientists performed

24   scanning electron microscopy; right?

Steven R. Little, Ph.D.

1    A.  Yes.

2    Q.  Differential scanning calorimetry; right?

3    A.  They did, yes.

4    Q.  Thermogravimetric analysis, TGA; correct?

5    A.  Yes.

6    Q.  Histology; right?

7    A.  Yes.

8    Q.  And those were all studies that you or -- or

9    techniques that you, I believe, testified that you

10   could do but were not asked to -- to do on any

11   explanted Boston Scientific Marlex products;

12   correct?

13           MS. STEELE:  Object to form.

14   A.  Right.  So I was not asked to do that.  You

15   know, if there was -- if there were mesh available,

16   then I think that it would be helpful to perform

17   the analysis.  But again, with respect to the

18   report -- the conclusions that I -- I come up with

19   in my report, that's based on the literature.

20           MR. THORNBURG:  Move to strike

21   everything after, I was not asked to perform that

22   analysis.

23           MS. STEELE:  Opposed.

24   Q.  If you look at the conclusion section of

Steven R. Little, Ph.D.

1    this article, the authors conclude that overall,

2    "The results support our hypothesis that in vivo

3    oxidation plays a role in the degradation of

4    polypropylene hernia mesh materials and that there

5    may be a difference in the degree of oxidation

6    between a heavyweight material and a lightweight

7    material because of a reduced inflammatory

8    response."

9                Did I read that correctly?

10    A.  Yes, you did.

11    Q.  Do you agree or disagree with that

12    statement?

13    A.  I disagree with that, and I can tell you why

14    specifically.

15    Q.  What's the basis for your disagreement?

16    A.  Well, so first of all, these meshes weren't

17    cleaned.  They were only cleaned for two hours.

18    And they were placed in formalin.  So it's clear

19    from the literature --

20    Q.  So, they weren't -- hold on -- hold on one

21    second.

22                MS. STEELE:  He was still finishing his

23    answer.

24    Q.  But you said they weren't cleaned but they

Steven R. Little, Ph.D.

1    were cleaned; correct?

2    A.  Should I --

3              MS. STEELE:  You can answer.

4    A.  -- finish my answer?

5              MS. STEELE:  Finish your answer.

6    Q.  They were cleaned; correct?

7    A.  Well, they were -- they were -- okay.  So it

8    depends on what you mean by cleaned.  What happened

9    was they were placed in, essentially, bleach for

10   two hours, okay, which --

11   Q.  What type of material -- what type of

12   reagent were they placed in to remove the tissue?

13   A.  Sodium hypochlorite solution, 6 to 14

14   percent active chlorine, two hours, 37 degrees, and

15   then rinsed.

16   Q.  Okay.  So you've never performed a -- you've

17   never attempted to clean tissue off of any

18   polypropylene explanted device; correct?

19   A.  Again, specifically, I have not analyzed

20   polypropylene explants.  But I can tell you that

21   it's clear from the literature that this is not

22   enough to clean it; and that's why previously, when

23   I was answering the question, when you said

24   cleaned, it's clearly not cleaned.

Steven R. Little, Ph.D.

1    Q.  You didn't -- did you compare the protocol

2    used by these researchers to the protocol

3    established by the ASTM?

4              MS. STEELE:  Object to form.

5    A.  I recall in the ASTM that there's more to be

6    done to clean the explants.  The specifics, I can't

7    recall.  But it's clear from this paper, that it's

8    not cleaned.

9    Q.  Can overexposure to sodium hypochlorite lead

10   to oxidation of polypropylene?

11   A.  Um, I think that studies have been done, off

12   the top of my head, to show that exposure to sodium

13   hypochlorite did not result in oxidative

14   degradation of polypropylene.  But what I can tell

15   you is, is that if all you do is do this level of

16   attempt at cleaning and it doesn't clean it, then

17   your results that are based on, you know, for

18   instance, SEM analysis where it says that, you

19   know, you can see a film on the top and it's

20   cracked so therefore it's -- proves that it's

21   degraded, that's a -- that's a faulty conclusion.

22   Q.  Is your opinion that it was not cleaned well

23   enough based on your review of the publications by

24   Dr. Thames and Dr. de Tayrac?

Steven R. Little, Ph.D.

```
 1      A.  That's one of the papers.  It's one of the

 2   more recent ones.  But there are other papers in

 3   the past as well where you can --

 4      Q.  Which papers?  Which papers?

 5      A.  Well, you can see, for instance, in

 6   Dr. Mays' paper that that level of cleaning doesn't

 7   remove the tissue.  It's very clear there's tissue,

 8   and I'm pretty sure that he even admits that it's

 9   not cleaned off, that there's tissue there.

10      Q.  That's your opinion; right?

11           COURT REPORTER:  I'm sorry?

12           MS. STEELE:  He was still finishing.

13      Q.  That's your opinion; correct?

14      A.  I --

15      Q.  Correct, Doctor?

16      A.  Do you want me to keep going, or do you --

17      Q.  Well, let me ask you --

18      A.  -- did you ask a new question?

19      Q.  -- is it fair to say that the -- the -- the

20   focus of your opinion that you rely on comes from

21   Dr. Thames and Dr. de Tayrac?

22           MS. STEELE:  Object to form; asked and

23   answered.

24      A.  So I was answering the question before.  I'm
```

Steven R. Little, Ph.D.

1    lost in the -- I'm trying to answer your questions,

2    and -- and you're interrupting me, so I don't know

3    what question we're on.

4      Q.  So your -- your opinion that these authors

5    and authors like Dr. Ramshaw and others who have

6    concluded that explanted polypropylene mesh

7    material degrades in vivo is based primarily on

8    your reliance on the publication by Dr. Thames and

9    Dr. de Tayrac; correct?

10          MS. STEELE:  Object to form; asked and

11   answered.

12     A.  I think -- what I would say is that those

13   two manuscripts are evidence of what I'm saying,

14   but there are a number of other manuscripts that

15   show that the type of cleaning that's performed is

16   not removing biological tissue.  And I gave an

17   example, one of which was a manuscript where the

18   corresponding author was Dr. Mays; I believe the

19   first author was -- last name was Imel.

20     Q.  Dr. Mays who has concluded that explanted

21   mesh devices degrade; correct?

22     A.  Well, so, for instance, he's concluding that

23   they degrade because he can see cracks on the

24   surface in the same way that this is concluding

Steven R. Little, Ph.D.

1    that there's cracks on the surface, but you can't

2    use that as evidence if the material is not cleaned

3    off.

4        Q.  Okay.  So the basis for your -- the primary

5    basis for your opinion sounds to me like Dr.

6    Thames, Dr. De Tayrac, and some of the work that

7    Dr. Mays has done in this litigation; is that

8    correct?

9        A.  And others.

10       Q.  And you don't -- sitting here today, you

11   can't name any others?

12       A.  I'd be --

13           MS. STEELE:  Object to form.

14       A.  I'd be happy to go through and look at these

15   to see all of the ones that suggest that it's not

16   cleaned off.  I mean, you go back to the earliest

17   papers and the authors say that you can't conclude

18   that it's oxidative degradation because it's

19   possible that it's still biological material on

20   there.

21       Q.  Okay.  Well, let's look at Dr. Thames'

22   publication really quick.  We'll mark that as

23   Exhibit No. 5.

24           (Little Deposition Exhibit 5 was marked

Steven R. Little, Ph.D.

```
1    for identification.)

2      Q.  Are you there?

3      A.  I am.

4      Q.  Okay.  And we're looking at the publication

5    by Dr. Thames, Joshua White, and Kevin Ong;

6    correct?

7      A.  Yes.

8      Q.  Okay.  And if you look at each -- each one

9    of their names has a footnote.  Do you see that?

10     A.  Yes.

11     Q.  Okay.  And are you aware that -- from

12   reviewing this publication that Mr. White and

13   Mr. Ong work for a company called Exponent?

14     A.  Yes.

15     Q.  Okay.  And are you aware that Exponent has

16   been retained by the mesh manufacturing defendants

17   including Boston Scientific --

18          MS. STEELE:  Object to form.

19     Q.  -- concerning the issue of mesh degradation?

20          MS. STEELE:  Object to form.  We have

21   not -- assumes facts not in evidence.

22     Q.  Well, are you aware that Exponent has been

23   retained by Bard and Ethicon, at least?

24          MS. STEELE:  Object to form.
```

Steven R. Little, Ph.D.

```
1    A.   I'm pretty sure that this says that the work
2    done by -- there was work done by White and Ong for
3    Ethicon, yes.
4    Q.   Do you know how many millions of dollars
5    Exponent has been paid to serve as experts by
6    Ethicon, Bard, and others in the context of this
7    mesh litigation?
8              MS. STEELE:   Object to form.
9    A.   I do not, but if the implication is that
10   they've been paid to forge this data, it would be
11   ridiculous.  When you look at this paper, it's very
12   clear.  Everything is shown.  It's described in
13   detail.  The results are very clear.
14   Q.   Do you agree that money can impact the
15   biases of witnesses?
16             MS. STEELE:   Object to form.
17   A.   I think that it's possible that money can
18   impact biases of witnesses.  In this case, you're
19   talking about Shelby Thames, who, you know, I -- I
20   guess I can't imagine, you know, that name and then
21   looking at this paper, where, you know, basically
22   everything is shown.  It looks like everything's
23   very clearly shown here.  There's nothing hidden.
24             MR. THORNBURG:   Move to strike.
```

Steven R. Little, Ph.D.

1    Q.  We're going -- we're going to talk about

2    the -- the details --

3              MS. STEELE:  Opposed.

4    Q.  -- of the study, but you aren't aware that

5    Exponent has been paid millions of dollars --

6              MS. STEELE:  Object to form.

7    Q.  -- by the manufacturers who are defendants

8    who are defending claims by plaintiffs concerning

9    injuries they suffered as a result of polypropylene

10   mesh devices?  You aren't aware of how many

11   millions of dollars they've been paid; correct?

12             MS. STEELE:  Object to form.

13   A.  I am not aware of the details of their

14   payment.

15   Q.  Do you know or were you aware that

16   Dr. Shelby Thames is also a paid expert in the

17   Ethicon and Johnson & Johnson polypropylene mesh

18   litigation?

19             MS. STEELE:  Object to form.

20   A.  I'm not aware of the details of that, no.

21   Q.  Do you know how many millions of dollars Dr.

22   Shelby Thames has been paid concerning his work in

23   the mesh litigation?

24             MS. STEELE:  Object to form.

Steven R. Little, Ph.D.

```
 1      A.  I'm not.

 2      Q.  But all of these authors are paid experts in

 3   the Ethicon litigation; correct?

 4      A.  Yeah, and I think that most of the authors

 5   publishing on this topic today are paid by either

 6   plaintiffs or defendants.

 7      Q.  Well, what about Dr. Ramshaw; is he paid?

 8      A.  I don't know the details of -- of

 9   specifically who's getting paid what.  No, I don't

10   know.

11      Q.  Okay.  Assume with me that Dr. Ramshaw is

12   not a paid expert in this litigation.  Okay?

13      A.  Okay.

14      Q.  And he concluded -- he concluded, which you

15   had disagreed with, but he concluded that

16   polypropylene mesh degrades; correct?

17           MS. STEELE:  Object to form.

18      A.  And we talked --

19      Q.  And --

20           MS. STEELE:  He was answering.

21      Q.  So let's look at the cleaning protocol that

22   was used by Dr. Shelby Thames.  On page 288 of

23   Exhibit 5.

24           MS. STEELE:  You may need to look at the
```

Steven R. Little, Ph.D.

1    one she gave you.

2      A.  (Witness reviewing.)  Okay.

3      Q.  Okay.  And Dr. Thames lays out a 23-step

4    cleaning process; correct?

5      A.  Yes.

6      Q.  Where he exposed the explanted mesh

7    materials to hours and hours of sodium

8    hypochlorite; right?

9      A.  Yes.

10     Q.  Have you ever sodium hypochlorite to remove

11   tissue from any explanted device?

12     A.  Yes.

13     Q.  Okay.  Which device?

14     A.  It was -- I believe that we just used it to

15   clean off some implants that we had that were made

16   of -- the materials we used was some

17   polyester-based materials.

18     Q.  Okay.  And did you publish that in a

19   peer-reviewed publication?

20     A.  I don't recall.

21     Q.  And how did you validate your -- your

22   cleaning protocol?

23     A.  I'm not understanding, how did you validate

24   it.

Steven R. Little, Ph.D.

```
1       Q.  Did you validate your cleaning protocol?

2       A.  No, we didn't -- I'm just saying that we

3   used it to try to clean off some things.  We didn't

4   go through validation stages.

5       Q.  How many hours of -- how many hours did you

6   expose the -- that device to after it was

7   explanted?  How many hours did you expose it to

8   sodium hypochlorite?

9       A.  I don't remember.

10      Q.  Was it an hour or less?

11      A.  I don't remember.

12      Q.  Can you give me a fair estimation?

13      A.  I -- I don't remember.

14      Q.  How many hours did Dr. Thames expose the

15  explanted Prolene mesh devices to?

16      A.  In the first -- in the first cleaning

17  sequence, it was five minutes to six and a

18  half hours depending on the bulk tissue.  Cleaning

19  sequence two, it was one and a half to two hours.

20  Three was four to six hours.  And then cleaning

21  sequence five included a four to twenty hour

22  exposure.

23      Q.  So up to thirty-four and a half hours?

24      A.  Yeah, approximately, yes.
```

Steven R. Little, Ph.D.

1    Q.  Okay.  And he also shook the explanted

2    devices in sonication and ultrasonication machines

3    for several hours; correct?

4    A.  Yes.

5    Q.  And he also exposed it, these explanted

6    devices, to -- to Proteinase K; correct?

7    A.  Yes.

8    Q.  And do you know when he actually performed

9    any FTIR analysis of these explanted devices, what

10   step?

11   A.  It was in the materials characterization

12   step after cleaning, in the blue.

13   Q.  Which step was that?

14   A.  It would have been after all of the steps in

15   the blue box.

16   Q.  Is it your understanding that he used FTIR

17   at each one of those material characterization

18   phases?

19   A.  Yes, if you go to Figure 6, it says --

20   there's the FTIR of the progressive cleaning steps.

21   Q.  Okay.  And -- and so the blue one would have

22   been the first step and -- and then this is just

23   layover of each one of the steps; correct?

24   A.  Yes.

Steven R. Little, Ph.D.

1    Q.   And the blue -- the first blue step would

2    have been the very first FTIR that he would have

3    performed; correct?

4    A.   Yeah, before cleaning.

5    Q.   Which shows an FTIR spectrum at 165167, and

6    158372, correct, and a number of other spectrums,

7    but --

8    A.   Yep.

9    Q.   -- those are spectrums closest to a spectrum

10   where you could see oxidation?

11            MS. STEELE:   Object to form.

12   A.   Well, what you -- what you would see is you

13   would see peaks, but if there's biological material

14   there, you wouldn't be able to see oxidation.

15   Q.   Doctor, where would you see a peak at on an

16   explanted polypropylene mesh if it was oxidized?

17   A.   Well --

18            MS. STEELE:   Object to form.

19   A.   Differentially from the regular

20   polypropylene, you could see that were ultimately

21   results of the disproportionation reaction that is

22   hypothesized to occur on these kind of implants in

23   vivo, and it would be in the regions that are shown

24   here with the green; but in those two regions, you

Steven R. Little, Ph.D.

1    would also see similar peaks for amide bonds.

2       Q.  Well, you'd see double amides; right?

3       A.  I'm sorry?

4       Q.  You'd see a double amide if it was protein;

5    right?

6       A.  Well, I think -- I think that you would see

7    peaks there.  What exactly you would see I think

8    would depend on all kinds of things including

9    formaldehyde fixation and -- I mean, I'm not going

10   to comment on specifically what you would see.

11      Q.  Well, do you know what you would see if you

12   had protein?

13      A.  Yeah, I mean, you would see -- you would see

14   peaks that would --

15      Q.  A double -- a double amide; right?

16            MS. STEELE:  Please don't interrupt him.

17            Dr. Little, you can finish your answer.

18      A.  You would see stretching and bending

19   peaks -- peaks associated with amide bonds which

20   would be your carbon double-bond oxygen, which is

21   your ketone group, and you could see stretching

22   from single bonds that would be over to the left.

23      Q.  Where would you see the double amide peak?

24      A.  The double amide peak, what are you

Steven R. Little, Ph.D.

1    referring to?  Double amide peak?

2       Q.  Yep, are you familiar with double amide?

3       A.  Double amide.  I'm not -- I'm not

4    remembering what you're talking about here with

5    double amide.  Could you please define?

6       Q.  Can you define it?  You've never heard of it

7    before?  You're not aware of it?

8       A.  The specific term that you're using, "double

9    amide," I'm not -- no, I'm not remembering.  If you

10   could -- if you could tell me what you mean by

11   that.

12      Q.  Well, let me ask you this question.  If you

13   had oxidized polypropylene, you would see a -- an

14   oxidization peak on the FTIR spectrum at somewhere

15   between 1800 and 1650, approximately; correct?

16      A.  I think you would see that, yes.

17      Q.  And have you ever intentionally oxidized

18   polypropylene before?

19      A.  I've not intentionally oxidized it, no.

20      Q.  Have you ever looked at any studies that

21   intentionally oxidized polypropylene to determine

22   where the peak would be located in a degraded --

23   intentionally degraded polypropylene mesh?

24      A.  I think so, yes, I remember studies with

Steven R. Little, Ph.D.

1    that.

2       Q.  Okay.  And would 1740, give or take a few

3    reciprocal centimeters, sound about accurate?

4       A.  In that range I think that sounds like that

5    makes sense.  There can be shifts for various

6    reasons, but yes.

7       Q.  That's why I said give or take a few

8    reciprocal centimeters; right?

9       A.  Well, I don't know if I -- I would say give

10   or take a few reciprocal centimeters; I would need

11   to look into that, but I know shifting can occur.

12      Q.  Have you looked into that?

13      A.  Looked into specifically all of the

14   circumstances and -- no, I have not.  But I just

15   know that it's -- it can be in that area and then

16   it can -- it can shift depending on the

17   circumstances.

18      Q.  Okay.  And if we look at the top figure on

19   page 291 of Exhibit 5, have you ever -- have you

20   been trained in looking for shoulder peaks?

21      A.  Have I been --

22      Q.  Do you know what I mean by shoulder peaks?

23      A.  Well, if you're -- if you're referring to

24   something that would overlap that would look like a

Steven R. Little, Ph.D.

1    shoulder, I think I know what you mean.

2      Q.  Okay.  What do you think I mean?

3      A.  That's what I just described to you.  But --

4      Q.  You could have -- you could have one -- you

5    could have two peaks that are -- one that you can

6    only see the shoulder and the other where you can

7    see a higher peak which is identifying chemical

8    differences?

9              MS. STEELE:  Object to form.

10     A.  Um, so I think I know what you mean.  I'm

11   not -- I'd have to look into this a little bit more

12   to -- to determine what could be responsible for

13   it.  I know that it can represent multiple peaks.

14     Q.  It could represent two different bidens

15   (phonetic); correct?

16     A.  Again, I'd want to look into this, but I

17   think it can, yes.

18     Q.  Okay.  And on -- if you look at the top

19   figure, you can see there's a peak at 1651?

20     A.  Okay.

21     Q.  And do you see there's a shoulder on that

22   broad peak at between 1800 and 1740?

23              MS. STEELE:  Object to form.

24     A.  I think I see what you're seeing; I'm not

Steven R. Little, Ph.D.

```
 1    sure I would call it that.

 2      Q.  What would you call it?

 3      A.  I don't know.  I mean, whether or not that

 4    is a signal that could be attributed to any

 5    particular thing, I'm -- I'm not sure they say, nor

 6    would I be able to say.

 7      Q.  Well, you know, in the Wood article,

 8    Dr. Wood and her colleagues who actually personally

 9    analyze explanted polypropylene, had determined

10    that in their conclusion polypropylene had degraded

11    based on a peak at about 1740 reciprocal

12    centimeters; correct?

13      A.  Let me find that paper.

14            THE WITNESS:  Do I have it here, Andrea?

15            MS. STEELE:  Yes.  It's Tab 12.

16            THE WITNESS:  Okay.

17            MR. THORNBURG:  We'll go ahead and mark

18    Wood as Exhibit 5 -- I'm sorry, 6.

19            (Little Deposition Exhibit 6 was marked

20    for identification.)

21            THE WITNESS:  Thanks.

22            MS. Steele:  Yep.

23      Q.  Are you there?

24      A.  I am.
```

Steven R. Little, Ph.D.

1      Q.   Okay.  And have you -- are you familiar with

2    the Wood article?

3      A.   I am.

4      Q.   And you understand in -- that the

5    researchers in this article had determined that the

6    poly- -- explanted polypropylene had degraded based

7    on their FTIR analysis?

8            MS. STEELE:  Object to form.

9      A.   Well, I think they -- they said that it --

10   that's one of their conclusions, but they make

11   conclusions about the other two materials as well,

12   that are similar.

13     Q.   Well, that's fine.  But their conclusions

14   about polypropylene was that it degraded; correct?

15     A.   Well, I think their conclusion is that all

16   three of them do; but, you know, for instance,

17   these other two polymers don't even have the bond

18   that we're talking about breaking, so.

19     Q.   Okay.  Do you want to talk about the bonds

20   of the other two polymers?  Because we can if you

21   want to.  Or do you want to focus on the

22   polypropylene here for a minute?

23           MS. STEELE:  Object to form.

24     A.   Are you asking -- is there a question?

Steven R. Little, Ph.D.

1    Q.   Yeah.  Let's -- why don't we try to focus on

2    my question; okay?  The authors of the Wood article

3    determined that the polypropylene explant --

4    explants had degraded in vivo; correct?

5              MS. STEELE:  Object to form.

6    A.   (Witness reviewing.)  Well, they conclude --

7    Q.   Let me -- let me do you a favor.  If you to

8    turn page 1120.

9    A.   Yeah, I'm there.  That's actually what I was

10   going to be reading from here.

11   Q.   Okay.  And this is under the section they

12   title Polypropylene; correct?

13   A.   Yes.

14   Q.   Okay.  And these authors summarize their

15   findings; correct?

16   A.   Yes.

17   Q.   And they write that both the scanning

18   electron microscopy and ATF -- ATR-FTIR provide

19   characterization of the surface morphology and

20   surface chemistry, respectively, but it is also

21   necessary to determine if the bulk properties of

22   the polypropylene material also changes.  Figure 6

23   displayed MS -- I'm sorry -- MDSC data which showed

24   a significant difference in delta H -- do you know

Steven R. Little, Ph.D.

1    what delta H means?

2      A.  I do.

3      Q.  What does delta H mean?

4      A.  It is the -- well, it's a enthalpy.  It's a

5    change in enthalpy.

6      Q.  It's the -- is it the heat of fusion or the

7    change in enthalpy?

8      A.  Here the delta H -- the difference is

9    delta H and melting point -- it's the heat -- it's

10   the heat of enthalpy.

11     Q.  Right.  And they're -- and they compared the

12   heat of enthalpy to what, Doctor?

13     A.  It's enthalpy.

14     Q.  The heat of enthalpy to what, Doctor?

15     A.  The -- the graph shows the molar heat of

16   enthalpy per -- for the individual groups.

17     Q.  Okay.  So they were performing some thermal

18   analysis; is that accurate?

19     A.  Yes.

20     Q.  Okay.  And they determined that the

21   explanted samples of the polypropylene displayed a

22   lower heat of fusion and lower melt temperature;

23   right?

24     A.  Well, they -- they determined that what they

Steven R. Little, Ph.D.

1    analyzed showed a change, but that included --

2      Q.  Right.

3      A.  -- the polypropylene and any of the other

4    biological material that would have been on or in

5    it.

6      Q.  Well, it was indicative of oxidatively

7    degraded polypropylene, wasn't it?

8              MS. STEELE:  Object to form.

9      A.  No.

10     Q.  Pardon me?

11     A.  No.

12     Q.  Based on what?

13     A.  Well, if you have other material in there,

14   especially if the polymer is, for instance,

15   plasticized, it's going to demonstrate different

16   properties using thermal testing.

17     Q.  What's that opinion based on, Doctor?  Your

18   review of Dr. -- that's based on your review of

19   Dr. Thames' report; right?

20             MS. STEELE:  Object to form.

21     A.  No.  It's based on understanding that if you

22   have a plasticizer in a material, it's going to

23   change the thermal properties.

24     Q.  How so?

Steven R. Little, Ph.D.

```
 1      A.  Well, um, the thermal properties are based

 2   on -- I mean, you're basically heating the material

 3   up.  So everything's wiggling around, and then it

 4   wiggles around more.  And then when it goes through

 5   a change, for instance, the amount of heat that

 6   causes it to go through that change can be

 7   examined.  But when you have something that, for

 8   instance --

 9      Q.  Well --

10      A.  -- is between the chains leading to chain

11   movement or more chain movement, then it will

12   change the rate or -- the rate of change or the

13   amount of heat required in order to observe a

14   thermal event, for instance.

15      Q.  Well, do you know if it changes it in a way

16   that would make it more difficult -- in other

17   words, you'd have to have more heat applied to the

18   explant to remove the material -- to melt the

19   material or less?

20      A.  Um, well, I mean, you've -- you now have

21   other material on there, too, so I guess I'm -- I'm

22   not sure exactly -- I mean, it just becomes more

23   complicated whenever you have biological material

24   in there.  The example that I just gave you, which
```

Steven R. Little, Ph.D.

1    is that you would have a plasticizer in it, then

2    that means that there would be less heat, but

3    that's for that specific example, to go through a

4    transition.

5      Q.  Would -- it's your opinion that a

6    plasticizer -- and by plasticizer, are you

7    suggesting to the ladies and gentlemen of the jury

8    that when explanted polypropylene material is

9    placed into formalin it becomes a -- there's some

10   sort of formaldehyde-protein bond that occurs?

11     A.  Well, so now we're talking about, I think,

12   something different.  But yes, if you have

13   biological material that's on the fiber, for

14   instance, protein specifically, and you add

15   formalin, then it can form crosslinks in a protein

16   coat.

17     Q.  Would that -- would that cause the polymer

18   to be more difficult to melt or easier to melt?

19          MS. STEELE:  Object to form.

20     A.  Well, like I said, I think it's sort of

21   complicated because you could potentially have

22   fatty acids that would be there, too.  And the rate

23   at which each of these would impact the final

24   results, I'm not sure.

Steven R. Little, Ph.D.

1            I think that what I'm trying to say is

2     that what's really important is that you -- you

3     clean them properly before you do this.  I think

4     these results can be --

5        Q.  It's also important --

6            MS. STEELE:  He's still speaking.

7        Q.  I apologize.  But if you're reading the data

8     and you're drawing conclusions from the data, it

9     would be important for you to know or to offer an

10    opinion as to -- and back that opinion up as to why

11    you think their conclusion that the DSC findings

12    demonstrated or were indicative of oxidatively

13    degraded polypropylene was incorrect and then back

14    that up.

15       A.  Well, I was -- I was --

16           MS. STEELE:  Object to form, and it

17    mischaracterizes the article.

18       A.  Yeah, I mean, I was answering the question

19    and you interrupted me.

20       Q.  You said it was complicated.  It's a very

21    complicated thing.  Well, do you know whether or

22    not the heat of enthalpathy -- enthalpy will go

23    down or will go up if this material -- if this

24    explant was not properly cleaned and was put in

Steven R. Little, Ph.D.

1    formaldehyde?

2              MS. STEELE:  Object to form.

3      A.   And so what I was trying to say before is

4    that you have multiple species that could be

5    exhibiting a number of different effects here.  So

6    what I think is that what's really important is

7    that you clean it and you show that it's cleaned.

8    So what you're doing is your analyzing just the

9    polypropylene before you come to your

10   determination.

11     Q.   Okay.  And if you -- if you turn to

12   page 1114 of Exhibit 6, you're not suggesting that

13   Dr. Wood, Dr. Cozad, Dr. Grant, Dr. Ostdiek,

14   Bachman, or Grant didn't clean this explanted

15   material, are you?

16     A.   I'm suggesting that the final result was

17   that it was not cleaned; they place it in 10

18   percent formalin solution and then also used sodium

19   hypochlorite but that that did not clean it.

20     Q.   Okay.  But they -- do you know what their

21   experience is on removing tissue from explanted

22   materials?

23              MS. STEELE:  Object to form.

24     A.   Well, I can say here that it says "remove

Steven R. Little, Ph.D.

1    residual tissue," but what, you know, they're not

2    talking about here is the amount of biological

3    material that would be directly on the surface of

4    the -- the mesh.  And I'm also referring to a

5    number of different articles that literally show

6    tissue still there; and that includes Dr. Mays'

7    article, and it also includes Dr. Thames' article,

8    amongst others.

9       Q.  We're going to get -- we're going to get

10   there; okay?  So let me ask you this question.  If

11   there was material still there, the FTIR would show

12   a peak -- strike that.

13            If there was biological material still

14   present in this explant that Dr. Wood and her

15   co-authors looked at, there would be a biological

16   finding on their spectrum; right?

17            MS. STEELE:  Object to form.

18      A.  Well, yeah, I mean, it's the same peaks

19   we're sort of talking about.  You would see these

20   ketone groups.

21      Q.  Yeah, like at 1650; right?

22      A.  In that area, yeah.  But --

23      Q.  Okay.  And --

24      A.  -- it could be definitely the peak that

Steven R. Little, Ph.D.

1    they're seeing here in Figure 3.

2        Q.  If you -- if you turn to 1118?

3        A.  Okay.

4        Q.  So these authors, not only did they do DSC

5    and determine that it was -- their DSC findings

6    were indicative of degraded polypropylene, but they

7    also did FTIR; correct?

8        A.  Yeah, but you -- there's some things in what

9    you just said that have a bunch of assumptions in

10   it that I don't agree with.

11       Q.  Well, you may not agree with them, but that

12   was the conclusions of these -- these authors who

13   actually looked at explanted polypropylene;

14   correct?

15            MS. STEELE:  Object to form.

16       A.  Well, so -- okay.  There's a couple of

17   issues here.  So first of all, when you say

18   degraded, we're talking about a technique that can

19   look, you know, what, less than a -- the size of a

20   human cell, down into this fiber.  So at best, you

21   are saying that you're seeing these C double bond O

22   peaks on the surface, which is -- does not in any

23   way indicate that the material is degraded; right?

24            So at best you're seeing a signal on the

Steven R. Little, Ph.D.

1    surface of the fiber, and analysis of the

2    degradation of the material would require you to

3    perform a whole bunch of different things;

4    cross-sectioning, it would require you to do things

5    like mechanical analysis, all this.  So I just want

6    to make sure the record's clear --

7      Q.  Well --

8      A.  -- that this is not showing degraded --

9    biomaterial's perspective degraded polypropylene.

10   At best it would show signals on the surface.

11     Q.  Well, hold on a second.  DSC in this

12   particular publication -- DSC is a bulk analysis;

13   right?

14     A.  Yeah, but we talk -- we just talked about

15   that.

16     Q.  Well -- but hold on.  We're going to talk

17   about some of the other data, but DSC is a bulk

18   analysis; correct?

19     A.  Yes.

20     Q.  And in that bulk analysis that these

21   researchers performed, they determined that the

22   polymer fiber, the polypropylene polymer fibers,

23   had undergone oxidative degradation to such a

24   degree that there was actually a drop in the

Steven R. Little, Ph.D.

1    molecular weight.

2              MS. STEELE:  Object to form.

3       Q.  That was their conclusion; right?

4              Because you -- you understand, don't

5    you, Doctor, that if there's a drop in the DSC then

6    you can correlate that drop to -- you actually

7    correlate that drop to a drop in the molecular

8    weight; correct?

9       A.  In a sample that is properly cleaned and

10   that's all you're looking at, you could correlate

11   that to a number of things including, potentially,

12   a drop in molecular weight.

13      Q.  And that's what these authors are -- are

14   attempting to show; correct?

15             MS. STEELE:  Object to form.

16      A.  That's what they're speculating based on the

17   data that they have.

18      Q.  Now, you testified a moment ago when we

19   looked at Dr. Thames' publication, the scientist

20   who's a paid expert and has been paid, his group,

21   his co-authors have been paid millions of dollars

22   by defendants in this litigation -- but you opined

23   that their FTIR of the first explanted material

24   showed a peak at 1650 which was indicative of

Steven R. Little, Ph.D.

1    biological material; correct?

2           MS. STEELE:  Object to form; comments by

3    counsel.

4      A.  Could you repeat the question?  I'm -- I'm

5    losing you here.

6      Q.  Well, when we looked at Dr. Thames'

7    publication and there was a peak at 1650, you

8    suggested that peak was biological in nature;

9    correct?

10     A.  Yes.

11     Q.  And I'm not disputing it because that was

12   before he'd really cleaned the material; right?

13          MS. STEELE:  Object to form.

14     A.  This sample was before cleaning, that you're

15   referring to, I believe.

16     Q.  Okay.  So now if we look at -- back to

17   Dr. Wood's article on 1118, we look at the spectrum

18   for -- sorry, on page 1117 -- okay, are you there?

19     A.  Yes.

20     Q.  Okay.  There's a peak at 1740 reciprocal

21   centimeters; this is of the -- their cleaned

22   polypropylene explant; right?

23     A.  I don't agree that it's cleaned.  It has

24   gone through a procedure to remove some residual

Steven R. Little, Ph.D.

1    tissue.

2       Q.  There's -- there's a peak at 1740; correct?

3       A.  There is a peak at 1740 in the explanted,

4    yes.

5       Q.  And you've testified earlier that a -- if

6    you intentionally oxidized polypropylene that you

7    would see a peak at about 1740, give or take a few

8    reciprocal centimeters; correct?

9       A.  No.

10          MS. STEELE:  Object to form.

11      Q.  That wasn't your testimony?

12      A.  No.

13      Q.  Okay.  The record will speak for itself.

14          If you look at page 1117, we have the

15   explanted polypropylene, and there's a peak at

16   1740; right?

17      A.  Yes.

18      Q.  And there's -- there is not a large, broad

19   peak at 1650, is there?

20      A.  Um, there's not a peak indicated here, no,

21   at 16 -- you're saying what was the -- the

22   reciprocal centimeters?

23      Q.  1650 reciprocal centimeters.

24      A.  I -- I guess what I would say is that I

Steven R. Little, Ph.D.

1    think that your 1740 here is biological material.

2        Q.  Based on what?

3        A.  Based on --

4        Q.  Based --

5        A.  -- how you can still see that there's

6    biological material on the fibers.

7        Q.  Have you gone to the Aldrich Library?

8        A.  The Aldrich Library, no.

9        Q.  You haven't gone to the Aldrich Library to

10   see what protein or biological material, what the

11   spectrum would be -- where the spectrum would be

12   found?

13       A.  Um, I mean, I generally understand where

14   the -- where you're going to see signals here.

15   It's actually, you know, indicated in the articles

16   that we just looked at.

17       Q.  Okay.  And they said that the spectrum would

18   be found at 1650 if it was biological in nature?

19            MS. STEELE:  Object to form.

20       A.  No, there's a -- there's a number of peaks

21   you'd see.  What I'm -- what I don't think it's --

22   you can comment on is where exactly you're going to

23   see this here, depending on how it's run, depending

24   on what is going on in the sample.  What I think is

Steven R. Little, Ph.D.

1    that in the -- in the Wood article what you're

2    seeing there is biological material for multiple

3    reasons, not the least of which that you can

4    literally see it on the fibers.

5       Q.  Doctor, you didn't go -- you didn't make any

6    attempt to go to the Aldrich Library to see where

7    biological material would show up on a -- on a

8    spectrum, FTIR spectrum?

9              MS. STEELE:  Object to form.

10      A.  I didn't specifically go to the Aldrich

11   Library, that specific source; but from my

12   understanding and education, you would see

13   biological signal where you're showing me this is

14   happening in -- on page 117 of Wood.

15      Q.  Have you gone to any spectrum -- FTIR

16   spectrum library to determine where on an FTIR

17   spectrum biological material would appear?

18      A.  I may have in the past; it's my

19   understanding just from my education and

20   experience.

21      Q.  On your education and experience?

22      A.  Yeah, and I mean, the work of a number of

23   others here in this area that are concluding the

24   same thing as me.

Steven R. Little, Ph.D.

```
1      Q.  Have you ever found in any of the library
2   spectrums that you've looked at that protein or
3   biological material would give you an FTIR spectrum
4   at 1740?
5            MS. STEELE:  Object to form.
6      A.  I mean, I could look at the charts.  There's
7   a number of different signals that it could give
8   you in those range.  You have bending; you have
9   stretching.  I mean, I'm not commenting
10  specifically on where you'd get it or whether
11  you're going to see it only in one place.
12     Q.  Isn't that the purpose of FTIR?
13     A.  There's limitations to what you conclude
14  with FTIR.  So what I don't think is what you're
15  implying is correct which is that you'd be able to
16  look at the difference here between 1740 and 1655
17  and tell the difference between the amide bond --
18  they're a range.  So whenever you look at the
19  charts that are published for this, when you see
20  it, there's a range that's given.
21     Q.  But you understand based on your knowledge,
22  training, and experience that the amide -- amide
23  bonds would appear somewhere on a spectrum of 1750
24  to 1500.
```

Steven R. Little, Ph.D.

```
1      A.   There's a range -- no.  So what I said,

2    there's a range and there's also multiple bonds.

3      Q.   But there's -- you can't point to one source

4    of information as you sit here today that would

5    suggest that an amide bond one or two, would --

6    would appear in the 1740 reciprocal centimeter

7    range; right?

8              MS. STEELE:  Object to form.

9      A.   No.  What I'm saying is, is that when I have

10   looked in the past to see, you know, where you can

11   find some of these peaks, there's a range that's

12   given.  Whether it's specifically the range that

13   you're talking about and giving me right now, I

14   would have to look into that to see what that is.

15   There's almost always a range that's given, and

16   those ranges can shift depending on the

17   circumstances.

18             So I do not think that you can

19   specifically call out that there's a difference

20   between 1740 and 1650 and therefore the two things

21   are different.  That's my opinion.

22     Q.   You don't -- your opinion is that the

23   Aldrich Library, for example, if it showed that an

24   amide bond would be somewhere below 1700 reciprocal
```

Steven R. Little, Ph.D.

1    centimeters, you would disagree with them?  You'd

2    disagree with the Aldrich Library?

3            MS. STEELE:  Object to form.

4       A.  Well, so what I would say is, again, that

5    it's going to depend on your circumstance and your

6    sample that you're testing.  There's multiple peaks

7    that we're seeing -- that you can potentially see

8    in these samples; those have each a range.  So what

9    I'm saying is it's my opinion that you can't just

10   pick one that was done at 1740, disparately in

11   another example and experiment pick one that's at

12   1650, and say that those two things are definitely

13   distinctly different.

14      Q.  Have you gone to the Aldrich Library to look

15   for potentially oxidized isotactic polypropylene to

16   determine where the oxidation peak would appear on

17   an FTIR spectrum?

18           MS. STEELE:  Object to form.

19      A.  I have not specifically gone to the Aldrich

20   Library.

21      Q.  Isn't that the purpose of the Aldrich

22   Library?  To help scientists or people who are

23   going to testify in trial to help them look at the

24   Library to determine that they're properly

Steven R. Little, Ph.D.

1    characterizing these chemicals --

2              MS. STEELE:  Object to form.

3     Q.  -- or these chemical findings?

4     A.  Well, I mean, any of these databases can

5    help you to properly identify them; but I don't

6    believe that it's the purpose of the Library to say

7    that you're going to be able to look at a spectrum

8    like you're looking at in Wood, look at a spectrum

9    like you are in Thames and say that those two are

10   distinctly different chemical entities done in

11   different experiments.  No, I don't believe that.

12    Q.  You think -- you think -- your opinion is

13   that the 1740 that we see, the very high, strong

14   1740 peak that we see in the Wood article, that you

15   cannot offer an opinion one way or the other if

16   there's any difference between the 1650 peak that

17   we see in Dr. Thames' work?

18    A.  Like I said, you're looking at --

19              MS. STEELE:  Object to form.

20    A.  -- multiple bonds here.  So could -- could

21   the predominance of the peak in Thames here be an

22   amide double bond and the predominance of the peak

23   that you're seeing here in Wood be a fatty acid

24   carbon-oxygen double bond?  I don't know.  I know

Steven R. Little, Ph.D.

1    there's lots of bonds.

2            What I would say is this, which as I

3    said before, that the most important thing is that

4    you properly clean it, you confirm that, and then

5    you could perform this analysis and make

6    conclusions -- which Wood clearly didn't do.

7    Q.  So you're critical of Dr. Wood's

8    conclusions, but you didn't take the time out of

9    your day while working on this litigation to go and

10   look at the Aldrich Library or some other spectrum

11   library to determine whether or not, for example,

12   cholesterol -- cholesterides, fatty acids, or

13   whatever you just said, would have a -- an FTIR

14   peak at 1740 --

15           MS. STEELE:  Object to form.

16   Q.  -- right?

17   A.  No.

18   Q.  You didn't -- you didn't do that.

19   A.  No, I did.  I -- I looked to see what the

20   ranges are and confirmed them to make sure that my

21   understanding was correct; but what I recall, and

22   this is typical, is that you see ranges of these

23   things.  In addition to the ranges, they can shift

24   depending on the circumstance.  In addition to

Steven R. Little, Ph.D.

1    that, you may have different bonds.  So an amide

2    double bond under one circumstance could give

3    you -- could give you a difference in signal from a

4    carbon double bond oxygen on a fatty acid that's

5    not in an amide configuration.

6              So to be honest with you, I don't

7    understand the need to go to this particular

8    database you're talking about to make the

9    confirmation.  I feel like I could do that without

10   looking into that particular database.

11   Q.   Okay.  But you didn't do that in preparation

12   for your opinions in this litigation; correct?

13             MS. STEELE:  Object to form.

14   A.   I didn't look at that particular database,

15   but I did check to see when I looked to see whether

16   it was in the ranges that I remember, and there's

17   nothing that would indicate to me that I needed to

18   then somehow go to the -- to the Aldrich database.

19             MR. THORNBURG:  I'm going to go ahead

20   and mark really quick as Exhibit No. 7 the Céline

21   Mary article.

22             COURT REPORTER:  I'm sorry?

23             MR. THORNBURG:  Céline Mary.

24             (Little Deposition Exhibit 7 was marked

Steven R. Little, Ph.D.

1     for identification.)

2     Q.  Doctor, before we go there, let me ask you

3     this question.  Do you have any opinion one way or

4     the other whether or not Prolene polypropylene mesh

5     devices have better stability than Marlex mesh

6     devices manufactured by Boston Scientific?

7                MS. STEELE:  Object to form.

8     A.  No, I didn't do an analysis of the

9     differences between the two.  My analysis was more

10    generally focused on polypropylene meshes as a

11    whole.

12    Q.  Not specific to Marlex or Prolene?

13    A.  Other than commenting on some of the details

14    of Marlex in my report, no.

15    Q.  Do you know what the additives package is in

16    the Prolene polypropylene used by Ethicon or

17    Johnson & Johnson?

18               MS. STEELE:  Object to form.

19    A.  Off the top of my head, I don't remember

20    what they are.

21    Q.  Do you know what design validation studies

22    may have been done by Ethicon to determine the

23    suitability of the antioxidant additives package it

24    chose to use for its Prolene product?

Steven R. Little, Ph.D.

```
 1                    MS. STEELE:  Object to form.

 2        A.   No, not that I recall, no.

 3        Q.   Okay.  If you look at Exhibit 7, Céline

 4   Mary -- and this is an article that you're familiar

 5   with; correct?

 6        A.   Yes.

 7        Q.   And this is authored by Céline Mary and a

 8   number of other scientists including Robert

 9   Guidoin?

10        A.   I can confirm that, yes.

11        Q.   Have you heard of Dr. Robert Guidoin before?

12        A.   No.

13        Q.   Have you heard of the Quebec Biomaterials

14   Institute?

15        A.   I have.

16        Q.   Okay.  They're a respected biomaterial

17   institute; correct?

18        A.   Yeah.  Like I said, I think so.

19        Q.   Okay.  And if you look at this -- and this

20   is dated 1998; right?

21        A.   Yes.

22        Q.   And you understand this was a study that --

23   a preclinical study that compared explanted Prolene

24   to another -- another polymer known as PVDF?
```

Steven R. Little, Ph.D.

1    A.  Yes.

2    Q.  And you understand, without going into great

3    detail yet -- but you understand that the

4    conclusions of these authors like Wood and like

5    Cozad was that polypropylene material will degrade

6    in vivo?

7              MS. STEELE:  Object to form.

8    A.  I understand that that's the conclusion that

9    they came to when looking at this data, yes.

10   Q.  And this would be more researchers who you

11   would disagree with; correct?

12             MS. STEELE:  Object to form.

13   A.  Well, so I would say that I disagree that

14   it's oxidizing.  And I disagree that it's

15   degrading.  There's parts of this, I believe, that

16   I agree with where the authors are suggesting that

17   this is biological material on the fibers.

18   Q.  Well, if we look at this, their conclusion

19   actually was that you can have biological material

20   on the fibers but that the polypropylene does

21   indeed undergo in vivo degradation; right?

22             MS. STEELE:  Object to form.

23   A.  Well, yeah, based on these pictures right

24   here that suggest this is biological material.

Steven R. Little, Ph.D.

1    Again, I disagree with that conclusion, but that's

2    what they concluded.

3       Q.   And if you look at the description

4    section -- the discussion section, sorry, they talk

5    about a stress cracking phenomenon.  Are you

6    familiar with environmental stress cracking?

7       A.   I'm generally familiar with the concept.  It

8    looks exactly like this biological material.  I'm

9    familiar with the concept.

10      Q.   And you're familiar with the concept that

11   when there's a drop in the crystallinity of

12   polypropylene materials, including fibers, that

13   there -- and there can be amorphous zones that are

14   created on the surface and that, for example,

15   estrogenized fatty acids -- I probably said that --

16   I probably butchered that -- but they can become

17   absorbed into the surface and expand and crack the

18   polypropylene?

19           MS. STEELE:   Object to form.

20      A.   No, what you just said doesn't sound

21   scientifically correct.

22      Q.   Okay.  So you would disagree with that?

23      A.   The way you just said --

24           MS. STEELE:   Object to form.

Steven R. Little, Ph.D.

```
 1      A.  -- that right there, yeah, that doesn't -- I

 2   guess I'm not understanding, but that doesn't sound

 3   scientifically correct to me.

 4      Q.  More ionic bonds of -- of esters --

 5           COURT REPORTER:  I'm sorry, can you

 6   repeat that?

 7      Q.  What is -- what is the onic -- ionic charge

 8   of esters?

 9      A.  Well, I mean an ester bond doesn't have a

10   charge.

11      Q.  It's your opinion that ester bonds don't

12   have charges?

13      A.  Yeah, a normal ester bond is not an ionic

14   bond.

15      Q.  What's an ionic bond of Marlex

16   polypropylene?

17           MS. STEELE:  Object to form.

18      A.  Marlex polypropylene is not -- does not have

19   an ionic bond.

20      Q.  Okay.  And let me ask you another quick

21   question; it's a little bit off topic.  But did you

22   ask for the design history file -- to review the

23   design history file in rendering any of your

24   opinions in this case?
```

Steven R. Little, Ph.D.

1          MS. STEELE:  Object to form.

2     A.  No, I don't think so, no.

3     Q.  So you don't know -- have any opinion

4  necessarily about the design history file of the

5  content -- content therein; correct?

6     A.  Not that I --

7          MS. STEELE:  Object to form.

8     A.  Not that I can recall, no.

9     Q.  Did ask you for one?

10          MS. STEELE:  Object to form.

11     A.  Not that I can recall, no.

12     Q.  Okay.  If we look at this really quick, and

13  I won't go into great detail here, but do you

14  recall reading that these authors and other authors

15  that they cite discuss a skin/core structure in

16  extruded polypropylene fibers?

17     A.  In the Mary article now we're talking about?

18     Q.  Yeah.  And she cites other authors like --

19  like the scientists Dr. Blais, et al.

20     A.  Okay.

21     Q.  You reviewed the publications by Dr. Blais?

22     A.  Not that I can recall, no.

23     Q.  This paragraph on page 205 of Exhibit 7, the

24  authors write, "The reason for this stress cracking

Steven R. Little, Ph.D.

1    phenomenon in oriented polypropylene monofilaments

2    has been explained by their pronounced skin/core

3    structure.  This bicomponent structure is created

4    by the differential cooling rates between the

5    external and internal layers of the monofilaments

6    during the melt spinning process, which leads to

7    the formation of a low order nonfibrillar outer

8    skin a few microns thick, and a highly oriented the

9    crystalline fibrillar inner core."

10                   Did I read that correctly?

11     A.  Right, so this is what they're speculating

12   in here.  They didn't do a study to show this.

13     Q.  Well, they -- they cited some publications;

14   right?

15     A.  Yes, but the speculation based on what

16   they've seen.  You didn't do a study where you --

17   you had any controls where you could make that

18   conclusion.  It's in the discussion section, so

19   it's a speculative reason as to why they could have

20   seen what they believe is a cracked surface, which

21   is very clearly biological material.

22     Q.  They cite to other scientists -- they say,

23   "Blais et al. identified a distinct separation and

24   different properties between these two layers.

Steven R. Little, Ph.D.

1    They found that the outer skin is more susceptible

2    to oxidative degradation than the fibrillar inner

3    core."

4              You didn't read Blais; correct?

5    A.  I didn't read -- read Blais no.

6    Q.  And so you didn't consider what Blais

7    thought, the work of Blais, and Dr. Blais'

8    findings; correct?

9    A.  No, I disagree with that.  I read this page,

10   and what I see is I see them speculating if what

11   they're seeing here on these SEMs is oxidatively

12   degraded polypropylene, which I do not believe it

13   is, they're saying that that could be a possible

14   reason for it; and they cite another article that

15   describes where that speculation came from, but

16   they do not prove that that's what it is.

17   Q.  You haven't proven that that's what it

18   isn't, have you?

19   A.  Well, when you look at all --

20              MS. STEELE:  Object to form.

21   A.  When you look at all of the literature, then

22   you can clearly see the pristine polypropylene

23   fibers underneath of this stuff.

24   Q.  When you -- when you cite to paid

Steven R. Little, Ph.D.

1    consultants like Dr. Thames and Dr. de Tayrac;

2    right?

3              MS. STEELE:  Object to form.

4    A.  Yeah, I mean, I guess I don't see how you

5    can have eleven-and-a-half-year fiber and then have

6    it -- the surface look exactly like this --

7    Q.  I'm going to show you.

8    A.  -- and then have the -- the piece of it come

9    off in a lock-and-key formation that underneath

10   shows a pristine fiber with the manufacturer's

11   striations.

12   Q.  We're going through the data, aren't we,

13   Doctor?  So you're relying on the find- -- the

14   publications by Dr. de Tayrac and Dr. Thames;

15   correct?

16              MS. STEELE:  Object to form.

17   A.  And all of the others that we talked about

18   before, going all the way back to the original

19   article that says that it could be biological

20   material on the surface and that you can't

21   conclusively say that it's --

22   Q.  You've never --

23   A.  -- oxidative degradation.

24   Q.  You haven't identified any others than

Steven R. Little, Ph.D.

1    Dr. de Tayrac and Dr. Thames --

2    A.  No, I offered --

3    Q.  -- (inaudible).

4         COURT REPORTER:  I'm sorry, I can't hear

5    you.

6         MS. STEELE:  Object to form.

7    A.  That's not correct.  I did offer others and

8    I also offered to go into it, and you kept going on

9    and interrupting me.

10   Q.  Okay.  So I'm going -- I'm going to have you

11   highlight for me at the end of this the ones that

12   support your opinion.  But we'll keep on going.

13        MS. KROTTINGER:  Hey, Dan, we need to

14   change the tape for the video.

15        MR. THORNBURG:  How much time do we

16   have?  I'd like to finish this line of questioning

17   real quick.

18        MS. KROTTINGER:  Three minutes left.

19        MR. THORNBURG:  Let's finish this real

20   quick.  Let's see how far we can get.

21   Q.  Blais -- they talk about Blais and Blais

22   "identified a distinct separation and different

23   properties between these two layers.  They found

24   that the outer skin is more susceptible to"

Steven R. Little, Ph.D.

1    oxidation -- "oxidative degradation than the

2    fibrillar inner core.  Cleavage of the polymer

3    chains causes relaxation of the folded lamellae,

4    increases in crystallinity and density, and

5    contraction localized to the outer skin.  This in

6    turn leads to a regular circumferential crack

7    formation at the surface, but only to the depth of

8    the outer layer.  Because this cracking is confined

9    to the outer layer (sic), which is clearly

10   distinguishable from the inner core structure, it

11   is not surprising to observe that, during abrasive

12   stresses, such as cleaning, there was a tendency

13   for the cracked rings at the surface to flake off

14   and separate from the underlying core material."

15             Did I read that correctly?

16   A.   Yes.  But I would just say --

17   Q.   And --

18   A.   I would just say that all of this is the

19   same thing that you would expect to have happen if

20   you had biological material on the surface.  You

21   would see the same thing.

22   Q.   Did Dr. Thames remove the outer layer in his

23   cleaning protocol that he used?

24             MS. STEELE:  Object to form.

Steven R. Little, Ph.D.

1    A.   I'm sorry, I'm not understanding your

2    question.

3    Q.   Would you -- would you agree with me that

4    the protocol that Dr. Thames and Dr. Ong

5    established, and which they cite to in the

6    publication we looked at a moment ago, shows a --

7    an abrasive cleaning procedure?

8              MS. STEELE:  Object to form.

9    A.   No.

10   Q.   Do you know if Dr. Thames ever analyzed the

11   outer layer after it was removed to determine

12   whether or not he was removing degraded

13   oxidatively -- or oxidatively degraded

14   polypropylene?

15   A.   Yes.

16   Q.   What -- what studies can you -- strike that.

17             I've taken the deposition of Dr.

18   Thames; I'm very familiar with his work.  He has

19   never collected the polypropylene material or the

20   material that was removed during his studies and

21   tested them to -- to validate that he wasn't

22   removing degraded polypropylene.

23             MS. STEELE:  Object to form.

24   Q.   Right?

Steven R. Little, Ph.D.

```
 1     A.  Well, he -- are you putting that testimony

 2   in, or is that a question?

 3     Q.  Well, for example, there's a -- there's an

 4   ASTM protocol concerning collecting the particulate

 5   matter from surface -- polypropylene surfaces that

 6   are being cleaned and a guideline to be followed to

 7   not only collect but also to test the removed

 8   material to determine whether or not the material

 9   that was removed was degraded polypropylene.

10   You -- you understand that there's an ASTM

11   concerning that exact issue; right?

12              MS. STEELE:  Object to form.

13     A.  Sure, but he checked the composition each

14   time he did the cleaning procedure, so you're

15   seeing what material was taken off and what's

16   underneath of it each time he cleaned.

17              MS. KROTTINGER:  Hey, Dan, we have to go

18   off.

19              MR. THORNBURG:  Okay.  We'll go off now.

20              THE VIDEOGRAPHER:  We're going off the

21   record.  The time is 12:32 p.m.

22              (Whereupon, a recess was taken.)

23              THE VIDEOGRAPHER:  This is the beginning

24   of disc three.  We are going back on the record.
```

Steven R. Little, Ph.D.

1    The time is 12:43 p.m.

2    BY MR. THORNBURG:

3      Q.   Dr. Little, before we took a quick break, we

4    were discussing the Mary article; right?   Correct?

5      A.   I thought we were discussing the Thames

6    article before the break.

7      Q.   We were talking about it in the context of

8    the Mary article, specifically the paragraph by

9    Dr. Mary and her colleagues on page 205 that

10   discusses how explanted polypropylene, as a result

11   of the oxidative degradation process that happens

12   in vivo, can cause the outer degraded layer to

13   crack and flake off and separate from the

14   underlying core material during abrasive cleaning

15   processes; right?

16            MS. STEELE:   Object to form.

17     A.   What -- I disagree that that's what's

18   happening, but okay.

19     Q.   You disagree with the Mary article; right?

20     A.   Well, so --

21     Q.   You disagree -- let me ask a better

22   question.

23            You disagree with the conclusions by

24   Dr. Mary and her colleagues; correct?

Steven R. Little, Ph.D.

1    A.   Some of them.

2    Q.   Including the opinion that the polypropylene

3    material degraded in vivo; right?

4    A.   Yeah, but, I mean, she also said that

5    there's biological material on there, so.

6    Q.   Right.  But she's not suggesting that they

7    have to be mutually exclusive; right?  I mean, you

8    can have biological material and also have

9    degradation.

10   A.   You -- you -- it is possible for you to have

11   biological material and degradation; but if you

12   have biological material on there, you may not be

13   able to detect any degradation.

14   Q.   And it's your opinion that -- and by the way

15   -- strike that.

16        You understand that the authors of the

17   Mary article cleaned the tissue from the explants;

18   right?

19        MS. STEELE:   Object to form.

20   A.   No, so they -- they admit in this article

21   that this -- there could be biological material on

22   it.  So they go through a procedure, and they admit

23   that it's -- there's still biological material on

24   there.  So it's the -- it's the definition of

Steven R. Little, Ph.D.

```
 1    clean.  So if you take it through a cleaning

 2    procedure, that does not mean that all of the

 3    biological materials are off.  And many authors

 4    explicitly state that, including Mary.

 5      Q.  Well -- and Mary, if you look at the

 6    "Morphologic and Chemical Studies," there's a

 7    cleaning procedure that's described; correct?

 8      A.  So there's a procedure that is discussed

 9    here.  It -- it should be noted that when you

10    say cleaning procedure --

11      Q.  My question to you --

12      A.  -- that does not mean that it's clean --

13      Q.  With all due --

14      A.  -- but it--

15      Q.  With all due respect, Doctor, this is going

16    to be a long day if you don't answer my question.

17    My question was simply, the Mary article outlines,

18    on page 200, the cleaning procedure that they used;

19    correct?

20      A.  No.  They do not say cleaning procedure.

21      Q.  Well, look at -- look at Exhibit 7.  Okay.

22    Are you there?  On page 200?  Bottom right-hand

23    corner.

24      A.  I'm not with you, I'm sorry.
```

Steven R. Little, Ph.D.

```
1       Q.  What are the bolded -- what are the bolded

2   words?

3               MS. STEELE:  Dan?  Dan, he's just --

4   we're --

5       A.  I'm not --

6               MS. STEELE:  Where are you?

7       A.  Page 200.

8               MS. STEELE:  Of Exhibit 7.

9       A.  Of Exhibit 7.  Okay.

10      Q.  And what are the -- what are the bolded

11  words on bottom right-hand corner?

12      A.  Sorry, I was in another article.  So it says

13  here, "Cleaning procedure."

14      Q.  Okay.  And they discuss the procedure that

15  they used to clean the explanted PVDF and Prolene

16  sutures; correct?

17              MS. STEELE:  Object to form.

18      A.  They describe a procedure that they use to

19  remove -- an attempt to remove material, yes, but

20  they say in there that not all of the biological

21  material is removed.

22      Q.  Okay.  And they actually talk about, in the

23  very first sentence, they say this was a -- they

24  used a technique that they established in their
```

Steven R. Little, Ph.D.

1    laboratory; right?

2      A.   Yes.

3      Q.   And they used "special care...when handling

4    the sutures during this cleaning process."  You

5    think that's important; don't you?

6              MS. STEELE:   Object to form.

7      Q.   Do you agree it's important to use special

8    care when handling specimens that are being

9    studied?

10              MS. STEELE:   Object to form.

11      A.   Well, it depends on what you mean by special

12    care.  But, yes, generally, scientists would, you

13    know, try not to drop something.  Yes.

14      Q.   You don't want to contaminate the product;

15    right?

16      A.   Sure.

17      Q.   If she's correct about the skin/core

18    morphology and that degraded polypropylene surface

19    material will break away from the inner core,

20    that's another reason why she'd want to be careful

21    in handling the material; right?

22      A.   Well, so --

23              MS. STEELE:   Object to form.

24      A.   So she -- the -- your question has

Steven R. Little, Ph.D.

1    assumptions in it that I don't agree with.  I do

2    not agree that she proved that that's what's going

3    on.  It was a speculative thing that was put in the

4    discussion section as to one possible reason as to

5    why.  The study was not done.

6        Q.  She exposed both the PVD -- I'm sorry, the

7    PVDF suture and the Prolene sutures to the same

8    cleaning process; right?

9        A.  I believe so, yes.

10       Q.  And that's important; right?  She's

11   comparing the Prolene to PVDFs to prepare the

12   studies, so you have to treat them the same; right?

13       A.  Depending on what you're trying to conclude,

14   yes.

15       Q.  When you're comparing the changes to the --

16   to the surface area of two of these sutures after

17   explantage from animals; right?  Correct?

18           MS. STEELE:  Object to form.

19       A.  Could you repeat that question, please.

20       Q.  She is -- you understand that she treated

21   the PVDF the same way she treated the Prolene?

22       A.  Yes.

23       Q.  Okay.  And the -- you understand that they

24   found that after one year and two years the

Steven R. Little, Ph.D.

1    polypropylene was more degraded than the PVDF;

2    right?

3              MS. STEELE:  Object to form.

4      A.  Well, they show more -- they show more

5    material on the surface which is what you would

6    expect from a fiber that is very good at promoting

7    ingrowth of tissue.  Right?  So that -- they show

8    that.  Their conclusion ultimately is they say that

9    there is degradation.  I just disagree with that

10   conclusion based on the data.

11     Q.  Okay.  And they're comparing two different

12   polymer sutures; correct?

13     A.  Yes.

14     Q.  Under the same environment; right?

15     A.  Yes.  Correct.

16     Q.  And the same cleaning protocol; correct?

17     A.  Correct.

18     Q.  Yet they didn't find adhered biological

19   material surrounding the PVDF fiber like you claim

20   they found surrounding the Prolene fiber; correct?

21             MS. STEELE:  Object to form.

22     A.  Yep, that's right, and that's one of the

23   reasons why people use polypropylene fibers is that

24   they're better for getting the biological material

Steven R. Little, Ph.D.

1    in there.

2       Q.  In where?  These are fibers.

3       A.  That's right.  So it's coating the surface,

4    and the surface of polypropylene is hydrophobic.

5    It's one of the most hydrophobic materials that is

6    used in bio -- biological applications and

7    biomaterials applications.  So it's going to be

8    better at getting that protein coat on the surface

9    which dictate -- dictates all kinds of downstream

10   events.

11      Q.  And what's the surface of the PVDF?

12      A.  I'm sorry, what's the surface of it?

13      Q.  Is it hydrophobic as well?

14      A.  Well, I mean, it's going to have a

15   particular hydrophobicity, but what I'm saying is,

16   is that the polypropylene has -- and it's one of

17   the reasons that it's chosen for this -- it just

18   has this combination of properties that makes it

19   better for infiltration of cells and tissue.

20      Q.  Okay.  So you understand we're looking at

21   suture material here; right?

22      A.  Yes.

23      Q.  And do you know what PVDF is?

24      A.  Yeah, it's polyvinylidene fluoride.

Steven R. Little, Ph.D.

```
1      Q.  Have you ever studied PVDF?

2            MS. STEELE:  Object to form.

3      A.  I mean, I'm aware of the material, yes.

4      Q.  Are you aware that PVDF is a material that's

5   used in mesh material?

6      A.  Yes.

7      Q.  Okay.  And are you aware of the publications

8   that demonstrate, time and time again, that PVDF is

9   a more stable material than Prolene?

10            MS. STEELE:  Object to form.

11     A.  No, I don't think I would agree with that

12   assessment.

13     Q.  Well, did you read any publications other

14   than Mary that talked about PVDF?

15     A.  Well, what I -- what I'm saying is, is that

16   the -- that polypropylene has been chosen for this

17   application specifically, and there have been

18   comparisons to other materials, but ultimately

19   polypropylene is the one that's chosen.  And it's

20   for, amongst other things, because it's very good

21   at promoting infiltration of tissues and cells.

22     Q.  Have you ever chosen a polypropylene suture

23   over a PVDF suture to be implanted in any patient?

24            MS. STEELE:  Object to form.
```

Steven R. Little, Ph.D.

1    A.   No, I mean, I'm not a medical doctor.  I did

2    not do that, no.

3    Q.   Okay.  You understand that there are PVDF

4    sutures, don't you?

5    A.   Sure.

6    Q.   Okay.  And you understand that there are

7    doctors that use PVDF sutures in their patients?

8    A.   Sure.

9    Q.   And you understand that there are medical

10   device manufacturers who place on the market PVDF

11   sutures to be used by doctors in treating their

12   patients; right?

13   A.   Yes.

14   Q.   And have you looked at any of the stability

15   studies that have been done -- I'm sorry, not

16   stability studies -- strike that.

17        Have you -- have you looked at any of

18   the tensile strength studies that have been done on

19   explanted Prolene sutures?

20        MS. STEELE:  Object to form.

21   A.   You know what, actually there's -- there's

22   not a whole -- from what I've seen, not a whole lot

23   of mechanical property testing of the explants that

24   we're talking about, these meshes.  You just don't

Steven R. Little, Ph.D.

1    see people doing mechanical testing.

2      Q.  Well, you didn't cite to any, did you?

3             MS. STEELE:  Object to form.

4      A.  Well, I mean there's, for instance, a test

5    that was done in Costello where -- I cite that one.

6    But I actually think that that test reinforces my

7    opinion in this matter, so.

8      Q.  Did you -- can you -- did you rely on any

9    tensile testing done to render your opinions that

10   polypropylene does not undergo in vivo degradation?

11            MS. STEELE:  Object to form.

12     A.  Other than what I cite in my report and in

13   my materials considered list, those are the things

14   that I considered.

15     Q.  Have you ever performed tensile stress

16   testing?

17     A.  I've been in -- I've been involved in the

18   performance of tensile strength testing.  I know

19   how it works.  I haven't specifically done that in

20   my papers, no.

21     Q.  Okay.  And so you can do -- you understand

22   that there are researchers who have done tensile

23   stress testing on pristine polypropylene sutures

24   and compared the tensile strength to explanted

Steven R. Little, Ph.D.

1     polypropylene sutures?

2             MS. STEELE:  Object to form.

3     A.  I'm sorry, is that a question?

4     Q.  Yes.  I mean, the Mary articles goes --

5     provides significant description of some of those

6     studies that found that, when compared to pristine

7     polypropylene sutures, explanted polypropylene

8     sutures broke -- or maintained only approximately

9     50 percent of the -- what the tensile strength of

10    -- was of a pristine.

11            MS. STEELE:  Object to form.

12    Q.  What would that -- that type of finding

13    suggest to you?

14    A.  Well, so, I mean, I guess I would -- I would

15    need to look at that study.  I know that whenever

16    you have -- if you don't properly clean the sample,

17    then you're going to get different properties of

18    the material, and you sort of see that in Costello.

19    Q.  So you believe that if you don't properly

20    clean an explanted suture -- polypropylene suture

21    material and perform a stress test on it, that

22    the -- it won't maintain the same tensile strength

23    as a pristine; is that your opinion?

24            MS. STEELE:  Object to form.

Steven R. Little, Ph.D.

```
1      A.  Well, specifically with tensile strength, I

2    could -- I could spend some more time looking at

3    this.  I -- I can tell you that if you do have

4    stuff coating the outside of it, it's going to

5    change the mechanical properties in the material.

6      Q.  Is it going -- is it going to change -- what

7    studies have you performed to determine whether or

8    not it would change the tensile strength of a

9    material?

10          MS. STEELE:  Object to form.

11     A.  I didn't perform studies, but I'm just

12   saying that if you have biological material like a

13   plasticizer or something that is stuck on the

14   outside of the material, it would change the

15   tensile properties.  It would change the mechanical

16   properties.

17     Q.  And that's your personal opinion based on --

18          COURT REPORTER:  I'm sorry?  I'm sorry?

19     Q.  That's you -- sorry.  That's your personal

20   opinion, Doctor, based on what?

21     A.  Well, it's just based on I know in, you

22   know, basic material science, that if you add a

23   plasticizer, it changes the mechanical properties.

24   If you were to coat the outside of it with
```

Steven R. Little, Ph.D.

1    something, it would change the mechanical

2    properties.

3      Q.  Will it change the mechanical properties in

4    such a way that it reduces the tensile strength?

5            MS. STEELE:  Object to form.

6      A.  Yeah, I mean, I'd have to look at the

7    specific study to see what you're referring to, but

8    I can imagine a situation where, if you add

9    biological material, it could change things, yes.

10     Q.  Okay.  But you haven't looked at those

11   specific studies; correct?

12     A.  No, I didn't -- I didn't look at the

13   specific study, no.

14     Q.  So you're not going to offer testimony at

15   trial regarding tensile strength other than what's

16   in your expert report?

17           MS. STEELE:  Object to --

18     A.  I would just say that -- that I will offer

19   testimony that the mechanical properties testing

20   that I've seen in the papers that I -- that I have

21   in my -- I mean, I cite them in my report, those

22   tests suggest that it's not degrading.

23     Q.  But -- but that's not specific to any

24   tensile strength analysis; correct?

Steven R. Little, Ph.D.

```
 1    A.   Yeah, I'm not -- I'm not remembering the

 2    specific test that you're talking about, no.

 3    Q.   So my question is -- look, this is my only

 4    opportunity to ask you questions before you appear

 5    at trial.

 6              You're not going to go and suddenly

 7    appear at trial and have opinions about tensile

 8    strength testing?

 9              MS. STEELE:   Object to form.

10    Q.   Correct?

11    A.   Well, I mean for instance, I will -- I will

12    talk about, potentially, the compliance testing in

13    Costello, how that supports my opinion; the

14    mechanical property testing in Liebert, how that

15    supports my opinion, but I'm -- I would imagine I'm

16    not going to refer to the specific study you're

17    talking about because I -- it's not in my report,

18    and I didn't feel like it was important for my --

19    my conclusions that I made.  So I probably won't

20    talk about that.

21    Q.   Do you agree that all polypropylene degrades

22    at some rate?

23              MS. STEELE:   Object to form.

24    A.   Well, I think -- it's an interesting
```

Steven R. Little, Ph.D.

```
 1    question; right?  I mean, it's almost like a

 2    meaningless question because like everything in the

 3    universe degrades at some rate, so.

 4      Q.  So the answer to my question is yes?

 5      A.  Yeah, everything in the universe would be

 6    chemically reactive to some degree.

 7      Q.  Including Boston Scientific's polypropylene

 8    Marlex meshes; correct?

 9            MS. STEELE:  Object to form.

10      A.  Well, what I'd say is that I -- I would say

11    that's true if you heat it up.  I don't think that

12    it's reacting in the human body.

13      Q.  Do you agree that the primary and secondary

14    stabilizers only slow the degradation rate;

15    correct?

16      A.  Yeah, again, it's almost like a -- I just

17    say, it's like a meaningless question; right?  I

18    mean it's --

19      Q.  It's a yes or no.  Do you agree with it or

20    not?

21      A.  Yeah, I mean, it slows the degradation,

22    that's the purpose of it.  Yes.

23      Q.  Do you agree that more than any other --

24    strike that.
```

Steven R. Little, Ph.D.

```
 1                  Do you agree with me that antioxidants

 2     are sacrificial stabilizers utilized in the

 3     production of Marlex HGX-030-01 and other

 4     polypropylenes and are consumed over time?

 5                  MS. STEELE:  Object to form.

 6     A.  Yes, so there are multiple layers of

 7     antioxidants that, you're correct, they do get

 8     consumed over time.  The question is, what time are

 9     you talking about and what conditions you're

10     talking about as to whether they're consumed to any

11     meaningful degree.

12     Q.  You understand that there are many different

13     types of stabilizers; right?

14                  MS. STEELE:  Object to form.

15     A.  I mean, I guess -- yeah, I mean, there's

16     different kinds of stabilizers.

17     Q.  And each stabilizer has a different purpose;

18     right?

19                  MS. STEELE:  Object to form.

20     A.  Well, yeah, I mean, I would say that when

21     manufacturers add them, they add them with a

22     specific purpose.  It's possible that they can have

23     multiple effects.  But, yeah, I mean, that's why

24     they're added is for a specific purpose.
```

Steven R. Little, Ph.D.

1    Q.  Can you explain to the ladies and gentlemen

2    of the jury what a primary stabilizer is.

3    A.  Sure.  I mean, a primary stabilizer is -- it

4    basically takes on a radical.  So if there is a

5    radical that exists that could be reactive, it

6    takes it on and then basically displaces it so that

7    it's not in any one particular location on the

8    molecule.  So the result is, is that the molecule

9    that takes on the radical is not reactive.

10   Q.  Do you know what the primary stabilizer is

11   in Marlex HGX-030-01?

12   A.  Yeah, it's in my report.  We were talking

13   about it earlier.  It's Irganox.

14   Q.  Okay.  Irganox 3114?

15   A.  Yes, 3114.

16   Q.  You understand, don't you, that Irganox 3114

17   is not a long-term thermal stabilizer?

18        MS. STEELE:  Object to form.

19   A.  Again, you've got to define like long-term

20   and what you're talking about.  Again, you know,

21   are we at high temperatures that -- temperatures in

22   the body?  But, you know, you're right, it -- under

23   high temperatures, for instance, it will be

24   consumed at one point.

Steven R. Little, Ph.D.

```
1      Q.   And what temperatures are used during the
2   manufacturing process of Boston Scientific's Marlex
3   devices?
4             MS. STEELE:   Object to form.
5      A.   Well, it would be over the melting
6   temperature which is going to be like 160,
7   realistically.  So it's over that.  The specific
8   temperature --
9      Q.   For the record, 160 what?
10     A.   Degrees Celsius.
11     Q.   Okay.
12     A.   And, you know, there's other -- as I show
13  here, there's other antioxidants that are put in
14  there, and one of the reasons is that -- so that it
15  protects the primary antioxidant during the
16  manufacture.
17     Q.   Can you explain to the ladies and gentlemen
18  of the jury what a secondary stabilizer is.
19     A.   Sure.  So a secondary stabilizer -- in this
20  case it's Irgafos 168 -- it can deactivate a --
21  basically a chemical group that's produced during
22  an oxidizing event.  So if it gets -- another way
23  to say this is that if it gets past the primary
24  antioxidant, there's a layer behind it to stop the
```

Steven R. Little, Ph.D.

1    thing that gets produced from that event.

2       Q.   Okay.  And what is the secondary stabilizer

3    in Marlex HGX-030-01?

4       A.   It's Irgafos 168.

5       Q.   Okay.  And you testified a moment ago that

6    polypropylene won't degrade in the human body

7    because it's not exposed to light or heat; right?

8             MS. STEELE:  Object to form.

9       A.   Yes.  So it's, you know -- the kind of

10   conditions that degradation is studied is like at

11   least 200 degrees C, so you don't see anywhere near

12   those temperatures in the body.

13      Q.   Okay.  But you also cite to the Liebert

14   article, don't you?

15      A.   Yes.

16      Q.   And the Liebert article involved a

17   preclinical study where unstabilized polypropylene

18   and stabilized polypropylene were implanted in

19   hamsters; correct?

20      A.   Yes.

21      Q.   And what's the temperature inside a hamster?

22      A.   Well, it's going to be close to 37 degrees

23   Celsius.

24      Q.   Okay.  And there are -- there's blood and

Steven R. Little, Ph.D.

```
1     free radicals and other biologic material like

2     humans; right?

3       A.  Well, yes, so there's -- there's

4     concentrations of things.  The concentration of the

5     stuff you're talking about like free radicals is

6     very small.

7       Q.  And despite that, the polypropylene sutures

8     that were implanted in the hamsters that weren't

9     stabilized degraded; right?

10            MS. STEELE:  Object to form.

11      A.  What number is this?

12            MS. STEELE:  Do you want to mark it?

13      Q.  Sure, we can mark it.  I didn't think you

14    needed to mark it; it's in your expert report.  I

15    mean, if your testimony is that polypropylene won't

16    degrade inside the human body because it's not

17    exposed to UV or heat, then the polypropylene that

18    was implanted -- the unstabilized polypropylene

19    that was implanted in hamsters wouldn't have

20    degraded?

21      A.  Well, you know, it's -- one of the things I

22    mention in the report here is that, you know,

23    you're basically using this FTIR signal, which is

24    just looking at the surface, to say that you're
```

Steven R. Little, Ph.D.

1    seeing this C double bond O signal.  And, you know,

2    if you -- if you correlate this to the mechanical

3    testing, during this rapid period of increase in

4    these bonds that they're saying are degraded

5    products, you see no change in mechanical

6    properties.

7       Q.  Doctor, hold on a second.  That -- that

8    didn't answer my question whatsoever.

9              My -- you made a suggestion to the

10   ladies and gentlemen of the jury that polypropylene

11   won't degrade inside the human body because it's

12   not exposed to UV and it's not exposed to excessive

13   heat.  That was your opinion.  That was your

14   statement to the ladies and gentlemen of the jury;

15   right?

16      A.  No, you --

17              MS. STEELE:  Object to form.

18      A.  -- you put words in my mouth.

19      Q.  Well, the record will speak for itself

20   Doctor.

21              But isn't it true that Liebert's study

22   demonstrated that there are oxidative species in

23   the body that will degrade polypropylene if it's

24   not adequately stabilized?

Steven R. Little, Ph.D.

```
 1                 MS. STEELE:  Object to form.

 2      A.  So first of all, what I'd say is that my

 3   comments about polypropylene not degrading are very

 4   certain related to the stabilized polypropylene

 5   formulations.  Liebert, for instance, shows that

 6   stabilized polypropylene here does not degrade at

 7   all.

 8                 Secondly, when it comes to

 9   non-stabilized polypropylene, which is where you

10   are now in taking my statement before and using it,

11   what I'm saying is, is that in this particular

12   case, there are pieces of information in this paper

13   that are very curious.

14                 So you're seeing, for instance, an

15   increase in signal, which we have talked before

16   about there could be other reasons that you would

17   have an increase in signal on the surface.  During

18   that rapid increase in FTIR signal, you see no

19   change in mechanical properties.  So what that

20   tells me is that it can't be degrading the material

21   if you have this rapid increase in signal and it's

22   not changing the material properties.

23      Q.  What paper are you talking about?  You said

24   in this paper.
```

Steven R. Little, Ph.D.

```
 1     A.  Liebert's.

 2     Q.  I want the record to be clear.  Okay.

 3              So are you suggesting that Liebert's

 4   conclusions were incorrect?

 5     A.  I'm saying that there -- yeah, I mean, I'm

 6   saying that there are, A, the signal that you're

 7   seeing on the surface with FTIR, you can't

 8   necessarily conclude that it's degraded

 9   polypropylene; and, B, there is some very curious

10   things in here like the mechanical properties not

11   changing during this rapid increase in signal

12   that's on the surface.  So there are things in here

13   that would indicate to me that it's not degrading.

14     Q.  So when they performed a study, they

15   compared a stabilized polypropylene to an

16   unstabilized polypropylene as a control; right?

17     A.  They looked at both of them, yes.

18     Q.  Both of them were implanted in animals;

19   right?

20     A.  Yes.

21     Q.  They were -- they were treated the very --

22   the exact same way.  That's good science; right?

23              MS. STEELE:  Object to form.

24     A.  Well, they're -- they're -- they're treated
```

Steven R. Little, Ph.D.

1    in the same way, yes.

2      Q.  They were in the same in vivo environments;

3    right?

4      A.  Yep, according to the paper.

5      Q.  Okay.  And when they -- when the -- when

6    both materials that were treated the same way in

7    the same environments underwent testing, the --

8    there were differences in the controlled specimen,

9    the uncontrolled -- the unstabilized polypropylene

10   compared to the polypropylene specimen; right?

11              MS. STEELE:  Object to form.

12     A.  Well, changes, yes.  There were some changes

13   according to one variable, yes.

14     Q.  Okay.  And not just one variable; there are

15   a number of variables?

16     A.  Yeah.  And then there's also what I just

17   described to you, which is that when you see the

18   changes in the variables you're describing, you see

19   no changes in the material properties.

20     Q.  There were -- the mechanical testing looks

21   different between the two products.  You keep on

22   suggesting that the mechanical -- mechanical --

23              COURT REPORTER:  I'm sorry.  I'm sorry.

24     Q.  Yeah.  Strike that.

Steven R. Little, Ph.D.

```
1                    Dr. Little, you keep on suggesting
2      that the mechanical testing that was performed
3      demonstrated the same results, but that's not
4      correct.
5                    MS. STEELE:  Object to form.
6        A.  Could you please describe?  I'm not
7      following you.
8        Q.  Okay.  You're familiar with this article;
9      right?
10       A.  Yes.
11       Q.  Okay.  And the mechanical testing that was
12     done demonstrated that there were changes and
13     differences between the unstabilized and stabilized
14     polypropylene fibers when they performed mechanical
15     testing.
16                   MS. STEELE:  Object to form.
17       A.  No, I mean, I'm looking at page 949 where
18     they're saying that you should see changes in the
19     mechanical properties, and you don't.  If it's
20     degrading.
21       Q.  Under the results section?
22       A.  On page 949.
23       Q.  949.  Okay.
24       A.  It's in the discussion section.
```

Steven R. Little, Ph.D.

1    Q.  Okay.  Point to me where you're -- you have

2    an issue with this article.

3    A.  Well, it's not my issue.  It's their issue

4    they bring up.  So it's in the second paragraph.

5    You could start about halfway down and read to the

6    end of the paragraph.

7    Q.  That's not the mechanical testing.

8    A.  Tan delta?

9    Q.  Where you -- that is not tensile stress

10   testing; correct?

11   A.  Well, tan delta is --

12   Q.  That's a --

13   A.  Sinusoidal tensile strain, it's applied to

14   the end of the sample.  Phase angle delta between

15   the applied strain and resulting stress is

16   measured.

17   Q.  Yeah, but the -- so if you -- if you finish

18   the page onto 950, they discuss on page 949 that

19   there were actual changes that they observed in the

20   unstabilized polypropylene.

21   A.  Yeah, but it's not --

22   Q.  You're referencing one data point, but

23   they -- they describe multiple data points --

24   A.  No.

Steven R. Little, Ph.D.

1    Q.  -- that demonstrate changes.

2    A.  No, what they say is that you would expect

3    to see the change in tan delta when the carbonyl

4    groups are formed.  So what you see is that at the

5    beginning you see some change, right, but then you

6    don't have any of these carbonyl groups.  When the

7    carbonyl groups are appearing, you see no change.

8    Q.  At that time point.

9    A.  That's when they say you should see it.

10   Q.  Well, at that one time point in the study,

11   what they're referencing with respect to one data

12   point for a tan delta; correct?

13            MS. STEELE:  Object to form.

14   A.  They do tan delta, what, at one, two, three

15   data points.  So it's two data points that show --

16   confirm that there's no change.

17   Q.  They do -- they do GPC on the -- on the

18   unstabilized material; right?

19   A.  Are we talking -- wait.

20   Q.  On the same page, 949.

21   A.  949.  Okay.

22   Q.  And there were differences between -- in the

23   GPC data that they observed in the unstable versus

24   the stable; right?

Steven R. Little, Ph.D.

1                MS. STEELE:  Object to form.

2      A.  Well, they're -- they're talking about this

3   here, but that's on Figure 5, so if you look at

4   that Figure 5, that's just basically two

5   overlapping curves.

6      Q.  There's a -- you can see a difference on

7   946.  They're not -- they're not perfectly

8   overlapping; correct?

9      A.  Yeah, I mean, they look to me like they're

10   overlapping.

11      Q.  Okay.  And the FTIR data demonstrated a

12   difference between the unstabilized versus the

13   stabilized; correct?

14                MS. STEELE:  Object to form.

15      A.  Yeah, I mean, we've talked about that.

16      Q.  And it showed according these authors

17   oxidatively degraded polypropylene in the

18   unstabilized suture; correct?

19                MS. STEELE:  Object to form.

20      A.  They are saying that that could be

21   indicative of that, but we've talked about how that

22   could be other things; and most importantly, they

23   say in this paper that you would expect to see

24   changes in mechanical properties.  And you don't.

Steven R. Little, Ph.D.

1    Q.  So you believe that neither the unstabilized

2    nor the stabilized polypropylene fibers that were

3    implanted in these rats in the Liebert study

4    demonstrated degradation?

5              MS. STEELE:  Object to form.

6    A.  Material degradation, no.  That's -- that's

7    unquestionable because you see no change in the

8    material properties.  What's --

9    Q.  Was there --

10             COURT REPORTER:  I'm sorry?

11   Q.  Was there oxidative degradation?

12   A.  Well, so if you're saying degradation of the

13   material, no.  If there was any changes on the

14   surface -- I mean, you're detecting some change on

15   the surface with FTIR, but it's not degradation

16   because it's not change in the material properties.

17   So you're seeing something.  It's not change in

18   material properties, so it's not degrading the

19   material.

20   Q.  If you look at the conclusion section on

21   page 950.  Right?  Are you there?

22   A.  Yes.

23   Q.  Okay.  The paragraph 1 discusses these

24   authors' opinions that the unstabilized

Steven R. Little, Ph.D.

1    polypropylene degraded as a result of oxidative

2    degradation; correct?

3              MS. STEELE:   Object to form.

4    A.   Where are you?

5    Q.   On 950, the first paragraph under

6    conclusions.   Number 1.

7    A.   It -- okay.   So the following is a summary

8    of the findings.   Okay.

9    Q.   Then they discuss the carbonyl groups were

10   observed to form after 99 days of implantation.

11   The induction time was determined to be

12   approximately 108 days using their formula;

13   correct?

14   A.   Well, right.   So, you know, there's two

15   things you just said.   One of them is that you have

16   some change in the surface signal, which we talked

17   about, and that doesn't necessarily indicate that

18   the material is degrading.   And more so in this

19   paper, it can't be the material degrading because

20   you don't see changes in the physical properties.

21   Then the next piece --

22   Q.   If you look at --

23   A.   -- was the -- you're saying that there was a

24   formula that's used.   Right.   So that's, then, a

Steven R. Little, Ph.D.

1    theoretical calculation that they're performing

2    that's based on their data.

3       Q.   Number 4, "Dynamic mechanical tests of

4    implanted filaments show that the rigidity

5    increases during the first 30 days of implantation

6    but remains constant throughout, up to the last

7    limit of 150 days."

8               And that's the issue that you have --

9    you find the most support in your opinion that

10   neither the unstabilized or the stabilized

11   polypropylene degraded in this study; right?

12              MS. STEELE:   Object to form.

13      A.   Well, yeah, I mean, they're the ones that

14   are putting it forth.

15      Q.   But they actually say that there was a

16   decrease -- there was an increase but then that

17   increase stopped over time; correct?

18      A.   Well, right, but we just read that.  So it

19   says where you should see the increase if it's

20   degrading is when the signal increases, which is

21   what you don't see.

22      Q.   And then you disagree with paragraph 5, I

23   assume, because the authors conclude that the

24   infrared spectra and mechanical testing of

Steven R. Little, Ph.D.

1    implanted and nonimplanted filaments containing an

2    antioxidant showed no changes in the chemical and

3    physical properties as a result of implantation.

4    "These results" -- and this is where I think you

5    disagree -- "these results support the view that

6    the changes observed in pure implanted -- meaning

7    the unstabilized filaments -- are due to oxidative

8    -- oxidation rather than diffusion or other known

9    effects of the antioxidant specifically inhibits

10   and/or retards oxidation."

11      A.   Well, I think that what this is is it's

12   saying that you might conclude that because in the

13   one you have an FTIR signal that's different, that

14   the antioxidant could be responsible for that

15   effect.  I think that's what this is saying, but

16   when you put all this together, you know, the

17   material can't be degrading if I'm understanding

18   this correctly and they're showing everything

19   because, you know, how do you have increases in

20   that signal and no changes in the mechanical

21   properties.

22      Q.   Well, but you have increases in the signals

23   of both polypropylene specimens that were treated

24   the same way, yet in the unstabilized suture you

Steven R. Little, Ph.D.

1     have a change in the FTIR; right?

2               MS. STEELE:  Object to form.

3       A.  Yeah, I mean, we talked about this.  You're

4     talking -- you're talking about one piece of data,

5     and in that one piece of data, it's different.  And

6     that on its own I don't think is enough to say that

7     it's degrading, but in light of all of the rest of

8     the data, I think you can say that it is not.

9       Q.  And this was at how many days of

10    implantation, 108 days?

11              MS. STEELE:  Object to form.

12      A.  Well, I mean, they're including implantation

13    times of, what, 150 on these plots?

14      Q.  So at 150 days -- they concluded that after

15    150 days there was some evidence of oxidative

16    degradation in the unstabilized polypropylene?

17              MS. STEELE:  Object to form.

18      A.  Did you say they conclude?

19      Q.  They concluded that there was some evidence

20    of oxidative degradation in the unstabilized

21    polypropylene material; correct?

22      A.  Right.  So some evidence, and in that

23    they're specifically referring to this FTIR signal

24    which could not be correlated to any changes in the

Steven R. Little, Ph.D.

```
1    material properties.

2      Q.  Do you know what a phenolic is?

3      A.  A phenolic, I mean, I know the group, yes.

4      Q.  Explain what a phenolic is?

5      A.  Well, I mean, it's an aromatic ring that has

6    a hydroxyl group.

7      Q.  Do you agree that phossohites (phonetic) are

8    used during processing of the Marlex device product

9    to help limit the amount of primary antioxidants

10   that are consumed during processing?

11            MS. STEELE:  Object to form.

12     A.  Yeah, I'm sorry, I'm not following you.

13   What --

14     Q.  Will you agree that in manufacturing any

15   sort of polypropylene material, like a suture, do

16   you agree that phossohites are used during

17   processing to help limit the amount of primary

18   antioxidants that are consumed during the

19   processing?

20            MS. STEELE:  Object to form.

21     A.  I'm sorry, I don't understand all the words

22   that you said in your question.

23     Q.  Okay.  So you -- you can't answer that

24   question as phrased?
```

Steven R. Little, Ph.D.

```
 1      A.  I can't answer it because I don't
 2   understand.  Maybe it's the phone, but --
 3      Q.  Do you know if phossohites are used during
 4   processing of --
 5      A.  Could you spell that word?
 6      Q.  -- polypropylene sutures or polypropylene
 7   mesh material?
 8      A.  I'm not familiar with the word.
 9      Q.  Okay.  So you have no opinion one way or the
10   other regarding phossohites?
11      A.  No.
12      Q.  And you don't know the concentration
13   contained in Marlex used by Boston Scientific of
14   the -- of the different antioxidants; correct?
15           MS. STEELE:  Object to form.
16      A.  No, not off the top of my head, no.
17      Q.  And that has no import in your opinion?
18           MS. STEELE:  Object to form.
19      A.  What I would say is that I have not done the
20   analysis to determine the amounts or the ranges or
21   the acceptability, so I don't have an opinion on
22   it.
23      Q.  Are there any additional stabilizers that
24   are added during the processing of Marlex?
```

Steven R. Little, Ph.D.

```
 1                 MS. STEELE:  Object to form.

 2       A.  I'm pretty sure there's another antioxidant

 3    that we haven't talked about that's in there.

 4    There's three.

 5       Q.  Okay.  We -- I thought we talked about

 6    Irganox; right?

 7       A.  Yes.

 8       Q.  We talked about Irgafos; right?

 9       A.  Yes.

10       Q.  And is the other one DHT-4A?

11       A.  Yes.

12       Q.  And is DHT-4A a primary or secondary

13    stabilizer?

14       A.  Um, I --

15                 MS. STEELE:  Object to form.

16       A.  I think that the purpose of it in this, in

17    this specific example is it scavenges things that

18    would activate the materials that could be produced

19    during a reaction event.  So there are acids, for

20    instance, that would potentially activate the

21    species that we talked about that are produced in

22    the secondary antioxidants instance.  So it

23    scavenges those.

24       Q.  Which one of the stabilizers that we've
```

Steven R. Little, Ph.D.

1    discussed -- the Irganox, the Irgafos, or the

2    DHT-4A -- provide long-term stability in vivo?

3      A.  Well, they would all provide stability.  I

4    think, you know, you're talking about long-term, I

5    mean, they're going to provide stability on top of

6    the stability that polypropylene would already

7    have.

8      Q.  Do you know how long the Irganox, Irgafos,

9    or DHT-4A would provide stability in vivo?

10     A.  No, I don't have an opinion on that.

11     Q.  Do you know if any one of these antioxidants

12    were specifically used to prevent in vivo

13    oxidation?

14            MS. STEELE:  Object to form.

15     A.  Well, I mean, they're all going to play a

16    role in inhibiting in vivo oxidation.

17     Q.  Would you agree that inadequate

18    stabilization can create degradation during

19    processing?

20            MS. STEELE:  Object to form.

21     A.  I think it probably depends on the

22    processing.  But I didn't spend time looking into

23    that, so I don't have an opinion.

24     Q.  Do you agree that degraded polypropylene can

Steven R. Little, Ph.D.

1   become embrittled?

2      A.  Well, I don't know.  I mean, today you're

3   talking about things where you've got materials

4   diffusing in that could serve as plasticizers, so

5   it may not embrittle, but, I mean, I know that

6   there have been theories that have been put forth

7   about loss of amorphicity and increase in

8   stiffness.

9      Q.  Okay.  Have you studied those and will you

10   render any opinions about those in -- or at trial?

11      A.  Yeah, I mean, I think what I would say is

12   that you would see increased stiffness with

13   coatings of biological materials.  So you would not

14   be able to tell the difference as to whether or not

15   any increased stiffness or decrease in compliance

16   or any of these other mechanical tests that would

17   suggest that the material is stiffening is because

18   of any oxidized -- oxidizing of the material itself

19   or coating of other biological materials.

20      Q.  You understand, though, that when

21   polypropylene degrades, it becomes embrittled;

22   right?

23      A.  Well, so I haven't seen -- first of all, I

24   haven't seen any evidence of degradation of

Steven R. Little, Ph.D.

1    polypropylene in the body.  I've seen studies where

2    people have said that it's stiffer and less

3    compliant when it comes out, but they've said that

4    about other polymers in the exact same paper that

5    don't even have the bonds that are claimed to be

6    susceptible to degradation here.  So clearly in

7    those cases, it's not because of degraded

8    polypropylene because it's happening in the other

9    polymers.

10            If you're talking about thermal

11   oxidation, I know that there are studies done well

12   over 200 degrees C where, you know, I guess the

13   polypropylene is even above its melting

14   temperature, so.

15    Q.  So it would -- it would actually melt above

16   200 C; right?

17    A.  I'm sorry?

18    Q.  The Marlex polypropylene would melt at

19   200 C; it wouldn't embrittle?

20    A.  Well, I mean, the studies are done on very

21   high temperature.  I'm not aware of the specific

22   details, but I can tell you that at those

23   temperatures, you know, you might even have phase

24   changes of the polymer itself.  I mean, molecular

Steven R. Little, Ph.D.

1    oxygen has a different energy to react with the

2    material.  And there's so many differences.

3    It's -- it's like a different universe.

4       Q.  In your report you actually talk about OIT.

5    Do you recall that?

6       A.  Um, OIP?

7       Q.  OIT?  You just testified, I think consistent

8    with your report, that 200 degrees Celsius does not

9    apply at body temperature; correct?

10      A.  Correct.

11      Q.  Does DSC use OIT to determine shelf life

12   stability?  Do you know what I mean by OIT?

13      A.  No, I'm not -- I'm not remembering the part

14   of the report that you're referring to.  Could you

15   point me to that, please?

16      Q.  Yeah.  Hold on one second.  Do you know --

17   I'll strike the last question.

18           Do you know how Boston Scientific has

19   validated the shelf life stability of poly- -- of

20   this Marlex polypropylene?

21           MS. STEELE:  Object to form.

22      A.  No, I'm sorry, I don't recall.

23      Q.  And the melt temperature of polypropylene is

24   like 164 degrees, correct, 160 -- 160 to 165

Steven R. Little, Ph.D.

1    degrees Celsius?

2              MS. STEELE:  Object to form.

3        A.  Well, I mean, that's the melting temperature

4    of pure polypropylene.  It's like 170, but in --

5    realistically, by the time you account for some

6    imperfections, it's like 160.  But, you know,

7    whenever you have the -- because, remember, the

8    resin is like a met- -- it's like a combination of

9    a bunch of things.  So I don't recall specifically

10   what the melt -- melting temperature of that is.

11       Q.  You agree with me that polypropylene,

12   including the Marlex, is not stable at the melt

13   temperature, whatever that is?  160, 165 degrees

14   Celsius, whatever the melt temperature is, you'd

15   agree that polypropylene is not stable at that

16   temperature; correct?

17             MS. STEELE:  Object to form.

18       A.  I'm not sure I have the information as to

19   whether or not to say that's the case.

20       Q.  Do you agree that polypropylene will degrade

21   at room temperature particularly in the presence of

22   UV light?

23       A.  Well, so I know that UV light, yes, can

24   impact degradation kinetics of polypropylene.

Steven R. Little, Ph.D.

1   Q.  Do you understand that polymer stability at

2   melt temperature is required to generate a fiber?

3           MS. STEELE:  Object to form.

4   A.  I understand that some level of stability

5   would be required to get a melted fiber because you

6   have to melt it to extrude it.  But, you know,

7   "stability" is sort of a relative term, so it

8   depends on what you mean by that.

9   Q.  Now, in your expert report you talk about

10  the Chevron MSDS warning that the Marlex should not

11  be used in the human body?

12          MS. STEELE:  Object to form.

13          COURT REPORTER:  I'm sorry, I didn't

14  hear you.

15  Q.  Yeah, on page 12 you discussed the material

16  data sheet for Marlex HGX-030-01; correct?

17  A.  Yes.

18  Q.  And in that section, you discussed the

19  material data sheet -- sheet in V warning contained

20  within the MSDS that Marlex resin should not be

21  used in a human body.

22          MS. STEELE:  Object to form.

23  A.  Well, I mean, I do talk about that MSDS,

24  yes.

Steven R. Little, Ph.D.

1    Q.  And we have already established you're not

2  an expert in designing polypropylene; right?

3    A.  Well, I mean, I -- designing polypropylene,

4  I'm not sure I know what you mean by that.  I mean,

5  I certainly am educated pretty heavily in

6  polypropylene.  I know its uses.  It's a

7  biomaterial that is discussed very commonly in my

8  field.

9    Q.  You've never designed it, you've never

10  authored publications on it, you've never spoke

11  about it at presentations or lectures, you've never

12  authored any publications on it, and you haven't

13  even looked at the design history file concerning

14  the Marlex mesh manufactured by Boston Scientific;

15  right?

16          MS. STEELE:  Object to form.

17    A.  So we've talked about this.  I -- I don't

18  have experience in the specific design

19  considerations for the mesh.  I know the polymer

20  well.  I know the biomaterial well.  So I think

21  that that's what I needed to make the conclusions

22  in my report.

23    Q.  You're not experienced in determining what

24  the appropriate additive package is for

Steven R. Little, Ph.D.

 1    polypropylene mesh devices; correct?

 2              MS. STEELE:  Object to form.

 3    A.  No, I haven't done that, no.

 4    Q.  Would you agree that determining what the

 5    appropriate additive and the quantity of those

 6    additives should be -- in a permanent implantable

 7    device should be left to experts who have that

 8    experience and are at a comfort level in

 9    determining additive formulations?

10              MS. STEELE:  Object to form.

11    A.  I mean, I would -- I would say that the

12    final details of exactly how much to add could be

13    something that somebody does who has experience in

14    determining what the additive packages are, the

15    testing associated with it.  I would imagine that

16    somebody who had that experience would do that.

17    Q.  And would you agree or do you have the

18    expertise to offer any opinion that when selecting

19    the appropriate additive and the appropriate --

20    appropriate quantity of the additives to be used,

21    should take into consider -- consideration the

22    intended use of the polypropylene fiber?

23              MS. STEELE:  Object to form.

24    A.  I think it -- it probably depends on the

Steven R. Little, Ph.D.

```
1     circumstance that you're referring to.
2        Q.  Do you think that the use, the type of --
3     strike that.
4              Do you have the expertise to determine
5     the appropriate quantity of additives and the type
6     of additives that should be used in a permanent
7     medical device?
8              MS. STEELE:  Object to form.
9        A.  I think -- I think it's going to depend on
10    the circumstance and the tolerance and the type of
11    things and the specific application you're talking
12    about.  So I don't have an opinion on it.  I -- I
13    could look into that, but I have not.
14       Q.  Do you know if Boston Scientific conferred
15    with Chevron in the formulation of Marlex
16    HGX-030-01?
17             MS. STEELE:  Object to form.
18       A.  You're asking me if they conferred?
19       Q.  Yes, do you have any information, did you
20    look at any materials or have any discussions with
21    anybody from Boston Scientific to determine whether
22    or not they met and conferred with Chevron to
23    determine what the appropriate additives
24    formulation ought to have been?
```

Steven R. Little, Ph.D.

```
 1              MS. STEELE:  Object to form.
 2      A.  I mean, I know that they were talking, but
 3   the details of which you're referring to, I'm not
 4   offering an opinion on that.
 5      Q.  Have you reviewed any depositions from any
 6   Chevron employees?
 7      A.  I think that I, at one point in time,
 8   reviewed a deposition from somebody who was in
 9   product development from Chevron talking about the
10   MSDS.
11      Q.  When would you have done that?
12      A.  Probably last year.
13      Q.  Do you know if Boston Scientific ever did
14   any testing whatsoever to determine whether or not
15   the Marlex resin would break down and degrade
16   inside the human body before they placed it on the
17   market?
18              MS. STEEL:  Object to form.
19      A.  I don't recall looking into the details of
20   that, no.  I don't recall.
21      Q.  Would you agree that Chevron, the
22   manufacturer of the Marlex resin, the supplier of
23   the Marlex resin would be the expert on the
24   additives and the purpose of the additives it used?
```

Steven R. Little, Ph.D.

```
 1                 MS. STEELE:  Object to form.
 2      A.  Well, they would be an -- I guess you would
 3   say they would have expertise in adding additive
 4   packages; for a specific application, I'm not sure.
 5   Like you could imagine, there would be material
 6   scientists at another organization that would
 7   purchase the material that would have knowledge of
 8   that.  But again, it's going to depend on the
 9   specific circumstances.
10      Q.  Despite the warnings in the MSDS not to use
11   the Marlex resin in the human body, you're not
12   aware of any studies that Boston Scientific
13   Corporation conducted to determine whether or not
14   using Marlex as a permanent implant in the tissues
15   of women would be appropriate and safe; correct?
16                 MS. STEELE:  Object -- object to form.
17      A.  Okay.  Well, so, I mean, I might need you to
18   repeat the question again.  It was long, so it had
19   a couple different parts.
20      Q.  Despite the MSDS warning in the -- strike
21   that.
22                 Despite the MSDS warning not to use
23   Marlex as -- in permanent implantable devices, are
24   you aware of any clinical study that was done by
```

Steven R. Little, Ph.D.

1    Boston Scientific to determine whether or not using

2    the MSDS -- or using the Marlex resin would be safe

3    and effective for women --

4               MS. STEELE:  Object to form.

5       Q.  -- before they placed it on the market?

6               MS. STEELE:  Object to form.

7       A.  Okay.  So there's two -- I think, generally

8    two different pieces there.  So the first piece is

9    this warning that you're referring to in the MSDS,

10   which, you know -- I guess an MSDS from my

11   understanding is something that's supposed to help

12   the user who's going to be handling the raw

13   material determine, you know, whether they're going

14   to get hurt by this and how to actually properly

15   treat it.  Okay?  So, you know, it would have

16   something in there like could cause abrasion on

17   your skin or an irritation or what to do if like

18   some of the dust gets in your eyes or something

19   like that.  That's what you typically see with an

20   MSDS.

21              What I typically do not see with MSDSs

22   are end-use-type things.  So what you typically

23   don't see is recommendations as to what someone can

24   or can't do with a material on an MSDS.  It's just

Steven R. Little, Ph.D.

1    not really the purpose of an MSDS.

2              Now, that said, in my experience I have

3    seen that from time to time, and it's almost always

4    in a circumstance where somebody is attempting to

5    avoid any liability associated with it.  So, you

6    know, they don't have any testing as to determine

7    whether or not it's safe.  They're just saying if

8    you use this, I -- we're not liable for doing it.

9    And I have a number of circumstances that -- in

10   materials in my lab where that -- literally, that's

11   what's going on.

12             So that's with the MS- --

13   Q.  Sorry.  Go ahead.

14   A.  So I'm saying, that's with the MSDS.  So

15   first of all, you know, could someone have a

16   conversation based on that with the supplier, sure,

17   related to the end use.  But that in and of itself

18   is not some kind of scientific proof that you

19   shouldn't do that.  It could very well be an

20   indicator of liability.

21   Q.  Are you -- are you aware that once the

22   supplier of the Marlex found out that it was being

23   used in permanent implantable medical devices by

24   Boston Scientific, that they refused to supply the

Steven R. Little, Ph.D.

1    Marlex resin to Boston Scientific?

2            MS. STEELE:  Object to form and

3    mischaracterizes the evidence.

4    Q.  Are you aware of that?

5    A.  Well, so if -- if that's the case, it

6    wouldn't surprise me at all.  Just because, you

7    know, these people are selling resin.  They're --

8    they're not incorporating in their business

9    strategy ways to handle medical liability.  That's

10   not their business.  So that wouldn't surprise me

11   at all.

12   Q.  Well, have you -- have you talked to anybody

13   at Phillips?

14   A.  No.

15   Q.  Or Chevron?

16   A.  No, it's just something based on my

17   experience that I see with a handful of things.

18   Q.  Have you asked Chevron or Phillips

19   specifically why that language was included in

20   their MSDS?

21           MS. STEELE:  Object to form.

22   A.  Well, I think I saw deposition testimony

23   from somebody where they were saying that -- that

24   there wasn't really any scientific tests done; it

Steven R. Little, Ph.D.

1    was just something put in, and I think it was even

2    discussed how their -- it was like in consultation

3    with lawyers which, again, is exactly what I would

4    expect.

5       Q.   Did you ever determine why -- did you

6    specifically ask or read any depositions concerning

7    why Boston Scientific would have stopped or --

8    strike that.

9                -- why Chevron would stop producing or

10   supplying Marlex after they determined or found out

11   that the material was being used as permanent

12   implant by Boston Scientific?

13               MS. STEELE:  Object to the form.

14   Mischaracterizes the evidence.

15      A.   Did I specifically ask those questions?  No.

16   As I said, I just have the information that I had

17   from just the deposition testimony and my own

18   experience with MSDSs.

19      Q.   Okay.  So to the extent that Chevron or any

20   supplier refused to continue to supply Marlex, you

21   have no specific understanding based on deposition

22   testimony or discussions with company

23   representatives why that decision was made?

24               MS. STEELE:  Object to form.

Steven R. Little, Ph.D.

```
 1      A.  Well, no, I mean, what I said is I have some
 2   evidence as to why it wasn't made.  So what I know
 3   is that there was no discussion of any scientific
 4   studies that were behind it.  So I know that.  And
 5   I -- like I said, I have my own personal
 6   understanding of MSDSs, and I've seen this before.
 7   So I don't know if anybody specifically and
 8   explicitly said why they did it; I just know that
 9   it wasn't because of scientific reasons and it was
10   in consultation with their attorneys.
11                  THE WITNESS:  Are we at a point to take
12   a lunch break, or --
13                  MS. STEELE:  Dan, how much more?
14   It's --
15                  MR. THORNBURG:  I'm almost done.  We can
16   take a break if you want, but I'm almost done.  I'm
17   just going through -- I have a couple more
18   questions.
19                  MS. STEELE:  Okay.  So you think you'll
20   be done by like 2:00, 2:15?
21                  MR. THORNBURG:  Yeah.  Definitely.
22                  MS. STEELE:  Is that okay?
23                  MR. THORNBURG:  Well, maybe 2:30.
24                  THE WITNESS:  Why don't we take a break
```

Steven R. Little, Ph.D.

```
1    and come back.

2              MS. STEELE:  How long -- I think we need

3    to take a break.  I mean, he hasn't eaten.

4              MR. THORNBURG:  Yeah, we -- that's fine.

5    That's fine.

6              MS. KROTTINGER:  30 minutes?

7              MS. STEELE:  What?

8              MR. KROTTINGER:  30 minutes?

9              MS. STEELE:  30 minutes is fine.  We can

10   run downstairs and get something.

11             THE WITNESS:  Okay.

12             THE VIDEOGRAPHER:  We're going off the

13   record.  The time is 1:52 p.m.

14                      *  *  *

15             (Whereupon, a brief recess was taken.)

16                      *  *  *

17             THE VIDEOGRAPHER:  We're going back on

18   record.  The time is 2:35 p.m.

19             MR. THORNBURG:  Let's go ahead and

20   mark -- I think we're on Exhibit 7.

21             MS. KROTTINGER:  Eight is the next one.

22             MR. THORNBURG:  Exhibit 8, the amended

23   materials considered list.

24             (SMITH Deposition Exhibit 8 was marked
```

Steven R. Little, Ph.D.

1    for identification.)

2      Q.  Is it marked and in front of you, Doctor?

3      A.  Yes.

4      Q.  Okay.  Now, Doctor, I went through your

5    materials list, and I didn't -- or I couldn't

6    identify any specific publication that related to

7    Upholds and the risks of Upholds for patients who

8    are implanted with them.  Is that -- is that a fair

9    characterization?

10           MS. STEELE:  Object to form.

11     A.  I don't recall specifically doing an

12   analysis of Uphold and the specifics risks for

13   patients of like complications related to Uphold.

14     Q.  Okay.  And so you won't offer opinions at

15   trial concerning Uphold and the specific risks as

16   documented in the publication; is that correct?

17     A.  With regard to the specific risks of

18   complications in publications, no.

19     Q.  You don't know what the range of dyspareunia

20   is for Uphold?

21     A.  No.

22     Q.  Do you know what dyspareunia means?

23     A.  No, I -- the name's not ringing a bell.

24     Q.  Okay.  Painful intercourse?

Steven R. Little, Ph.D.

1              Have you heard that Uphold can cause

2    painful life-altering complications in women?

3              MS. STEELE:  Object to form.

4     A.  Well, what I know is that there are

5    complications that are discussed with patients, and

6    there are complications that are recorded during

7    visits.  I did not do an analysis of that and I

8    don't have opinions on it.

9     Q.  You don't know what the risk of dyspareunia

10   or painful intercourse is with regard to Uphold;

11   correct?

12    A.  Not off the top of my head, no.  That would

13   be something you'd have to talk to a doctor about.

14    Q.  Do you know what the failure rate of the

15   Uphold product is?

16    A.  Not off the top of my head, no.

17    Q.  You're not going to offer opinions at trial

18   concerning the risk of dyspareunia or the rate of

19   failure as it relates to Uphold; correct?

20              MS. STEELE:  Object to form.

21    A.  I'm not going to be specifically talking

22   about rates, no.

23    Q.  Do you know what the risk of extrusion

24   means?

Steven R. Little, Ph.D.

1    A.  Extrusion, um, if you're referring to a

2    complication from a patient that's called

3    extrusion, no.

4    Q.  Okay.  So you're not going to offer any

5    opinions at trial concerning the rate of extrusion

6    in patients treated with Upholds?

7    A.  No, not to my knowledge, no.

8    Q.  You don't even know what extrusion means.

9         MS. STEELE:  Object to form.

10   A.  Well, I mean, I know what erosion means

11   biologically; it sounds like it may be similar to

12   that.  But if there is a difference, then, no, I'm

13   not aware of that.

14   Q.  Do you know what the rate of erosion is for

15   patients treated with the Uphold devise?

16   A.  Not off the top of my head, no.

17   Q.  You're not going to offer any opinions at

18   trial concerning the rate of erosion concerning the

19   Uphold device; correct?

20   A.  No.  Not to my knowledge.

21   Q.  You don't know what the rate of the need to

22   undergo additional operations to treat

23   complications is with respect to the Uphold device;

24   correct?

Steven R. Little, Ph.D.

1    A.  No.

2    Q.  And you won't offer opinions at trial

3    concerning the same; correct?

4    A.  No.

5    Q.  You don't know what the rate of de novo

6    pelvic pain is in women treated with the Uphold

7    product; correct?

8    A.  No.

9    Q.  You're not going to offer opinions at trial

10   concerning the same; correct?

11   A.  No.

12   Q.  You don't know what the rate of de novo

13   urinary dysfunction is with respect to women

14   treated with the Uphold product; correct?

15   A.  No.

16   Q.  You won't, therefore, offer opinions

17   concerning the same.

18   A.  No.

19   Q.  Were any of those risks relevant in any way

20   or important in any way in understanding or

21   rendering opinions concerning the biocompatibility

22   of the Uphold device?

23          MS. STEELE:  Object to form.

24   A.  Well, what I would say is that you'd have to

Steven R. Little, Ph.D.

1    talk to a doctor about it because I know there's

2    different complication rates and complications that

3    are discussed with patients, and every different

4    situation very well could be different.  So no, I

5    did not feel like I needed to take that into

6    account in the analysis for my report.

7        Q.  And the same for the Obtryx, the Pinnacle,

8    and the Solyx; you didn't go out and look at the

9    epidemiological studies to determine what the rate

10   of complications were with respect to those

11   products either; right?

12       A.  No.

13       Q.  And you're not going to therefore offer any

14   opinions concerning the same at trial; correct?

15       A.  No.

16       Q.  And the risk of complication to patients

17   treated with the Uphold, the Pinnacle, the Solyx,

18   the Obtryx, those weren't important for you to

19   consider in rendering any of the opinions in this

20   case; is that correct?

21            MS. STEELE:  Object to form.

22       A.  Not the opinions in my report, no.

23       Q.  Now, I'm going to try to streamline this if

24   I can because I know everybody wants to leave, and

Steven R. Little, Ph.D.

1    I don't blame you.

2              But another article that you

3    referenced in your expert report is the Clavé

4    article; correct?

5      A.  Yes.

6      Q.  Okay.  And generally speaking, the authors

7    concluded that in a hundred patients that they

8    evaluated explanted polypropylene mesh, that the

9    polypropylene had undergone in vivo degradation;

10   correct?

11             MS. STEELE:  Object to form.

12     A.  With the stipulation I'm pretty sure that

13   they said that it could have been biological

14   material.

15     Q.  Well, their opinion was that polypropylene

16   is not inert; right?

17     A.  Well, that's in the title.  I will just

18   repeat again that they did say in this study that

19   what they observed could have been biological

20   material.

21     Q.  If you -- let's go ahead and mark really

22   quick Exhibit No. 9, the Clavé publication.

23             (SMITH Deposition Exhibit 9 was marked

24   for identification.)

Steven R. Little, Ph.D.

```
1      Q.  Do you have Exhibit 9 in front of you,

2   Doctor?

3      A.  It's being passed to me.

4              MS. STEELE:  He has it now.

5      Q.  Do you have it now?

6      A.  I do, yes.

7      Q.  Okay.  If we look at Exhibit 9, first page,

8   under the Abstract section, do you see where it

9   says "Conclusions"?

10     A.  Yes.

11     Q.  And this conclusion is that, "The study

12  provides evidence contrary to published literature

13  characterizing the polypropylene as inert in such

14  applications."

15             Did I read that accurately?

16     A.  Yes, you did.

17     Q.  Okay.  And the title of the publication is

18  "polypropylene as a reinforcement in pelvic surgery

19  is not inert"; correct?

20     A.  Yes.  That's what the title says.

21     Q.  And the conclusion -- you agree with me, the

22  ultimate conclusion of these researchers was that

23  polypropylene undergoes in vivo degradation;

24  correct?
```

Steven R. Little, Ph.D.

```
 1                    MS. STEELE:  Object to form.
 2        A.  Well, so, you know, we could -- just to say,
 3    we could be talking about two different things.
 4    So, you know, inert, depending on what you mean by
 5    that and who says it, it can have different
 6    meanings.  Right?  I mean, inert can have to do
 7    with its interactions with the body and even the
 8    ability for things to deposit on the material.  So
 9    that's one definition of inert.  And again, in
10    terms of oxidation, it specifically says that you
11    can't necessarily say this is oxidation because the
12    signals may be of biological origin.
13        Q.  Are you suggesting that these -- you read
14    this publication; correct?
15        A.  Yes.
16        Q.  You understand that or understood when you
17    read this publication that Dr. Clavé and the other
18    co-authors concluded or used the word "inert" to
19    mean that it's unstable in the human body over
20    time, that it will degrade; correct?
21                    MS. STEELE:  Object to form.
22        A.  Well, what I'm saying is that they're saying
23    an inert -- if you think about the word "inert," it
24    has to do with the body and the material itself.  I
```

Steven R. Little, Ph.D.

1   was just saying that some people use the word

2   differently.  So in this article, it could very

3   well be that they determined that -- they are

4   determining they think that this is degradation,

5   but I will just say that they put in here that it

6   could be because there was a material of biological

7   origin.  So they preface their conclusion by saying

8   that that may be what's going on.

9       Q.  They did a number of studies including -- in

10  addition to FTIR; correct?

11      A.  Yes.  So they did other studies as well.

12      Q.  So they did FTIR and they -- their FTIR

13  spectrum -- one of the spectrums that they

14  repeatedly saw was at 1730 reciprocal centimeters;

15  right?

16      A.  Yes.

17      Q.  And they said that could correspond with the

18  absorption of ester carbonyl groups which is likely

19  from esterified fatty acids; right?

20      A.  Right, so that's one source of a signal in

21  that area where you could get something that's

22  showing as positive.

23      Q.  They also did scanning electron microscopy;

24  right?

Steven R. Little, Ph.D.

1    A.  Yep, which is a visual analysis.

2    Q.  A visual analysis that you've performed in

3    the past to look at the integrity of the

4    morphological features of products you've looked

5    at; correct?

6    A.  Right.  In this case you're looking at what

7    would be biological material in the product

8    underneath of it, but yes.

9    Q.  These experts or these researchers also did

10   DSC?

11   A.  Yes.

12   Q.  And they concluded based on their FTIR

13   and/or their scanning electron microscopy and the

14   DSC that polypropylene is not inert --

15             MS. STEELE:  Object.

16   Q.  -- right?

17   A.  Right, so they're concluding that; but as

18   I've said before, if biological material's on the

19   surface, that would be another interpretation of

20   all of this data.  And, in fact, they even mention

21   that as a alternate explanation in the manuscript.

22   Q.  Their conclusion, though, was that the

23   polypropylene is not inert; correct?

24   A.  That's their conclusion, yes.

Steven R. Little, Ph.D.

1    Q.  Would you disagree with their conclusion?

2    A.  Yes.  But I would agree with the alternate

3    possibility that they mention as being viable as

4    well.

5    Q.  Can it be both, Doctor?

6    A.  Well, whenever you're looking at it if

7    there's biological material on it, that's what you

8    would be able to see.  Right?  So, you know, even

9    these SEMs that you're looking at, you know, you're

10   looking at SEMs of fibers on the left and you could

11   use a scale bar there to determine what the

12   diameter of the fiber is, and then over on the

13   right and you look at it and the fiber's bigger.

14   Q.  Is it your opinion that it can't be both?

15   It can't be degraded polypropylene and some

16   biological material on the outer layer of the mesh;

17   is that what your opinion is?

18              MS. STEELE:  Object to form.

19   A.  So as we discussed earlier, it's my opinion

20   that you could have both; but when you look at

21   this, if you're scanning the surface and biological

22   material's on the surface, that's what you would

23   detect.

24   Q.  So I just want to summarize really quick.

Steven R. Little, Ph.D.

```
1    You disagreed with the ultimate conclusions by

2    Clavé et al. that polypropylene is not inert; you

3    disagree with Dr. Wood who demonstrated and

4    concluded according to her findings that

5    polypropylene degrades in vivo; you disagree with

6    the Mary article and the scientists, her

7    co-authors, that found that polypropylene degrades

8    in vivo; you disagree with Costello who concluded

9    that polypropylene degrades in vivo; and you

10   disagree with Dr. Liebert from 1976 who concluded

11   that unstabilized polypropylene degrades in vivo;

12   correct?

13            MS. STEELE:  Object to form.

14     A.  With the stipulation that in each of those

15   cases their authors literally said there could be

16   an alternate explanation for some of these signals,

17   I disagree with the ultimate conclusion and agree

18   with a whole different set of literature that comes

19   to the conclusion that it's not oxidatively

20   degrading.

21     Q.  Well, we know that you agree with

22   Dr. Thames; right?

23            MS. STEELE:  Object to form.

24     A.  Well, so what -- right, so what Dr. Thames
```

Steven R. Little, Ph.D.

1    shows is that even after 11 and a half years, you

2    can see that there's a pristine fiber underneath of

3    the biological material.

4    Q.  Okay.  So we'll put Dr. Thames on the other

5    side of all of the peer-reviewed publications,

6    right, and we'll put you over there with

7    Dr. Thames; is that fair?

8              MS. STEELE:  Object to form.

9    Q.  You agree with Dr. Thames; right?

10   A.  What I'm going to disagree to is sides

11   because I think all these articles provide the

12   possibility of there being so -- there being

13   biological material on there.  So it's going to be

14   very difficult to put even the ones you just

15   discussed with me on a side.

16   Q.  Well, you just testified that you disagreed

17   with all of their ultimate conclusions that

18   polypropylene will degrade in vivo.

19   A.  Well, so, no, so they said that one ultimate

20   conclusion was that there could be biological

21   material that is responsible for some of the

22   signals that they're seeing.  So that's a

23   conclusion of the paper.  There's also --

24   Q.  Their -- their ultimate conclusion was

Steven R. Little, Ph.D.

1    polypropylene degrades in vivo.  We can go back and

2    look at all of the publications again.  We can look

3    at, you know, Dr. Liebert, who concluded that the

4    unstabilized polypropylene degraded, of that you

5    disagree with that and you have other findings that

6    you point to that disagree with that; but his

7    ultimate conclusion was unstabilized polypropylene

8    will degrade.  You disagree with that.

9              MS. STEELE:  Object to form and

10   characterization by counsel.

11   A.  Yeah, I disagree with some of the things in

12   the manuscript, but I agree with some of the other

13   conclusions in the manuscript.  These are not just

14   all one-sided manuscripts.

15   Q.  When we're talking specifically about in

16   vivo degradation, to the extent that any of those

17   authors or scientists concluded that polypropylene

18   degrades in vivo, you would disagree with that

19   conclusion?

20             MS. STEELE:  Object to form.

21   A.  Yeah, I mean, I guess I would disagree with

22   your categorization of the manuscripts.  I think

23   what manuscripts are doing is showing all the data

24   and discussing that data.  They're saying there

Steven R. Little, Ph.D.

1    could be alternate explanations.  That's very

2    common in scientific manuscripts.  That's not --

3    Q.  Let me ask the converse of that.  To the

4    extent that all these authors that we've already

5    talked about found that polypropylene does not

6    degrade in vivo, you'd agree with that?

7             MS. STEELE:  Object to form.

8    A.  Well, so based on my reading of the

9    literature, if someone had a manuscript and they

10   went through it and suggested that the

11   polypropylene doesn't degrade, that would be

12   consistent with the vast majority of evidence that

13   I've seen.

14   Q.  To the extent that these authors Clavé,

15   Costello one and two, Celine Mary, Clavé, Liebert

16   have concluded that polypropylene does indeed

17   degrade -- undergo degradation inside the body, you

18   would disagree with that; correct?

19             MS. STEELE:  Object to form.

20   A.  Yes, I would disagree with the conclusions,

21   and there's specific reasons because the biological

22   material would explain all of these things.

23   Q.  Okay.  And you would agree with all the

24   findings in Dr. Thames' report; correct?

Steven R. Little, Ph.D.

```
 1                MS. STEELE:  Object to form.

 2     A.  Well, I guess I didn't go through and

 3  analyze if there was anything in there in the

 4  methods that I disagree with.  I can tell you that

 5  with regard to degradation of the polypropylene, it

 6  was a thorough study that showed the results of

 7  multiple steps of cleaning and in between those

 8  steps did analyses of the material, and it seems

 9  very clear in that study that it's not degrading.

10     Q.  Now, Dr. Thames, his publication doesn't

11  relate to Marlex polypropylene; right?

12                MS. STEEL:  Object to form.

13     A.  I'm not so sure I'd say that, I mean,

14  basically, you know, my understanding of this is

15  that even other experts for plaintiffs like Dr.

16  Mayes is saying that polypropylene's polypropylene,

17  so.

18     Q.  Are you saying polypropylene is

19  polypropylene?

20     A.  Well, I'm saying that if you have this

21  stabilized polypropylene mesh that's in the body

22  for 11 years and you can crack films that look

23  exactly like the films that everybody else is

24  saying is oxidized polypropylene and underneath of
```

Steven R. Little, Ph.D.

1    it is a pristine fiber that has the manufacturer's

2    striations, it's pretty clear to me that that would

3    apply to both.

4       Q.  My question was pretty easy.  So are you

5    saying that polypropylene is polypropylene is

6    polypropylene; is that your opinion?

7            MS. STEELE:  Object to form.

8       A.  I'd say that with regard to my analysis of

9    the literature here in my report, I think the

10   answer is yes.  In all regards, details of

11   concentrations of things, maybe not.  I haven't

12   done that analysis.

13      Q.  Have you read the deposition of Dr. Barbol

14   who testified on behalf of Ethicon?  He was a

15   scientist at Ethicon and conducted and looked at

16   the degradation studies that Ethicon did

17   internally.  Have you read that?

18      A.  I don't believe so, no.

19           MS. STEELE:  Objection to evidence not

20   in this case.

21      Q.  If Doctor -- strike that.

22           MR. THORNBURG:  What's that?

23           MS. STEELE:  I don't think we would be

24   allowed to show them to him, but --

Steven R. Little, Ph.D.

```
 1                MR. THORNBURG:  It's in the same court.

 2                MS. STEELE:  Okay.

 3                MR. THORNBURG:  It's public information.

 4      Q.   If Dr. Barbol has testified that Ethicon's

 5   Prolene undergoes in vivo surface degradation, that

 6   the polypropylene actually degrades, would you also

 7   disagree with Dr. Barbol?

 8                MS. STEELE:  Object to form.

 9      A.   I haven't seen the evidence that he uses to

10   make that conclusion, so.

11      Q.   Did you know that Ethicon performed

12   numerous, dozens upon dozens of internal studies

13   looking specifically at whether or not Prolene

14   polypropylene will degrade?

15                MS. STEELE:  Object to form.

16      A.   I'm not aware of Ethicon studies.

17      Q.   How many Boston Scientific studies were done

18   internally by Boston Scientific to determine

19   whether or not if Marlex polypropylene mesh would

20   undergo in vivo degradation?

21                MS. STEELE:  Object to form.

22      A.   Well, I don't know if I've seen all the

23   documents associated with Boston Scientific, and

24   I -- even if I did, I don't know if I'd remember.
```

Steven R. Little, Ph.D.

1    So I think my answer is I don't remember.

2       Q.  So have you seen a single document by Boston

3    Scientific that tried to answer the question

4    internally whether or not Marlex polypropylene

5    materials that they were using in their pelvic mesh

6    devices would degrade?

7               MS. STEELE:  Object to form.

8       A.  And I know they went through the studies to

9    show FDA clearance which --

10      Q.  That wasn't my question.  That wasn't my

11   question.  My question was, did Boston Scientific

12   provide to you any internal study demonstrating

13   that Boston Scientific actually did internal

14   corporate studies to determine whether or not its

15   Marlex polypropylene would undergo in vivo

16   degradation?

17              MS. STEELE:  Object to form.

18      A.  Okay.  So internal studies, I don't

19   remember.

20      Q.  Did you ask them if they had any internal

21   studies?

22      A.  No, I didn't ask.

23      Q.  Doctor, what publications in your amended

24   reliance materials list support your opinion that

Steven R. Little, Ph.D.

1    Marlex polypropylene will not degrade in vivo?

2              MS. STEELE:  Object to form.

3      A.  Well, I'd say first of all, the ones that I

4    cite in my report.  Then I go through the specific

5    details of why I rely on those.

6      Q.  Are there any additional studies outside of

7    your expert report in your materials reliance list

8    that you claim support your opinion that Marlex

9    does not degrade in vivo?

10             MS. STEELE:  Object to form.

11     A.  I mean, I read all of these things and I

12   would say in all of them that you have in front of

13   you there was nothing there that made me believe

14   that it did degrade.  So as a whole, this materials

15   considered list suggests to me that polypropylene

16   is not degrading.

17     Q.  Have you ever looked at Dr. Thames' expert

18   report?

19     A.  Dr. Thames' expert report, I'm not sure I

20   remember.

21     Q.  Did you ever talk to Dr. Thames?

22     A.  No.

23     Q.  Ever met with Dr. Thames?

24     A.  Since this trial started, no.  Or since --

Steven R. Little, Ph.D.

```
 1    sorry, not the trial, my apologies.  Since I was

 2    retained for this case, no.

 3        Q.  Have you spoken with Dr. Thames before?

 4        A.  I may have seen him before, spoke.  I'm not

 5    good friends with him.

 6        Q.  You have listed on your reliance list

 7    Dr. Ostergard's publication or publications by

 8    Dr. Ostergard; correct?

 9        A.  Yes.

10        Q.  And Dr. Ostergard as you know from reading

11    his publications has concluded that polypropylene

12    will undergo in vivo degradation; correct?

13        A.  I don't have a copy of that article.  To

14    refresh my memory, I don't recall specifically what

15    that article talks about off the top of my head.

16        Q.  What about Dr. Iakovlev; did you review Dr.

17    Iakovlev's publication?

18        A.  Sorry, could you spell the name.

19        Q.  Iakovlev, I-A-K-O-V-L-E-V.

20        A.  I've seen those publications, yes.

21        Q.  And you know from reviewing his publications

22    that he's concluded that polypropylene undergoes in

23    vivo degradation; correct?

24        A.  I believe he concludes that, yes.
```

Steven R. Little, Ph.D.

```
1      Q.  And you would disagree with Dr. Iakovlev;
2   correct?
3      A.  I do.
4      Q.  And to the extent that Dr. Ostergard opines
5   that polypropylene undergoes in vivo degradation,
6   you would disagree with Dr. Ostergard?
7      A.  Yeah, I mean, I don't remember that article
8   off the top of my head.  I'd have to look at it
9   but...
10     Q.  To the extent that he did, you'd disagree;
11  right?
12              MS. STEELE:  Object to form.
13     A.  You know, I'd say, again, I'd like to look
14  at or remember the details of why an individual
15  would say that.  But I think that from my review of
16  the literature, it's my opinion that it's not
17  degrading in vivo.
18     Q.  Let's go ahead and mark as Exhibit No., I
19  think 10, the Ostergard degradation paper entitled
20  "Degradation, infection and heat effects on
21  polypropylene mesh for pelvic implantation:  what"
22  we -- "what was known and when it was known."
23              (SMITH deposition Exhibit 10 was marked
24  for identification.)
```

Steven R. Little, Ph.D.

1    Q.  Have you looked at this Dr. Ostergard

2    article?

3    A.  I do remember this article now, yes.

4    Q.  And you recall that Dr. Ostergard in this

5    paper goes through a time line of when it was known

6    that polypropylene will undergo in vivo

7    degradation?

8         MS. STEELE:  Object to form.

9    A.  Well, the time line here has a bunch of

10   different pieces of information that I believe

11   Dr. Ostergard would say that, you know, someone

12   could look at all of this and draw a conclusion.

13   There is some discussion here at the very end about

14   many publications and detailing things like

15   degradation mechanisms and heat exposure.  But this

16   is not a detailed study; it's just referencing a

17   bunch of other things.

18   Q.  But you understand and you understood when

19   you read this paper that Dr. Ostergard is stating

20   in this paper that it's been known and it was known

21   before mesh manufacturers began to sell

22   polypropylene mesh material that polypropylene mesh

23   would degrade in vivo; correct?

24   A.  Well, I -- I -- I'm trying to look for that

Steven R. Little, Ph.D.

1    ultimate conclusion here.  He's citing certain

2    papers, some of which I think we probably

3    discussed, and he's citing other things like

4    bacteria adherence, and it's just a compilation of

5    a bunch of different things here.

6        Q.  If you look at the first page, beginning

7    where, "There has been a lack of dissemination"; do

8    you see that?

9        A.  Yes.

10       Q.  "There has been a lack of dissemination of

11   information regarding many of the characteristics

12   of polypropylene mesh especially the many factors

13   which are implicated in the complications that our

14   patients experience postoperatively."

15               Did I read that correctly?

16       A.  I think you did read that correctly, yes.

17       Q.  And then he talks about some of the meshes

18   of when they were cleared by the FDA; correct?

19       A.  Yes.

20       Q.  And then he goes on to say, "I will

21   concentrate here on those factors known to

22   influence the behavior of mesh in vivo until 2003,

23   when many more new meshes were cleared by the FDA.

24   Heat effects and degradation will be summarized.

Steven R. Little, Ph.D.

```
 1    Relevant information has accumulated since the

 2    1950s and was available in the medical literature

 3    for many years before FDA clearance of various

 4    meshes and mesh kits as outline below."

 5              And then he goes through and talks

 6    about when it was known that bacteria will adhere

 7    to mesh fibers and could lead to infection;

 8    correct?

 9    A.  Yes.

10              MS. STEELE:  Object to form.

11    A.  Yes.

12    Q.  And then he goes through and says --

13    and outlines when it was known, based on his

14    research, when degradation was known to occur in

15    vivo with polypropylene mesh devices, and he

16    outlines that for us; correct?

17    A.  Well, he cites a paper that makes a

18    conclusion.  That particular paper said based on

19    the evidence they have, that there's degradation.

20    He's not concluding there's degradation; he's

21    citing other people.

22    Q.  Have you read any other of Dr. Ostergard's

23    publications where he concludes that polypropylene

24    degrades in vivo?
```

Steven R. Little, Ph.D.

```
1              MS. STEELE:  Object to form.

2       A.  I don't remember.

3       Q.  If Dr. Ostergard ultimately concluded in any

4    of his publications that polypropylene mesh used in

5    the treatment of pelvic organ prolapse and stress

6    urinary incontinence undergoes in vivo oxidative

7    degradation or some other form of in vivo

8    degradation, would you agree or disagree with Dr.

9    Ostergard?

10      A.  Well, I mean --

11             MS. STEELE:  Object to form.

12      A.  -- I guess I'd love to see the information

13   that he's using, the tests that were done.  But

14   like I said, my review of the literature suggests

15   that there's no degradation of the polypropylene

16   and, in fact, that the conclusions that are made by

17   those who say that there is degradation, most

18   notably the way the fibers look is the most common

19   thing that people use, and my research suggests

20   that that is a layer of biological material.

21      Q.  Now, you've also reviewed Dr. Jongebloed?

22      A.  The name sounds familiar, yes.

23      Q.  He's got a publication dating as far back as

24   the 1980s; correct?
```

Steven R. Little, Ph.D.

1    A.   Are these the studies in the eye?

2    Q.   Right.

3             He's got a number of studies.  He's

4    got eye studies and non-eye studies.

5    A.   Okay.

6    Q.   Subcutaneous.  Have you looked at

7    Jongebloed's subcutaneous studies?

8    A.   I can't recall if I've seen the subcutaneous

9    studies.  I do recall seeing the eye study.

10   Q.   Okay.  And in -- with respect to the eye

11   study at least you understand that Dr. Jongebloed

12   opined or concluded in his publications that

13   polypropylene mesh will degrade?

14   A.   Yeah.

15             MS. STEELE:  Object to form.

16   A.   From my recollection it's based on visual

17   observation of a coating on the outside of the

18   fibers.

19   Q.   And I want to clarify because I think I made

20   a mistake.  His conclusion was that polypropylene

21   sutures will undergo in vivo degradation; correct?

22             MS. STEELE:  Object to form.

23   A.   Right.  Same answer that I just gave for

24   sutures, yes.

Steven R. Little, Ph.D.

1    Q.  And you disagree with Dr. Jongebloed's

2    opinion that polypropylene sutures will undergo in

3    vivo degradation; correct?

4              MS. STEELE:  Object to form.

5    A.  Yeah, I think that the primary reasons for

6    people concluding that can be explained by a

7    coating of biological material.

8    Q.  You disagree with Dr. Jongebloed's opinion

9    that it actually is degraded polypropylene and not

10   some sort of biological material that's breaking on

11   the outer layer of the polypropylene fibers;

12   correct?

13             MS. STEELE:  Object to form.

14   A.  Yes, based on what I've seen, I think that

15   what is seen, for instance, in that study, is a

16   layer of biological material instead of

17   degradation.

18   Q.  And Dr. Iakovlev, I think you've testified

19   that you disagree with his conclusions that

20   polypropylene degrades in vivo; correct?

21   A.  Yes.

22   Q.  Other than Dr. Thames and Dr. de Tayrac,

23   what other publications do you rely on where the

24   conclusion from the researchers or the authors of

Steven R. Little, Ph.D.

1    the publication was that polypropylene does not

2    undergo in vivo degradation?

3              MS. STEELE:  Object to form.

4    A.   Yeah, I mean, so, again, we're doing this

5    dichotomy of things.  I think that there's plenty

6    of conclusions and speculation in all of these

7    papers that we were talking about that it could be

8    a layer of biological material, so I would not

9    limit it to those two papers.

10             But I do think that, of note, those two

11   papers come up with and focus on cleaning

12   mechanisms.  So the cleaning mechanic --

13   Q.   I'm not --

14             MS. STEELE:  He's still answering.

15   Q.   I'm sorry, I thought you were done.  Were

16   you done?

17   A.   No.

18             MS. STEELE:  Continue.

19   A.   So I was just saying that those two

20   particular papers focus on cleaning mechanisms, and

21   especially the Thames article more recently focuses

22   on a multistep cleaning mechanism where you can

23   literally see like the various results from the

24   various steps of the cleaning.  So in that regard,

Steven R. Little, Ph.D.

1    it's very clear in those manuscripts what's going

2    on.  But in the history of these papers, many of

3    which we've discussed, there's plenty of evidence

4    that this is a coating of biological material.

5      Q.  Provide me with one specific publication

6    other than Thames or Dr. de Tayrac where the

7    conclusion was that polypropylene sutures or mesh

8    do not undergo in vivo degradation.

9            MS. STEELE:  Object to form.

10     Q.  Just one.  This is your opportunity.

11     A.  Yeah, so I already -- I already gave you a

12   number of them.  And there's conclusions in there

13   that say that it could be that and that could be an

14   alternate explanation.  Whether or not it's the

15   final ultimate conclusion or not, which is what

16   you're trying to force me into, is a different

17   story.

18            But I think what I would point you to is

19   all the studies that do not show it.  So what you

20   wouldn't have happen is somebody publish a paper

21   that says we didn't find any oxidative degradation

22   because everybody would suggest and note that

23   there's not going to be oxidative degradation

24   because it's not a degradable material.  So it's

Steven R. Little, Ph.D.

1    not going to be a super-publishable thing.

2      Q.  You're saying there aren't publications that

3    you can point to that -- where the ultimate

4    conclusion was that polypropylene doesn't undergo

5    in vivo degradation because when those studies were

6    done they decided not to publish it because

7    everybody knew that polypropylene wouldn't undergo

8    in vivo degradation; is that your testimony?

9            MS. STEELE:  Object to form.

10     A.  What I'm saying is to, in addition to all

11   that I just said, there's going to be the

12   possibility of situations where somebody looked at

13   a polypropylene implant, saw no harmful effects

14   whatsoever, and wouldn't have necessarily published

15   that nor would it have been something an editor

16   would have been excited to accept because of all of

17   the history of safe use of polypropylene.  So all

18   I'm saying is, is that it's a more --

19     Q.  Other than speculation, Doctor, what is the

20   basis for that statement that you just made?

21     A.  Because --

22            MS. STEELE:  Object to form.

23     A.  -- because showing that polypropylene

24   degrades would be a provocative thing.  It's

Steven R. Little, Ph.D.

1    something that goes against many years of

2    established use.  You don't see widespread

3    failures, so you would expect that the material

4    would continue to be stable.  So to show that

5    there's some degradation is kind of a provocative

6    thing; it's something that editors would be more

7    likely to entertain for a publication.  So what I'm

8    saying is I based my conclusions off the literature

9    that's in my report.  That's what they're based off

10   of.

11      Q.  Can you give me the name of any -- any

12   scientist anywhere in the world who you've spoken

13   to who you've been in contact with who has told you

14   that they decided not to publish their findings on

15   in vivo implantation of polypropylene because it

16   wasn't provocative because it didn't show

17   degradation?  Tell me one scientist that you know

18   of who's ever done that.

19           MS. STEELE:  Object to form.

20      A.  That's not what I'm saying.  I have not

21   talked to scientists who have told me that and that

22   wasn't my point.

23      Q.  Okay.  So other than speculation, you've got

24   no other foundation to state that that has been

Steven R. Little, Ph.D.

```
1     what's happened?

2            MS. STEELE:  Object to form.

3      A.  I would just cite the very long history of

4     safe use.

5      Q.  Doctor, you've never even looked at the

6     epidemiological studies that looked at the dangers

7     or the risks or the complications associated with

8     the Uphold, the Obtryx, the Solyx, or any of Boston

9     Scientific's products.

10           MS. STEELE:  Object to form.

11     Q.  You never even looked at that

12    epidemiological data.

13           MS. STEELE:  Object to form.

14     Q.  Right?

15     A.  I have not looked at that epidemiological

16    data.

17     Q.  Is Uphold on the market anymore, Doctor?

18     A.  Um, my understanding is that Uphold is not

19    currently on the market.

20     Q.  Is the Pinnacle on the market anymore,

21    Doctor?

22     A.  I don't recall.  In fact, maybe it's one

23    that I thought I heard is not on the market and the

24    other one is.  I don't remember, I'm sorry.
```

Steven R. Little, Ph.D.

1    Q.  You don't know -- you don't even know which

2    products are on the market currently, do you?

3              MS. STEELE:  Object to form.

4    A.  Um, I don't, but I don't understand how

5    that's relevant to my opinions.

6    Q.  Well, you keep on saying decades of safe

7    use, but you haven't even looked at the

8    epidemiological studies concerning Boston

9    Scientific's pelvic mesh devices.  You don't know

10   which products are on the market or aren't on the

11   market anymore.  Do you know why Boston Scientific

12   stopped marketing some of their pelvic organ

13   prolapse devices?

14             MS. STEELE:  Object to form.  Calls for

15   speculation.  Argumentative.

16   A.  It was like three or four questions there.

17   I remember the last one.

18   Q.  Okay.

19   A.  Which is I don't know why specifically

20   Boston Scientific would have chosen to market or

21   not market something.

22   Q.  Have you read the FDA 522 orders?

23   A.  I don't recall reading FDA 522s.

24   Q.  Did you know that the FDA, just before

Steven R. Little, Ph.D.

1    Boston Scientific decided not to -- to no longer

2    sell some of their pelvic organ prolapse devices,

3    that the FDA had conducted an analysis and had

4    determined that Boston Scientific had not

5    demonstrated safety and that the studies that were

6    currently available did not demonstrate safety and

7    had required Boston Scientific to undertake

8    post-market clinical trials to determine the safety

9    and efficacy of their Marlex mesh pelvic organ

10   prolapse product devices?  Are you aware of any of

11   that history?

12              MS. STEELE:  Object to form;

13   mischaracterizes the evidence.

14     A.  Yeah, so you might have to repeat that

15   question.  It was very long.

16     Q.  Were you aware of the history concerning the

17   FDA's 522 orders of post-market clinical trials

18   that needed to be done in order for Boston

19   Scientific to continue to market some of their

20   pelvic organ prolapse Marlex mesh devices?

21              MS. STEELE:  Object to form.

22     A.  As I said before, I have not read the 522s.

23     Q.  Okay.  Are you aware of the

24   re-classification that's been done by the FDA?

Steven R. Little, Ph.D.

```
 1                 MS. STEELE:  Object to form.

 2     A.  I'm not an FDA expert here, so I'm not aware

 3   of the specifics of it, no.

 4     Q.  Is it fair to say that you haven't looked at

 5   all the epidemiological data to determine on your

 6   own the safety of the Uphold, the Pinnacle, the

 7   Obtryx, the Solyx devices?

 8                 MS. STEELE:  Object to form.

 9     A.  No, that's outside of the scope of the

10   opinions that I put in my report.

11     Q.  You're not going to offer regulatory

12   opinions at trial; correct?

13     A.  No.

14     Q.  You're not going to suggest to the ladies

15   and gentlemen of the jury that Uphold is a safe

16   product; correct?

17                 MS. STEELE:  Object to form.

18     A.  No, I mean, my opinions are contained in my

19   report.  There's a lot of things associated with a

20   product.  Doctors, you'd have to talk to them about

21   this as well.  I'm not providing testimony on all

22   of those things.

23     Q.  So to answer my question so the record's

24   clear, you're not going to offer opinions at trial
```

Steven R. Little, Ph.D.

1    that the Uphold product is safe as a permanent

2    implant for the treatment of pelvic organ prolapse

3    in patients?

4              MS. STEELE:  Object to form; asked and

5    answered.

6      A.  No, I'm only providing the opinions that are

7    in my report.

8      Q.  Okay.  You're not going to offer the opinion

9    at trial that the Pinnacle is a safe and effective

10   treatment option for women; correct?

11             MS. STEELE:  Object to form.

12     A.  Like I said, I'm not sure how to answer

13   this.  I think I already answered it.  My opinions

14   that I'm going to testify on are in my report.  So

15   I'm not going to be going into clinical safety,

16   efficacy; that's not my area of expertise.

17     Q.  Right.  Without having reviewed all of the

18   material concerning the safety and efficacy of the

19   product, you can't offer an opinion that a product

20   is safe and effective; right?

21             MS. STEELE:  Object to form.

22     A.  Correct.

23     Q.  You're not going to offer any opinions at

24   trial that, for the same reason, that the Obtryx

Steven R. Little, Ph.D.

```
1    device is a safe and effective product for the

2    treatment of stress urinary incontinence because

3    you simply haven't looked at all of the

4    epidemiological studies concerning that product;

5    correct?

6              MS. STEELE:  Object to form.

7       A.  Correct.

8       Q.  And the same with the Solyx; correct?

9              MS. STEELE:  Form.

10      A.  I'm not going to be offering opinions on

11   clinical safety and efficacy and epidemiological

12   studies on these materials, no.

13      Q.  You're not going to offer any opinion that

14   any one of the plaintiffs in any of the cases that

15   you've been disclosed as an expert wasn't harmed as

16   a result of being implanted with either the Uphold,

17   the Pinnacle, the Solyx, or the Obtryx; correct?

18             MS. STEELE:  Object to form.

19      A.  No.

20      Q.  Because that would be a medical opinion and

21   outside of your expertise; correct?

22             MS. STEELE:  Form.

23      A.  Yes.

24      Q.  You're not going to offer the opinion at
```

Steven R. Little, Ph.D.

```
1    trial that the Uphold, the Pinnacle, the Solyx, or

2    the Obtryx were not defectively designed --

3              MS. STEELE:  Object to form.

4    Q.  -- correct?

5    A.  What I would say is just to the extent that

6    my report's opinions talk about the polypropylene

7    itself as not --

8    Q.  You're going to limit your opinions --

9    you're going to limit your opinions to,

10   essentially, to degradation; is that fair?

11             MS. STEELE:  Object to form.

12   A.  Degradation and the local response, yes.

13   Q.  Having not looked at the design history

14   file, you can't offer an opinion about whether or

15   not the company has performed something below the

16   standard and has marketed a product that was in

17   some ways defective and harmful to patients;

18   correct?

19             MS. STEELE:  Object to form.

20   A.  Besides what we've talked about, I'm not

21   offering opinions on that, no.

22   Q.  And you haven't reviewed FMEA?  Do you know

23   what FMEAs are?

24   A.  I think it's basically a failure modes
```

Steven R. Little, Ph.D.

1    analysis.  I'm not offering opinions -- I'm not

2    offering opinions on that.

3      Q.  And you won't be offering any opinions

4    concerning the adequacy or inadequacy of any of the

5    labeling that was provided to physicians or to

6    patients; correct?

7      A.  Correct.

8            MR. THORNBURG:  Now, let me just go off

9    the record for one moment.

10           THE VIDEOGRAPHER:  Going off the record.

11   The time is 3:26 p.m.

12           (Whereupon, a recess was taken.)

13           THE VIDEOGRAPHER:  Beginning of disk

14   four, going back on the record.  The time is

15   3:32 p.m.

16           MS. STEELE:  Dan, do you want to pass

17   witness to Katy?

18           MR. THORNBURG:  Yes.  I'm passing the

19   witness to Katy.

20                   EXAMINATION

21   BY MS. KROTTINGER:

22     Q.  Dr. Little, is this your first deposition in

23   this litigation?

24     A.  Yes.

Steven R. Little, Ph.D.

1    Q.   And how did you become a witness in this

2    litigation?

3    A.   Well, I mean, I guess -- I don't know the

4    details of the legalese of this.  I submitted a

5    report.  Exactly how I'm chosen to come give verbal

6    testimony, I don't know.

7    Q.   So Boston Scientific's counsel sought you

8    out to be an expert in this litigation?

9    A.   Yes.

10   Q.   And your report dated October 24th of 2016,

11   that's your first expert report that you drafted in

12   this litigation?

13   A.   That sounds -- that sounds right.

14   Q.   And you've only written one report thus far?

15   A.   I've only -- that I know of, I've only

16   written one report.

17   Q.   Have you read the expert reports of

18   Dr. Spiegelberg or Dr. Badylak?

19   A.   I don't believe I have, no.

20   Q.   Do you know who Dr. Spiegelberg is?

21   A.   I know who Dr. Spiegelberg is.  I've never

22   spoke to him.  We haven't met.

23   Q.   How about Dr. Badylak?

24   A.   Yes, I know Dr. Badylak.

Steven R. Little, Ph.D.

1     Q.   Have you reviewed any of his work or

2     studies?

3     A.   Well, I mean, I guess he's been at the

4     University of Pittsburgh since I came in 2006, so I

5     knew him and generally aware of his work.

6     Q.   Do you know him personally?

7     A.   I do.

8     Q.   Did you become involved in this litigation

9     because of your relationship with Dr. Badylak?

10    A.   No.

11    Q.   Do you believe that polypropylene oxidizes

12    inside the body?

13    A.   Do I believe that it oxidizes inside the

14    body?  No.

15    Q.   Zero percent, no oxidation whatsoever --

16    A.   Hmm.

17    Q.   -- that's your opinion?

18         MS. STEELE:  Object to form.

19    A.   Well, I think that the studies are very

20    clear that it's not degrading.  You know, zero

21    percent, I -- I mean, is it possible that you have

22    like a polymer chain on the surface that -- that

23    can oxidize?  I don't know.  I mean, it depends on

24    the details of the antioxidant package and how long

Steven R. Little, Ph.D.

1   it's been in there.  But I mean, geez, even after

2   11 and a half years, you can still see it's not

3   degraded.

4           So I think if there is any surface level

5   of oxidation which again we're talking about

6   extremely thin layer on the surface, if anything, I

7   can't say with a hundred percent certainty whether

8   there's like a bond or two bonds or a hundred

9   bonds, but I can tell you for sure that those

10  numbers I just gave and even much bigger numbers

11  than I just gave would make no impact on the

12  material property of the system.

13  Q.  But it's your opinion that polypropylene can

14  oxidize inside the human body?

15  A.  I think it can oxidize under thermal

16  conditions.  I think it's unclear; I've never seen

17  anybody show that it can oxidize in the body.  So I

18  think no one knows.

19  Q.  Are peroxides oxidative agents?

20  A.  Peroxides are considered reactive oxygen

21  species.

22  Q.  And not to belabor this point because I

23  think Dan went over this quite a bit, but do you

24  believe that polypropylene is one hundred percent

Steven R. Little, Ph.D.

1    inert?

2              MS. STEELE:  Object to form.

3      A.  I mean, if by inert you mean that it -- the

4    most useful term for inert is that it maintains its

5    ability to do its job over the period of time that

6    it's intended to do its job, then I believe it is

7    inert, yes.

8      Q.  So if it -- so is that your definition of

9    inert, an inert material?

10     A.  Generally, that's the definition of inert

11   that I think is useful.  So, for instance, a

12   definition of inert where, you know, there's any

13   bonds that degrade or something, is a useless

14   definition.  Because, I mean, everything in the

15   universe can -- there would be nothing that would

16   be inert if that's the definition.

17     Q.  Okay.  Do you know what the foreign body

18   response is?

19     A.  Yes.

20     Q.  Do you believe that the foreign body

21   response to implanted materials is chronic?

22     A.  Um, is it chronic?  I think from what I've

23   seen, I don't see evidence of a chronic

24   inflammatory response.  I will say that the foreign

Steven R. Little, Ph.D.

1    body response is not necessarily a bad thing and

2    actually required for healing.  So just the fact

3    that you have inflammation is not necessarily bad

4    at all.

5      Q.  Does the foreign body response ever stop?

6           MS. STEELE:  Object to form.

7      A.  Um, I think that we're going back to the

8    same thing before, I guess it depends on your

9    definition.  Is it a useful definition or not.  I

10   mean, is there -- is there a -- is there a

11   lymphocyte or a monocyte or something that goes in

12   and that -- does that mean the foreign body

13   response never stops?  That would be sort of, I

14   think, in my opinion, a useless definition.  I

15   don't think that there's evidence of a chronic

16   inflammatory response which is what I think

17   ultimately is going to -- if you have

18   complications, then you can associate it with that.

19   I don't see evidence of that.  So I guess my answer

20   is, again, that you have to be careful with what

21   you are defining in order for it to be a meaningful

22   question.

23     Q.  Do you think different types -- different

24   parts of the body have different reactions to

Steven R. Little, Ph.D.

1    foreign bodies?

2    A.  I think it's possible for you to have a

3    different response to an implanted material in one

4    part of the body than another one, yes.

5    Q.  And earlier you testified that you're not an

6    expert in the pelvic floor anatomy; correct?

7    A.  I'm not an expert in the anatomy of the

8    pelvic floor; correct.

9    Q.  Do you think that the vagina acts

10   differently to implanted materials than other parts

11   of the body?

12   A.  It may react differently.

13   Q.  Do you know if it does or not?

14   A.  Um, I mean, I guess I would say that I

15   haven't extensively looked into what those

16   differences would be, but I think that it's

17   reasonable to believe that it's possible.

18   Q.  Do you know whether or not there are

19   peroxides in the vagina?

20   A.  I think that there probably are.  I mean,

21   there's peroxides that are available as a result of

22   a foreign body response throughout the body.  So I

23   don't think there's any reason to exclude that

24   particular anatomy from that.  Yeah, I mean, I'd

Steven R. Little, Ph.D.

1    say the concentrations most people -- most people

2    realize, I mean, the concentrations you're talking

3    about are extraordinarily small.

4       Q.  Okay.  Turn to page 6 of your report,

5    please.  Okay.  The first full paragraph, you state

6    that, "The deposited collagen, both within the

7    pores and around the mesh may contract.  This is,

8    again, an anticipated part of the foreign body

9    response.  Importantly, there is not the -- this is

10   not the mesh itself contracting or 'shrinking' and

11   certainly is not the polymer chains (that make up

12   that material) shrinking."

13             Did I read that correctly?

14      A.  Yes.

15      Q.  Why did you include that opinion in your

16   report?

17             MS. STEELE:  Object to form; to the

18   extent it calls for any attorney/client privilege

19   and the protection of draft reports.

20      A.  Well, what I was trying to say here is that

21   most of the focus that I've seen in this question

22   related to the polypropylene has to do with some

23   supposed breakdown in the polymer structure leading

24   to physical changes.  What I wanted to point out

Steven R. Little, Ph.D.

1    here is that there's a normal, necessary part of

2    healing that goes on, and in that case there is the

3    possibility of some contraction of that tissue.

4    And by that I'm talking about on like the cellular

5    and tissue level.  What I wanted to make sure in

6    the context of this and again, you know, the next

7    section is on polypropylene is non-degradable, I

8    wanted to make sure that any of this contraction

9    that's a part of the expected foreign body response

10   is not attributed to some kind of material change

11   in the polypropylene that's causing the

12   polypropylene to contract.

13     Q.  So I just want to see if I understand this

14   correctly.  Your opinion is that if there is

15   contracture, it's because the mesh -- or I mean the

16   tissue is making the mesh contract through the

17   healing process; is that accurate?

18             MS. STEELE:  Object to form.

19     A.  Yes.  So the polymer itself is not going to

20   contract.  The tissue can.

21     Q.  And the whole purpose of these mesh products

22   is for tissue ingrowth; correct?

23             MS. STEELE:  Object to form.

24     A.  The whole purpose of this process is to form

Steven R. Little, Ph.D.

1    this synthetic and biological -- I mean, it's not a

2    true composite, but it's kind of like both of them

3    together.

4        Q.  So does this process cause the surface area

5    of the mesh to decrease?

6                MS. STEELE:  Object to form.

7        A.  Hmm.  Well, I mean, I guess it depends on

8    what do you mean by surface area and how you're

9    calculating it.  If you fill it with biological

10   tissue and now all that biological tissue is there

11   and you're looking at just the surface area of this

12   thing rather than what it was before which was this

13   with pores, then the surface area would decrease.

14       Q.  Do you know by how much?

15       A.  No.

16       Q.  Do you think it's important to know how

17   much?

18       A.  Um, do I think it's important to know?  For

19   what reason?

20       Q.  I'm asking questions, not you.

21                So do you think it's important to

22   know?

23                MS. STEELE:  Object to form.

24       A.  You know, could I imagine a question where

Steven R. Little, Ph.D.

1    the surface area may be relevant to some output

2    parameter?  It's possible.  But until I know what

3    I'm understanding in regard to the surface area, I

4    can't answer the question.

5      Q.  Do you think it would be important for

6    doctors to know whether or not the surface area of

7    the product changed once it was implanted inside

8    the human body?

9              MS. STEELE:  Object to form.

10     A.  I don't know, I mean, you'd have to ask a

11   doctor.

12     Q.  Do you know if Boston Scientific has done

13   any research as far as this is concerned?

14             MS. STEELE:  Object to form.

15     A.  I don't know.

16     Q.  Do you think they should have?

17             MS. STEELE:  Object to form.

18     A.  Um, I don't know.  I think that's outside of

19   the scope of my opinions in my report.

20     Q.  Well, I mean, you have an opinion about

21   whether or not the mesh contracts and shrinks once

22   it's implanted inside the human body; correct?

23     A.  I do.

24     Q.  So you don't think that it's important for

Steven R. Little, Ph.D.

1    Boston Scientific to have done some research in

2    this regard?

3            MS. STEELE:  Object to form.

4    A.  Um, well, I mean, I guess the question I was

5    trying to answer had to do with like surface area

6    and, again, I maybe don't understand what

7    specifically we're looking at in regard to the

8    surface area changing.  Could I imagine that it's

9    important for Boston Scientific to have done

10    studies related to this particular topic?  I mean,

11    I don't know.  It's not my area of expertise.

12    You'd have to talk to a doctor.

13    Q.  If there was a 30 percent decrease in

14    surface area of the mesh, do you think that that

15    would tend to prove that the material is not inert?

16            MS. STEELE:  Object to form.

17    A.  Hmm, I don't know.  I don't have the context

18    to understand the 30 percent.  And, I mean, I know

19    these are put in tension-free.  I know that they're

20    put in a way where it's --

21    Q.  The Uphold is not put in tension-free.

22    A.  Oh okay.

23            MS. STEELE:  Object to form.

24    A.  I mean, it's -- this seems to be outside of

Steven R. Little, Ph.D.

1    the area of my opinions, so I don't know if I have

2    an opinion on this.

3       Q.   So you can't say whether or not a 30 percent

4    decrease in the surface area of the Uphold, for

5    instance, would mean that it's not functioning as

6    intended?

7             MS. STEELE:   Object to form.

8       A.   What I would say -- what I would say is

9    this, and that's that tissue growth into this mesh

10   is part of how it's supposed to work.  The degree

11   at which that tissue infiltrates and imparts its

12   properties on the system and the degree at which

13   the final orientation of the system is in order to

14   impart its effect in the local biological

15   environment, I don't know.  That's not my area of

16   expertise, so I can't answer the question.

17      Q.   What if it decreased by 70 percent; would

18   that mean that the mesh was not functioning as

19   intended?

20            MS. STEELE:   Object to form.

21      A.   Well, I think what I'd want to know is some

22   information -- again, this is not my area of

23   expertise because it seems like it's -- what it's

24   intended to do in terms of the tissue environment

Steven R. Little, Ph.D.

1   and the support, a doctor would know that.  So if

2   somebody said that it was intended to shrink one

3   percent and then you said that it shrinks 70

4   percent and the tolerance level for that was less

5   than the difference between 1 and 70 percent, then

6   you'd say it's not functioning as it was intended.

7   But I don't know the details as to what percent was

8   intended in the first place.

9     Q.  So are you going to offer any opinions at

10  trial of what rate of shrinkage is acceptable and

11  is not acceptable?

12          MS. STEELE:  Object to form.

13    A.  No.

14          MS. KROTTINGER:  Okay.  No further

15  questions.

16          MS. STEELE:  Okay.  I don't have any

17  questions. Can we go off the record? Dan, are you--

18          MR. THORNBURG:  I'm here.

19          MS. STEELE:  I think we are all done.

20          MR. THORNBURG:  Thanks, everybody.

21          THE VIDEOGRAPHER:  That concludes the

22  deposition.  Going off the record.  The time is

23  3:40 -- I'm sorry, 3:48 p.m.

24  (Signature waived.)      CONCLUDED -- 3:48 P.M.

Steven R. Little, Ph.D.

```
 1                    CERTIFICATE
 2
     COMMONWEALTH OF PENNSYLVANIA )
 3                               ) SS.
     COUNTY OF WESTMORELAND       )
 4
 5          I, Dutcheen O. Cameron, a Registered
     Merit Reporter-Certified Realtime Reporter and
 6   Notary Public in and for the Commonwealth of
     Pennsylvania, do hereby certify that the witness,
 7   STEVEN LITTLE, Ph.D., was by me first duly sworn to
     tell the truth, the whole truth, and nothing but
 8   the truth, and that the above deposition was
     recorded in stenotype by me and reduced to
 9   typewriting under my direction.
10          I further certify that the said
     deposition constitutes a true record of the
11   testimony given by said witness; that the foregoing
     deposition was taken at the time and place stated
12   herein.
13          I further certify that the inspection,
     reading and signing of said deposition were waived
14   by counsel for the respective parties and by the
     witness.
15
            I further certify that I am not a
16   relative, employee or attorney or counsel of any of
     the parties, or a relative or employee of such
17   attorney or counsel or financially interested
     directly or indirectly in this action.
18
            IN WITNESS WHEREOF, I have hereunto set
19   my hand and affixed my seal of office this 19th day
     of February, 2017
20
21
                       Dutcheen O. Cameron, RMR, CRR
22                     Notary Public
23
24
```