# EXHIBIT D

Jimmy W. Mays, Ph.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

```
-----------------------------------§
IN RE: BOSTON SCIENTIFIC CORP.,    §   MDL NO. 2326
PELVIC REPAIR SYSTEM PRODUCTS      §
LIABILITY LITIGATION               §
                                   §
---------------------------------- §
THIS DOCUMENT RELATES TO:          §
                                   §
ALL WAVE 4 CASES IN MDL NO. 2326   §
                                   §
-----------------------------------§
```

- - -
Thursday, August 16, 2018
- - -

    Videotaped deposition of JIMMY W. MAYS, Ph.D.,
held at the JW Marriott Marco Island Beach
Resort, 400 South Collier Boulevard, Marco
Island, Florida, commencing at 9:08 a.m., on the
above date, before Susan D. Wasilewski,
Registered Professional Reporter, Certified
Realtime Reporter, Certified Realtime Captioner,
Certified Manager of Reporting Services, Florida
Professional Reporter, Certified Court Reporter
(New Jersey), and Realtime Systems Administrator

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Golkow Litigation Services - 877.370.DEPS

Jimmy W. Mays, Ph.D.

Page 29

1  materials are used for permanent implantation, but I
2  can't completely rule it out.  I simply don't know,
3  but I don't think so.
4       Q.   In the materials you were developing or
5  testing, were they used for a short-term, long-term,
6  permanent implant?
7       A.   They were not used as implants.  These were
8  elastomeric materials that are being used as such,
9  elastomers, rubbery materials.
10      Q.   Rubbery materials?
11      A.   Yes.
12      Q.   I wanted to turn now to page 21 of your 2008
13 expert report.
14      A.   Okay.
15      Q.   And specifically I want to -- so the first
16 full paragraph which is -- starts with "My research
17 group carried out a study..."
18      A.   Yes.
19      Q.   And this study -- I'll hand it to you, it's
20 been marked as Exhibit 6.
21           (Mays Exhibit 6 was marked for
22 identification.)
23 BY MS. STEELE:
24      Q.   And is that a copy of the published study?
25      A.   Yes, it is.  This is the published paper.

Jimmy W. Mays, Ph.D.

Page 30

1   This does not include the supplementary data, which
2   is substantial with this, but yes, this is the main
3   paper.
4       Q.   And we previously discussed the details of
5   this testing and this article in detail in a prior
6   deposition; is that right?
7       A.   Yes, we did.
8       Q.   And the testing that's encompassed within
9   the article with lead author Imel entitled "In vivo
10  oxidative degradation of polypropylene pelvic mesh,"
11  and with you -- are you the corresponding author, is
12  that --
13      A.   Yes, and -- yeah, I was a corresponding
14  author on this.
15      Q.   And so the testing contained within this
16  article is testing that was completed for the
17  purposes of litigation in the Boston Scientific
18  pelvic mesh litigation, correct?
19      A.   Well, this contains the characterization
20  work that was done at the University of Tennessee,
21  and also work that was done by Sam Gido in this
22  case.  You know, we weren't asked by attorneys to do
23  any particular test.  We were given materials that
24  were explants.  I was aware of Clave's paper saying
25  polypropylene is not inert in the human body.  So I,

1  in collaboration with Dr. Gido, outlined a series of
2  experiments that we thought would test what the
3  actual cause of degradation is.
4       Q.   And that testing is -- so, basically, there
5  were two parts of the testing that you and Dr. Gido
6  tested explanted mesh materials, correct?
7       A.   Yes.
8       Q.   And those test results are contained within
9  your first report?
10      A.   Yes.
11      Q.   And then you conducted further
12 characterization testing on polypropylene pellets as
13 long as -- as well as pristine polypropylene meshes
14 for Boston Scientific, right?
15      A.   That's correct.
16      Q.   And that testing is outlined in the data
17 that is within your second expert report, is that --
18 which is marked as Exhibit 3; is that right?
19      A.   That's correct.
20      Q.   And the testing that's outlined in
21 Exhibits 2 and 3, which are your two prior expert
22 reports, are the basis for all of the data that's
23 contained within the Imel article, correct?
24      A.   Yes, I believe they are the basis of all of
25 the experimental data.  We did have an addendum

1   where we looked at the effect of bleach exposure on
2   a pristine polypropylene mesh just to make sure that
3   there is not oxidative degradation that is occurring
4   due to the bleach, and we allude to that testing in
5   here as well, so, yeah, maybe with that one
6   additional experiment.
7       Q.  With the one kind of control experiment
8   using bleach on pristine mesh, there is no
9   additional testing that -- in the Imel article
10  that's not contained within Exhibits 2 and 3,
11  correct?
12      A.  I think that's correct, yes.
13      Q.  Now I want to turn to -- we'll discuss
14  Dr. Thames' article and the responses, but first I
15  want to talk about on page 25.  On page 25 in the
16  first paragraph --
17          (Mays Exhibit 7 was marked for
18  identification.)
19  BY MS. STEELE:
20      Q.  I'm going to hand you Exhibit 7, which is an
21  article with lead author Talley, and this article
22  contains two components:  First, an in vitro
23  oxidative degradation test completed by Drs. Russell
24  Dunn and Scott Guelcher.  Is that right?
25      A.  Yes.  It does contain some in vitro