# Exhibit C

Jimmy W. Mays, Ph.D.

```
 1              IN THE UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3                     CHARLESTON DIVISION
 4
 5
 6       -------------------------------x
         IN RE: COLOPLAST CORP.        )  Master File No.
 7       PELVIC SUPPORT SYSTEMS        )  2:12-MD-02387
         PRODUCTS LIABILITY LITIGATION )  MDL No. 2387
 8       _____ )
 9       THIS DOCUMENT RELATES TO:     )
                                       )
10       ALL COLOPLAST WAVE 5, 6 AND 7 )
         CASES                         )
11       _____x
12
13
14
15
16
                 DEPOSITION OF JIMMY W. MAYS, Ph.D.
17
                        NAPLES, FLORIDA
18
                     FRIDAY, APRIL 26, 2019
19
                          9:03 A.M.
20
21
22       Job No.: 214446
23       Pages: 1 - 325
24       Reported by: Leslie A. Todd
```

Jimmy W. Mays, Ph.D.

```
1          Deposition of JIMMY W. MAYS, Ph.D., held in
2      the conference room at:
3

                THE RITZ-CARLTON GOLF RESORT
4

                2600 Tiburon Drive
5

                Naples, Florida 34109
6

7

8

9      Pursuant to notice, before Leslie Anne Todd,
10     Court Reporter and Notary Public, who officiated
11     in administering the oath to the witness.
12

13

14

15

16

17

18

19

20

21

22

23

24
```

Jimmy W. Mays, Ph.D.

```
 1                A P P E A R A N C E S

 2

 3    ON BEHALF OF THE PLAINTIFFS:

 4         JIM M. PERDUE, JUNIOR, ESQUIRE

 5         PERDUE & KIDD LLP

 6         777 Post Oak Boulevard

 7         Suite 450

 8         Houston, Texas 77056

 9         (713) 520-2500

10         Jperduejr@perdueandkidd.com

11

12    ON BEHALF OF THE DEFENDANT:

13         WILLIAM E. STEIMLE, ESQUIRE

14         OLIVER THOMA, ESQUIRE

15         KING & SPALDING LLP

16         101 Second Street

17         Suite 2300

18         San Francisco, California 94105

19         (415) 318-1259

20         wsteimle@kslaw.com

21         othoma@kslaw.com

22

23

24
```

Jimmy W. Mays, Ph.D.

```
 1                    C O N T E N T S

 2    EXAMINATION OF JIMMY W. MAYS                  PAGE

 3       By Mr. Steimle                               8

 4

 5                    E X H I B I T S

 6               (Attached to transcript)

 7    MAYS DEPOSITION EXHIBITS                       PAGE

 8    No. 1     Amended Notice of Deposition of

 9              Jimmy W. Mays, Ph.D.                  13

10    No. 2     Document re Compensation             17

11    No. 3     Expert Report of Jimmy Mays, Ph.D.   17

12    No. 3-1   Exhibit C: Reliance List and

13              Documents Reviewed, Jimmy Mays, Ph.D. 17

14    No. 4     April 10, 2019 letter re April 2019

15              Billing for Consulting Work on

16              Plaintiffs v. Coloplast              18

17    No. 5     Biomaterials Science, An

18              Introduction to Materials in

19              Medicine, 2nd Edition                19

20    No. 6     Article entitled "Mechanisms of

21              Biodegradation of Implantable

22              Polymers"                            20

23    No. 7     Article entitled "Review:

24              Biodegradation of surgical polymers" 20
```

Jimmy W. Mays, Ph.D.

1                  E X H I B I T S (Continued)

2                  (Attached to transcript)

3    MAYS DEPOSITION EXHIBITS                        PAGE

4    No. 8    Article entitled "Review:  Foreign

5             body reaction to biomaterials"          21

6    No. 9    Article entitled "Materials

7             characterization of explanted

8             polypropylene hernia mesh:

9             Patient factor correlation"             21

10   No. 10   Exhibit A:  Curriculum Vitae

11            Jimmy W. Mays                           68

12   No. 11   Article entitled "In vivo

13            oxidative degradation of

14            polypropylene pelvic mesh"             107

15   No. 12   AUGS Position Statement, "Mesh

16            Midurethral Slings for Stress

17            Urinary Incontinence"                  126

18   No. 13   Expert Report of Benny Dean

19            Freeman, Ph.D., P.E.                   168

20   No. 14   Article entitled "Characterization

21            of Heavyweight and Lightweight

22            Polypropylene Prosthetic Mesh

23            Explants From a Single Patient"        210

24

Jimmy W. Mays, Ph.D.

1                    E X H I B I T S (Continued)

2                    (Attached to transcript)

3     MAYS DEPOSITION EXHIBITS                        PAGE

4     No. 15    Biomaterials Science, "An

5               Introduction to Materials in

6               Medicine"                             221

7     No. 16    Biomaterials Science, "An

8               Introduction to Materials in

9               Medicine"                             229

10    No. 17    Article entitled "Subcutaneous

11              Implants of Polypropylene Filaments"  237

12    No. 18    Article entitled "Five Year Study of

13              Tissue Reaction to Synthetic

14              Sutures"                              242

15    No. 19    Article entitled "Materials

16              Characterization of Explanted

17              Polypropylene Hernia Meshes"          247

18    No. 20    Article entitled "Polypropylene as

19              a reinforcement in pelvic surgery

20              is not inert: Comparative analysis

21              of 100 explants"                      263

22

23

24

Jimmy W. Mays, Ph.D.

```
 1                    E X H I B I T S (Continued)

 2                    (Attached to transcript)

 3     MAYS DEPOSITION EXHIBITS                        PAGE

 4     No. 21    Article entitled "Comparison of

 5               polypropylene and polyethylene

 6               terephthalate (Dacron) meshes for

 7               abdominal wall hernia repair:  A

 8               chemical and morphological study"    275

 9     No. 22    Article entitled "Degradation of

10               polypropylene in vivo: A

11               microscopic analysis of meshes

12               explanted from patients"             285

13     No. 23    Article entitled "The myth: In

14               vivo degradation of polypropylene-

15               based meshes"                        297

16     No. 24    Article entitled "Reply to 'In vivo

17               polypropylene mesh degradation in

18               hardly a myth'"                       301

19

20

21

22

23

24
```

Jimmy W. Mays, Ph.D.

```
1                    P R O C E E D I N G S

2                    --------------------

3                    JIMMY W. MAYS, Ph.D.,

4          and having been first duly sworn,

5          was examined and testified as follows:

6              EXAMINATION BY COUNSEL FOR DEFENDANT

7    BY MR. STEIMLE:

8          Q    Good morning, Dr. Mays.

9          A    Good morning.

10         Q    Could you state your name for the

11   record, please.

12         A    Jimmy Wayne Mays.

13         Q    We introduced ourselves off the record.

14   My name is Wes Steimle.  I'm an attorney for

15   Coloplast.  My colleague here is Oliver Thoma.

16   And we met Mr. Perdue, as well, off the record.

17              Is there any reason that you cannot give

18   complete and truthful testimony today?

19         A    No.

20         Q    And you've had your deposition taken

21   before?

22         A    Yes.

23         Q    Several times?

24         A    Yes.
```

Jimmy W. Mays, Ph.D.

1      A     I haven't had more.

2      Q     Well, that's not my question.  Have they

3  offered to give you any more?

4      A     No.

5      Q     Have you asked for any more?

6      A     Yes, in fact, I have.  I have told

7  attorneys, you know, I would be happy to test

8  more.

9      Q     Okay.  And what did they tell you in

10  response?  They don't have any?

11      A     Usually they don't have any.

12      Q     Okay.  Other than "usually," is there

13  anything --

14      A     I've never -- I've never been denied.

15            Actually, I will say this:  You have to

16  have enough material to do the testing.

17  Oftentimes the amount of material that's available

18  is so small.  I'm looking for materials where

19  there is a substantial amount that I can do pretty

20  extensive testing on it.

21      Q     The Imel article is the only article

22  that you've published on the purported degradation

23  of polypropylene surgical mesh in implants; is

24  that right?

Jimmy W. Mays, Ph.D.

1       A    I believe that's correct, yes.

2            MR. STEIMLE:   I'm just going to go ahead

3    and mark that as the next exhibit.

4            (Exhibit No. 11 was marked for

5            identification.)

6    BY MR. STEIMLE:

7       Q    I've handed you what we marked as

8    Exhibit 11.  And, just for the record, this is the

9    Imel, et al., 2015 article that we talked about.

10      A    Yes, it is.

11      Q    And this is the one that you were the

12   coauthor on and performed some of the

13   experimentation in?

14      A    Yes.

15      Q    This says it was published in a journal

16   called Biomaterials.  Is that correct?

17      A    Yes.

18      Q    What kind of a publication is that?

19      A    It's generally considered to be the top

20   peer-reviewed journal in the area of biomaterials.

21      Q    And what would you call biomaterials?

22   How would you define that, sort of broadly

23   speaking?

24      A    Broadly speaking, those are materials

Jimmy W. Mays, Ph.D.

1    that are used in biological environments or they

2    might also be things like biopolymers that occur

3    naturally in the body.  But -- but generally, it's

4    oriented towards materials that are used in

5    biological application.

6        Q    Naturally occurring biopolymers, things

7    like proteins?

8        A    Yes.

9        Q    Okay.  And so I would imagine a large

10    part of the focus is about implants in that

11    journal.

12        A    That's a substantial portion, yes.

13    Implants.  You would run into things like

14    restorative dentistry.  You would run into things

15    like tissue engineering.

16        Q    Is Biomaterials a publication that is

17    regularly circulated among polymer chemists?

18        A    Yes.

19        Q    Okay.  Those that are interested in

20    biomaterials as well as just chemistry?  I mean if

21    you're just a chemist, so to speak, or not so much

22    interested in the biosphere, would you still look

23    at a journal like this?

24        A    If you were a physical chemist

Jimmy W. Mays, Ph.D.

```
 1    interested in ultrafast spectroscopy, you probably

 2    wouldn't read Biomaterials, but if you were an

 3    organic chemist or a polymer chemist developing

 4    materials that might have potential applications

 5    as biomaterials, you would read it.

 6         Q    So if you were helping to develop a

 7    longer lasting bone cement, for example --

 8         A    Absolutely.  Absolutely.

 9         Q    -- that would be something you would

10    look at?

11         A    Yes, sir.

12         Q    Was this article that we've marked as

13    Exhibit 11, was it peer-reviewed by Biomaterials?

14         A    Yes.

15         Q    And how do you know that?

16         A    They have all of their submissions peer

17    reviewed, and when you submit a paper to the

18    journal, you receive the reviewers' comments.  And

19    when you receive those reviewers' comments, you

20    get a letter from the editor, and they say, Your

21    paper is rejected because of these comments or

22    your paper is accepted because of these comments.

23    Those are the two extremes obviously.  Usually

24    what you get is a letter saying, Please consider
```

Jimmy W. Mays, Ph.D.

1    the reviewers' comments and revise your manuscript

2    accordingly.

3         Q    Okay.  And it looks like that might have

4    happened with the submission of this paper to

5    Biomaterials; is that correct?

6         A    That's correct.

7         Q    That's reflected in the article info on

8    the first page, the article history; is that

9    right?

10        A    Yes, it is.

11        Q    It looks like it was received by

12   Biomaterials May 3rd of 2015; is that right?

13        A    That's correct, yes.

14        Q    Is that when you submitted it?

15        A    Must have been.

16        Q    Okay.  No reason to think that's

17   inaccurate?

18        A    Absolutely correct.

19        Q    And then it says, "Received in revised

20   form 3 September 2015."  Do you see that?

21        A    Right.

22        Q    What comments were received back?  I'm

23   assuming there were some.

24        A    There were.  They were minor, very

Jimmy W. Mays, Ph.D.

1    minor.

2         Q    Do you recall what they were?

3         A    No, honestly, I don't.  I'd have to go

4    back and pull them out.  But it didn't take very

5    long to address the comments of the reviewers.

6    And in fact, the editor told me that because of

7    the fact that this was a paper where we

8    acknowledge in the acknowledgments that it was

9    conducted in litigation, before the manuscript

10   goes out for review, the editorial board

11   themselves, the editorial advisory board members

12   look at the paper to establish merit, and they

13   decided it was meritorious, they then sent it out

14   for peer review, we got peer review back, minor

15   revisions were made, and the paper was probably

16   accepted after we did that.

17        Q    All right.  But you don't recall what

18   those revisions were?

19        A    I don't.

20        Q    Do you recall if they related to any of

21   the testing that you had done versus some of the

22   other coauthors?

23        A    I don't.

24        Q    Is there a record of the comments

Jimmy W. Mays, Ph.D.

```
 1    anywhere?
 2         A     I might be able to go back and find
 3    them.
 4         Q     Where would they be?
 5         A     Maybe I have e-mail that far back.   I
 6    don't know.
 7         Q     All right.  Outside of that, would there
 8    be any way to find the comments, to your
 9    knowledge?
10         A     No.
11         Q     Would I be able to go to Biomaterials
12    and find them?
13         A     I don't think they would do that.
14         Q     They wouldn't hand them out or they
15    wouldn't keep them, or what?
16         A     They wouldn't keep them or -- I don't
17    know.  But I doubt they would turn them over to
18    you.
19         Q     Do you know who the peer reviewers were?
20         A     No.  The peer review process is
21    confidential in almost all cases.  And since the
22    editorial advisory board provided some sort of
23    screening, we could maybe identify who some of
24    those individuals were.  But the D. F. Williams,
```

Jimmy W. Mays, Ph.D.

1   who is the name on a couple of those papers that I

2   brought in this morning, he was the

3   editor-in-chief of Biomaterials at the time we

4   were submitting the manuscript.

5        Q    And are you familiar with Mr. Williams?

6        A    I don't believe I've met him personally,

7   but certainly I'm familiar with his reputation.

8   He's -- he's very -- very well known in the area

9   of biomaterials and polymer biomaterials.

10       Q    Have you met any of the advisory board,

11  the editorial advisory board of Biomaterials, at

12  least as they were constituted at the time you

13  submitted this article?

14       A    I don't know.  I simply did not go look

15  up who they were at that time.  You know, I -- I

16  know people like Buddy Ratner, Allan Hoffman, Jack

17  Lemons, you know, the types of folks that might

18  well be on there, but, you know, I don't know.

19       Q    Those folks you just mentioned who were

20  all your editors or authors on -- on the Ratner

21  book, the Biomaterials Science book --

22       A    Yes.  Yes.

23       Q    -- do you know those fellows personally?

24       A    I know Allan Hoffman.  I've met Buddy

Jimmy W. Mays, Ph.D.

1   Ratner a few times.  I know Jack Lemons very well.

2   Very nice fellow.

3        Q     And you said he worked at Tennessee with

4   you?

5        A     He was at UAB.

6        Q     Oh, UAB.

7        A     I think he's retired now.  He was

8   getting up in years at the time I left UAB, and

9   that was at the end of 2001.

10       Q     Do you know -- understanding it's

11  confidential, but do you know if the reviewers

12  were polymer chemists?

13       A     Since I don't know who the reviewers

14  are, how can I say what kind of chemists they

15  were?

16       Q     Well, they might have provided that kind

17  of information.  I don't know.

18             So you would have no way of knowing what

19  sort of expertise that the reviewers of this

20  Exhibit 11, Imel, et al., paper, actually had?

21       A     I disagree, and I disagree strongly.

22             We passed peer review by the editorial

23  advisory board at the top Biomaterials journal in

24  the world, and we also passed the peer review

Jimmy W. Mays, Ph.D.

1    process at that same journal.  They've got a

2    rigorous process.  You can -- you can bet that the

3    people that were reviewing the paper were

4    competent and highly qualified.

5         Q    But in what field, you're not -- you're

6    not able to determine?

7         A    Well, obviously, when an editor sends

8    out a paper, they send it to people that have

9    expertise.  That's the editor's job that's

10   handling the manuscript, to look at the content

11   and to choose reviewers that are experts in that

12   area.

13            So they wouldn't send a paper like this

14   to someone that was working in metal, some sort of

15   metal implant.  Okay.  Obviously metals are used

16   as biomaterials.  Ceramics are used as

17   biomaterials.  They would have sent the paper to

18   someone that's knowledgeable in polymer

19   biomaterials.

20        Q    Okay.  And knowledgeable about polymer

21   chemistry?

22        A    Certainly at some level, yes.

23        Q    And about the type of testing that was

24   done in this --

Jimmy W. Mays, Ph.D.

1         A     Yes.

2         Q     -- in this article?

3         A     Yes.   That's what competent peer

4    reviewing is about.   The editor making those

5    judgments, making sure they get in the hands of

6    the right people.

7               And I remember enough from the

8    reviewers' comments, yeah, the -- obviously

9    they're people that read the paper and knew what

10   we were talking about.

11        Q     And how are you able to say that,

12   though?   I mean what was -- what were the

13   comments?

14        A     I can't remember the specific comments,

15   but only very minor revisions were required.

16        Q     Was Biomaterials the only publication

17   that this article was submitted to?

18        A     Yes.   I simply decided to send it to the

19   best journal in the field.

20        Q     Actually, can we turn to page 141 of

21   Exhibit 11.   And I think you've touched on this.

22   It's under the section Acknowledgments.

23        A     Yes.

24        Q     It says:   "This study was initially

Jimmy W. Mays, Ph.D.

 1    conducted in litigation and sponsored for

 2    claimants against Boston Scientific Corporation."

 3    Correct?

 4         A    Yes.

 5         Q    This was -- the testing that was done

 6    and reflected in this Exhibit 11, the Imel,

 7    et al., article, was part of a report that you

 8    submitted prior to this article in the Boston

 9    Scientific litigation.  Is that true?

10         A    Yes.

11         Q    All right.  And you were deposed upon

12    that?

13         A    Yes.

14         Q    Okay.  And the testing and the opinions

15    from the report in the Boston Scientific

16    litigation ultimately made it into this Imel,

17    et al, article subsequently.

18         A    Yes.

19         Q    Okay.  There's no new testing reflected

20    in this article that wasn't also in your report

21    for the Boston Scientific litigation.  Is that

22    true?

23         A    I believe there's some additional data

24    in here that was on exemplars.

Jimmy W. Mays, Ph.D.

1        Q      What does that mean?

2        A      Material that was never implanted,

3    pristine material right out of the package.  I

4    believe there is some additional data here on the

5    exemplars that maybe wasn't in the initial report

6    that was filed in the Boston Scientific case.

7        Q      And what kind of data about that

8    pristine material would that be?

9        A      It would be just the testing according

10   to these different methods that we used here,

11   SEM/EDS, FTIR, GPC, et cetera.

12       Q      So that if I understand correctly, the

13   report that you submitted in the Boston Scientific

14   litigation did not have the pristine or unused

15   mesh samples?

16       A      No, it did, but it only had Pinnacle

17   and -- what's the other one? -- Obtryx.  In this

18   paper, I believe we tested all of the different

19   exemplars just to basically see if they were all

20   made of the same material and had similar --

21   similar molecular characteristics and similar

22   spectra.

23       Q      And when you say all of the materials,

24   you mean everything that was in Boston

Jimmy W. Mays, Ph.D.

```
 1    Scientific's inventory, for lack of a better term,

 2    for this particular type of pelvic reconstructive

 3    surgeries?

 4         A    I believe that's correct, sir.  And if I

 5    can direct you to Table 1 on page 132, you will

 6    see them listed here.

 7         Q    Is that the only difference in terms of

 8    the testing that was performed between the report

 9    you submitted in the Boston Scientific litigation

10    and this paper, to your knowledge?

11         A    I -- I think so, yes.

12         Q    Okay.  In that Boston Scientific

13    litigation, you're aware that you were excluded

14    from presenting the testing that had been done

15    that was subject to the report in the Boston

16    Scientific litigation, correct?

17         A    Yes.

18         Q    All right.  And had you read the judge's

19    opinion on that?

20         A    I don't think so.

21         Q    Why not?

22         A    You know, I don't go looking for what

23    judges are saying.

24         Q    You weren't curious about what it is
```

Jimmy W. Mays, Ph.D.

1    that he might have said or --

2        A    I don't go Google around for things like

3    that.  I don't go Google around my name.

4        Q    Are you aware that the opinions that you

5    were allowed to present as an expert at trial were

6    limited to items that you had read in the

7    literature as well as your training and

8    experience, but not the testing that had been

9    done?

10                 MR. PERDUE:  Form.

11                 MR. STEIMLE:  I'll rephrase it.

12   BY MR. STEIMLE:

13       Q    Do you know what limitations the judge

14   put on your testimony --

15       A    The specific --

16       Q    -- in the Boston Scientific litigation?

17       A    The specific limitations, no.  I do

18   recall very clearly in my first Boston Scientific

19   depo that they were taking great pains and many

20   hours to try to discredit our data as

21   cherry-picking and -- and litigation driven.  And

22   I guess ultimately they may have persuaded the

23   judge of that.  But, you know, we published those

24   same data, as we just discussed, in the top peer-

Jimmy W. Mays, Ph.D.

1    review journal in the biomaterials area.

2         Q    Let me ask you about that.

3              Did you advise the Biomaterials journal

4    that your work had been excluded in a court?

5         A    I did not.

6         Q    Why not?

7         A    It was not relevant.

8         Q    Why not?

9         A    A judge's opinion is not relevant to

10   peer review at a scientific journal.  I did what I

11   needed to do in terms of this being work that was

12   done in litigation, and that's that acknowledgment

13   that you see at the end of the paper.

14             I know as a person that's reviewed

15   literally thousands of papers myself, I wouldn't

16   be swayed one way or another -- it would be

17   totally irrelevant to me whether or not data had

18   been excluded in litigation by a judge.

19        Q    As a polymer chemist, it would be

20   irrelevant?

21        A    No, as a scientist determining whether

22   or not a paper submitted by another scientist is

23   worthy of peer review or not.

24        Q    Okay.  But whether a judge would exclude

Jimmy W. Mays, Ph.D.

1    any opinion of yours and the reasons therefor may

2    not be relevant to science, but would it be

3    relevant to your work consulting as an expert?

4              MR. PERDUE:  Form.

5              THE WITNESS:  Obviously, if a judge says

6    that I can't rely on such data as I formulate

7    opinions and express those opinions in a court of

8    law, then, yes, it would affect it.

9    BY MR. STEIMLE:

10        Q    All right.  Even after you had published

11   the Imel, et al., article in Biomaterials, were

12   you ever allowed in any court so far to testify

13   about the testing that was done in there?

14        A    I have not been called upon in court to

15   rely on my testing explicitly.

16        Q    Have you testified in court since the

17   bio -- or since the Boston Scientific litigation

18   in Tyree?

19        A    As I mentioned, when we started talking

20   this morning, after Tyree -- well, Tyree was --

21   which one?  Tyree was the one that was in West

22   Virginia, the day before I testified in a trial in

23   Miami.  And then approximately five months -- I'm

24   guessing approximately five months later, I

Jimmy W. Mays, Ph.D.

1    testified in LA in Sanchez, et al.

2        Q    And in the Miami trial testimony or the

3    Los Angeles trial testimony, did you discuss the

4    testing that was the subject of this Imel, et al.,

5    report?

6        A    I did not present those data, that's

7    correct.

8        Q    All right.  And was that because of

9    limitations by the court as to what you could say?

10           MR. PERDUE:  Form.

11           THE WITNESS:  I would presume so,

12   although my task was basically to explain to the

13   jury what polypropylene is, what happens to it

14   inside the human body, how it affects the

15   properties, the polypropylene, and how that might

16   impact the patient that has that material in them

17   as an implant.

18   BY MR. STEIMLE:

19       Q    Have any of your -- are there any other

20   cases where you've been an expert witness or a

21   consultant where you're aware of your opinions

22   having been excluded?

23           MR. PERDUE:  Form.

24           THE WITNESS:  No, I am not.

Jimmy W. Mays, Ph.D.

1    there, so you generally have reduced foreign body

2    response.

3              MR. STEIMLE:  All right.  I think we're

4    pretty much through here.  I don't know if you

5    intend to do any direct exam.

6              MR. PERDUE:  No.

7              MR. STEIMLE:  All right then.

8              THE WITNESS:  I'm serious, I'll go

9    buy everybody --

10             MR. PERDUE:  We came in under the wire.

11   We'll reserve ours till the time of trial.  Thank

12   you.

13             (Whereupon, the deposition of

14             JIMMY W. MAYS, Ph.D. was concluded

15             at 4:18 p.m.)

16

17

18

19

20

21

22

23

24